FILED

2005 Jun-03  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **ALABAMA ENVIRONMENTAL** | ) |
| **COUNCIL,** | ) |
| | ) |
| **Plaintiff-Intervenor** | ) |
| **v.** | ) **Civil Action No.-01-152-VEH** |
| | ) |
| **ALABAMA POWER COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION ON CORRECT LEGAL TESTS

### I. **Introduction and Procedural Background**

On January 12, 2001[1], the Attorney General of the United States, acting at the

request of the Administrator of the United States Environmental Protection Agency

("EPA") and through the United States Attorney for the Northern District of Alabama,

filed this action against Defendant Alabama Power Corporation ("APC").  Doc. #1.

The EPA alleges that APC constructed new, or made modifications to existing,

electrical power generating plants APC operates in Alabama (variously referred to

herein as "plant", "plants", "unit", "units", "facility", "facilities") and that those

---

[1]  The United States originally sued Alabama Power and others on November 12, 1999, in
the Northern District of Georgia, Case No. 99CV2589.  The action was dismissed against
Alabama Power on the grounds of a lack of *in personam jurisdiction*, and refiled in this District.

actions were in violation of the Clean Air Act (the "CAA" or "Act"), 42 U.S.C. § 7401 *et seq.*  EPA alleges APC failed to obtain New Source Review ("NSR")" permits in violation of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92, and APC violated Alabama's State Implementation Plans ("SIP") approved by EPA under the Act for the State of Alabama.  On April 26, 2001, the Alabama Environmental Council (sometimes referred to "AEC" or "Intervenor-Plaintiffs") moved to intervene as plaintiffs.  Doc. #6.  On May 21, 2001, EPA, APC, and AEC filed a Joint Stipulation permitting AEC to intervene under the same terms as had been set by the Northern District of Georgia when this action was pending there.[2]  Doc. #12.  On May 29, 2001, the court granted the Joint Stipulation on intervention, and denied as moot the AEC intervention motion.  Doc. #13.

This CAA enforcement action is similar, if not identical, to a number of other November, 1999, CAA enforcement actions brought by EPA against other regional utilities (e.g. Ohio Edison, Southern Indiana Gas and Electric, and Duke Energy) in the midwestern and southeastern United States.  As discussed in detail later, the legal issues here are sufficiently similar to the other enforcement actions that have been litigated that  much of the court's work here involves reference to and analysis of the

---

[2] USDJ Julie Carnes, ND-Ga., entered an Order governing AEC's intervention.  The parties stipulated to the same terms here.

other enforcement actions.  Many, if not all, of the parties' arguments and authorities set out in their briefs and responses have been raised in the other enforcement actions.

One difference here is noted: this case involves one facility, the "Miller" plant, that the parties agree is different and is not addressed in this Memorandum.  The court expresses no opinion on whether and, if so, how much of this Opinion will apply to the Miller plant because of the parties' agreement the Miller plant should be treated differently where applicable in this action.  In other words, the Miller plant portion of this litigation was not considered, and left for subsequent decision is whether the Miller plant issues will be affected by this Opinion.

## II.  **The Issues Involved In This Memorandum**

This matter comes before the court for ruling on the parties' response to item 3 of the Scheduling Order entered on August 5, 2004. Doc. #68  In their response, the parties identified two issues they agreed were ripe for adjudication, Doc. #75, and the court ordered briefing on those issues as suggested by the parties.  Doc. #77.   The two issues for decision are:

> 1) the correct legal test for determining a physical change, including the correct legal test for determining routine maintenance, repair, and replacement; and
>
> 2) the correct legal test for determining a significant net emissions increase.

EPA, APC, and AEC each have filed an opening and response brief.[3]  Docs. #101, 99, 96, 112, 107, 106.  Numerous exhibits have also been filed by the parties.  The United States has stipulated that the regulations applicable to the claims in this case are the Alabama rules approved by the United States Environmental Protection Agency ("EPA") in 1981, 46 Fed. Reg. 55517 (Nov. 10, 1981) (APC Ex. 26), and currently codified at ADEM Admin. Code R. 335-3-14-.04.  Doc. #69.

### III.  **Preliminary Discussion**

1.     The Clean Air Act And NSR Review Provisions

The Clean Air Act is codified at 42 U.S.C. §§ 7401-767 (2000).  The implementing regulations are found at 40 C.F.R., pts. 50-99.  The original Act and the amending legislation can be found, respectively, at Clean Air Act Amendment of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 108 Stat. 2399 (1990).

> "New source review" denotes a series of provisions within the federal Clean Air Act (Act). Congress enacted the Clean Air Act in 1970, with major amendments occurring in 1977 and 1990.  The Act represents one of the federal government's earliest efforts to protect the environment through a

---

[3]  The United States and Alabama Power Company also filed briefs regarding the significance to this case of the Seventh Circuit's decision in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"), and the impact on *WEPCO* of the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218 (2001).  Docs. #70 and 71.

comprehensive regulatory scheme.

The Clean Air Act requires the Environmental Protection Agency to establish baseline "national ambient air quality standards" (NAAQS), setting maximum permissible concentrations for "criteria" pollutants. The Act divides the United States into two types of regions: those that are currently in compliance with all of the NAAQS standards ("attainment areas"), and those that are violating some or all of these standards ("non-attainment areas"). The Act establishes different emissions requirements for facilities in each region, with stricter standards applicable to facilities in non-attainment areas.

The 1977 Amendments to the Clean Air Act incorporated the new source review provisions. These provisions were designed to ensure that large industrial sources of air pollution included modern pollution-control equipment when they altered their facilities. New source review mandated that the "best" emissions-control technology be installed whenever a "major" source were built, replaced, or modified (creating, in NSR terminology, a "new source" of air pollution). NSR provides an exception to this best-technology requirement for some "routine maintenance" to major sources.

What qualifies as the "best" technology in turn depends on the ambient air quality in the surrounding region. Facilities seeking to build or modify equipment in attainment areas are subjected to "prevention of significant deterioration" (PSD) review. To proceed with their proposed projects, facilities must determine whether new or increased emissions resulting from these projects would cause the area to exceed ambient air quality standards or to suffer a "significant" deterioration in air quality. PSD review requires that any new source adhere to the "best available control technology" (BACT) standard, governing emissions of regulated pollutants. BACT, a source-specific standard, is generally understood to require the best pollution-control technology available, after taking into account energy, economic and environmental considerations.

Facilities seeking to build or modify structures in NAAQS non-attainment areas are subject to more stringent requirements. These facilities must obtain pre-construction permits, certifying that pollution from any new source will not hinder the region's progress towards attainment of the NAAQS standards. New

5

sources must install emissions-control equipment that meets the stringent "lowest achievable emissions rate" (LAER) standards.  LAER standards are generally stricter than BACT standards, because they are set without any consideration of energy or economic factors.  Facilities seeking to add sources in non-attainment areas must show, furthermore, that they plan to "offset" any projected emissions increases from these new or modified sources with emissions decreases in other areas of the same facility or from other facilities in the non-attainment area.

Martin, The Reform of New Source Review: Toward A More Balanced Approach, 23 Stan. Envtl. L.J. 351, 356-58 (2004) (citations omitted)

2.    *WEPCO* and the CAA/NSR Framework

In the years leading up to *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"), owners and operators of power plants routinely made many types of routine repairs and modifications ("RMRR") to their units without triggering the NSR regulations.  A review of decisional law reveals no appellate review of how to interpret RMRR, specifically the term "modification" (narrowly or broadly), until the Seventh Circuit's decision in *WEPCO*.  Wisconsin Electric Power Company (WEPCO) challenged EPA's determinations that WEPCO's proposed renovations to its Port Washington power plant would subject the plant to the more stringent provisions of the Act because the work, in EPA's assessment, would be a major modification.  EPA further concluded that the renovation of the electric power plant would subject the plant to new source performance standards ("NSPS")  and prevention of serious deterioration requirements ("PSD") of the Clean Air Act.

In *WEPCO*, the Seventh Circuit became the first appellate court to undertake a review of a CAA enforcement action against an electric utility for violating the CAA. As it began, the Seventh Circuit described the CAA and NSR framework as it saw it at the time of decision:

> In 1970, Congress enacted the Clean Air Act Amendments, Pub.L. No. 91-604, 84 Stat. 1676, to establish minimum air quality standards that would regulate the emission of certain pollutants into the atmosphere. To this end, Congress instructed the EPA to develop National Ambient Air Quality Standards ("NAAQS") that would specify the maximum permissible concentration of air pollutants in different areas across the country.
>
> In section 111 of the 1970 Amendments, Congress required the EPA to promulgate New Source Performance Standards ("NSPS") in order to regulate the emission of air pollutants from new sources. These standards addressed hourly rates of emission and, in addition to new sources, applied to modifications of existing facilities that created new or increased pollution. Indeed, section 111(a)(2) of the Act stated that NSPS would apply to any stationary source, the construction *or modification* of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source. 42 U.S.C. § 7411(a)(2) (emphasis supplied). Congress then defined "modification" as *any physical change* in, or change in the method of operation of, a stationary source *which increases the amount of any air pollutant emitted* by such source or which results in the emission of any air pollutant not previously emitted. 42 U.S.C. § 7411(a)(4) (emphasis supplied).
>
> Subsequently, faced with only varying degrees of success in controlling pollution in different parts of the country, Congress enacted the Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (codified at 42 U.S.C. §§ 7401-7642 (1982)). Congress revised the NSPS so that regulated sources of pollution would have to use "the best system of continuous emission reduction which (taking into consideration the costs of achieving such emission

7

reduction, and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated...." 42 U.S.C. § 7411(a)(1)(C). In addition, Congress added a program for the Prevention of Significant Deterioration ("PSD"), concerned with increases in total annual emissions, to ensure that operators of regulated sources in relatively unpolluted areas would not allow a decline of air quality to the minimum level permitted by NAAQS. Air quality is preserved in this program by requiring sources to limit their emissions to a "baseline rate"; regulated owners or operators in areas that have attained NAAQS must obtain a permit before constructing or modifying facilities. 42 U.S.C. § 7475(a)(1). Congress also essentially adopted its NSPS definition of "modification" for the PSD program. 42 U.S.C. § 7479(2)(C). From this statutory framework, the EPA promulgated regulations for both the NSPS and PSD programs. In this case, its regulations concerning modifications are central. The EPA defines "modification" in substantially the same terms used by Congress:

> [A]ny physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of section 111 [42 U.S.C. § 7411] of the Act. 40 C.F.R. § 60.14(a) (1988). To determine whether a physical change constitutes a modification for purposes of NSPS, the EPA must determine whether the change increases the facility's *hourly rate* of emission. 40 C.F.R. § 60.14 (1988). For PSD purposes, current EPA regulations provide that an increase in the *total amount* of emissions activates the modification provisions of the regulations. 40 C.F.R. § 52.21(b)(3) (1988).

893 F.2d 901, 904-05 (emphasis in original).

The Seventh Circuit ruled in favor of the EPA on two (2) key issues over which the industry and EPA have been at odds with each other since.  The first is how to determine what types of maintenance are "routine" or RMRR, and therefore do not

8

trigger NSR, and what types aren't routine, and do trigger NSR.  The second issue is what constitutes an increase in emissions.  The emissions measurement methodology is critical because any project that results in an increase in emissions would trigger the NSR regulations, no matter how minor the project.[4]

NSR applies to two similar permitting functions affecting APC, but the focus in this action is on the PSD program.  PSD requires permits to be obtained for construction of new facilities and for "major modifications" of existing facilities.  42 U.S.C. §§ 7470-92.  The significance of triggering PSD permitting is that any construction falling under PSD must use "best available control technology" ("BACT").

The dispute between APC and EPA, like the dispute in *WEPCO* and the reported (district court) cases, centers on how to determine whether the pertinent APC facilities have undergone a "major modification."  Two factors determine whether a plant has made a "major modification" subject to PSD permitting: the "physical change" test's RMRR exclusion and the emissions increase test.[5]  Both factors must

---

[4] Sometimes overlooked in *WEPCO* is that the Seventh Circuit found  EPA had improperly relied on inappropriate assumptions for calculating its assessment of increased total annual emissions under the "actual-to-potential" test, and remanded the matter to EPA for review of its "prevention of significant deterioration" rule implementation.  This part of the ruling led to the *WEPCO* rule making discussed *infra*.

[5] 40 C.F.R. §  52.21(b)(2)(I).

be present to trigger the requirement to obtain a PSD permit.

3.     Physical Change And The "Routine Maintenance
       Repair Replacement" Exclusion

The "change" analysis under the Act is about the only issue that is simple and easily answered: "any physical change in or a change in the method of operation" of a major (emissions) source qualifies. Because this test is so broad, encompassing nearly every change to a plant's operations, there are several exclusions, the relevant exclusion here being RMRR.[6]

The court does not understand APC to dispute that it has made "physical changes" to its affected plants in the form of needed repairs to, or replacement of, degraded equipment in those plants. Thus, the legal issue as to the physical change part of the test is whether APC's projects should be deemed RMRR, as APC says, or major modifications, as EPA says. As noted, the former does not trigger NSR permitting; the latter does.

Resolution of the physical change question depends in turn on, as noted above, whether the RMRR exclusion should be interpreted narrowly (EPA) or broadly (APC). EPA says the RMRR exclusion should only apply to work projects that are routine for an **individual** unit; APC says the RMRR exclusion applies to projects that

_____

[6] 40 C.F.R. § 52.21(b)(2)(iii).

are **routine within the industry.**  The court understands  that, by "routine within the

industry", APC means work of  a type performed commonly within the industry,

although perhaps infrequently at any specific one or more of APC's particular plants.

The dispute over the meaning of the "routine" exclusion arose recently in this

Circuit.  *Tennessee Valley Auth. v. EPA*, 278 F.3d 1184 (11th Cir. 2002), *withdrawn

in part*, 336 F.3d 1236 (11th Cir. 2003).  There the Court observed, without resolving

the issue, that the "central disagreement between [the parties] is whether 'routine'

should be defined relative to an industrial category or to a particular unit."  *Id.* at

1189 n.3.  APC says "industrial category"; EPA says "particular unit".

If the authorities and exhibits submitted by the parties, and the authority and

exhibits set out in the other enforcement action cases (*Ohio Edison, SIEGO*[7], *Duke

Power*) are accurate, the court says that prior to commencing this and the other 1999

enforcement actions, EPA provided little consistent guidance as to what its position

was on RMRR, *i.e.* what work was RMRR and whether the RMRR exclusion would

be broadly or narrowly construed, and the guidance it did provide was changeable.[8]

The only reported case on the RMRR exclusion to physical change factor,

---

[7]  *United States v. Southern Indiana Electric and Gas Co*., 245 F.Supp. 2d 994 (S.D. Ind.
2003).

[8]  While the *Ohio Edison* and *SIEGO* courts sided with EPA, they did so with deference
to EPA's position, *see Ohio Edison*, 276 F.Supp. 2d at 861, and *SIEGO*, 245 F. Supp.2d at 1009.

*WEPCO, supra*, found the criteria used by EPA to assess physical change - the nature, extent, purpose, and frequency of the work- adequate.  Neither EPA nor the *WEPCO* court provided guidance on whether these four (4) factors should be construed narrowly (individual unit) or broadly (industry as a whole).  *Cf.* EPA Brief (narrow/individual unit review standard) *with, e.g.* 57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (industry as a whole standard).  This is one reason the court does not believe *WEPCO* answers the question(s) before it; as discussed later, there are others.[9]

4.    Emissions Increase - How To Measure

The second part of the PSD threshold is whether the work resulted in an emissions increase of the (regulated) pollutants exceeding threshold levels.[10]  The reader will not be surprised that EPA and APC cannot agree on how emission increases are measured.  EPA, citing 57 Fed. Reg. 32,314 and a letter from Lee M. Thomas, EPA Administrator, to John Boston, Vice President of WEPCO (Oct. 14,

---

[9]  The court observes, and it is only an observation, that a "case by case" enforcement policy using four (4) different factors that are capable of differing and subjective interpretation, is particularly ill-suited to a regulated industry with huge capital investment in plant and equipment where operators cannot quickly change their methods of operation.  The four factor approach also seems to undercut the national purpose behind the Clean Air Act, because what the "nature, frequency, extent, and purpose" of a project in one part of the country might be seen quite differently in another, regardless of the implementing regulations or regulatory guidance.  Case by case offers little guidance to an operator, particularly where, as here, the rules seem to change over time.

[10]  40 C.F.R. §  52.21(b)(23).

12

1988), says APC must measure actual annual emissions before the change and projected annual emissions after the change ("**annual actual emissions**"); the practical effect of this test is that it could be triggered either by an increase in the plant's capacity or by a simple increase in hours of operation.

APC's position is that emission increases are calculated only on the basis of **"maximum hourly emission rates"**.  This is the same test EPA uses in its "new source performance standard" regulations.[11]  The practical effect of using maximum hourly emission rates is that past and future levels of plant operation are irrelevant to the test; emission increases would be likely when APC expanded the size of a facility or recaptured lost production capacity (*e.g.*, from equipment degradation).  Put another way, the emissions increase test would not be triggered if APC operated its plants more hours in a year at the same production rate as it did before the work was undertaken.  APC bases its argument, *inter alia*, on the "hours of operation" exclusion in the PSD regulations, which say that a "mere" increase in hours of operation cannot be a covered change.[12]

APC's position is not conceded by EPA, particularly where, as here, the

---

[11]  40 C.F.R. § 6060.14(b).

[12]  40 C.F.R. §  52.21(b)(2)(iii)(f).

increase in hours of operation is accompanied by construction at the affected plant. *See WEPCO, supra*, 893 F.2d at 916; *see also* WEPCO rulemaking, where EPA rejected a similar position on the scope of the "hours of operation" exclusion, 57 Fed. Reg. 32,328, responding to the "industry as a whole" language in 57 Fed. Reg. 32,326.

## IV.  EPA Interpretation vs. ADEM Interpretation

EPA and APC are at odds over whether, with respect to PSD regulations, the Alabama Department of Environmental Management ("ADEM") may, by regulation, permitting, or interpretation, vary or differ from those promulgated or announced by EPA.

If the interpretation question involves the unambiguous language of the statute, or regulation(s) issued by EPA that clearly fall within its statutory authority[13], the court reads *Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461, 124 S.Ct. 983 (2004)[14], together with *dicta* in *Sierra Club v. Leavitt*, 368 F.3d 1304, n.9 (11th Circuit 2004), to say that, if the decision at hand comes down solely to whose interpretation controls, EPA's or ADEM's, EPA prevails.

---

[13]  And the regulations are themselves unambiguous, i.e., are those in which EPA has been consistent and clear in its interpretation.

[14]  Decided after *Ohio Edison* and *Duke Power*, although it is by no means clear that *Alaska Dep't* would have altered the District Court's decision in *Duke Power*.

In *Alaska Dept.*, the Supreme Court held that EPA had the authority to issue a stop work order for the construction of a power plant when EPA disagreed with the (Alaska) state agency's judgment as to what constituted BACT.  Alaska had issued the permit, and the Court held that its decision to do so was arbitrary and capricious because it didn't require the utility to install selective catalytic reduction technology on a new generator; Alaska had argued EPA lacked the authority to override a state's judgment as to what constitutes BACT.

In *Leavitt*, *supra*, the Eleventh Circuit said in *dicta* that, where a SIP "does track the language of the CAA, [] we suspect that an interpretation of the Georgia Rule is sufficiently intertwined with the administration of the CAA that it can be considered part of the federal law of pollution control".

The court declines discussion of the numerous legal issues that could arise in a "state versus federal" interpretation of law conflict.  The Supreme Court's discussion of the national scope of the PSD guidelines in *Alaska Dept.*, 124 S.Ct. at 1000, is sufficient.  While *Alaska Dept.* was limited to a BACT permitting decision, the court notes that Alaska attacked EPA's authority over a state in a CAA dispute, and sees no cogent reason why, were EPA and ADEM to square off over implementation of another CAA provision, EPA would not prevail. In *Alaska Dept.*, the Court observed that, without national guidelines, emitting facilities/industries

15

could move to more permissive states, or pit one state against other states in the way often seen in other industries, e.g., the motor vehicle manufacturing industry, where states vie with each other to offer the biggest incentives to the manufacturer in hope of landing the plant and the economic benefits large projects bring in the form of jobs and taxes. If APC's only argument were that "ADEM said it was ok", this Opinion would be much shorter.[15] This is not to say that the court misapprehends the CAA statutory scheme that, in significant ways, envisions a federal-state partnership. What the court is saying that, if a state and the United States clash over an issue that falls within EPA's enforcement authority, it expects the United States' view would prevail.

## V. <u>Other NSR Litigation: Ohio Edison And Duke Power</u>

In trying to answer the RMRR and increased emissions questions, the court, like the parties, focuses primarily on two (2) district court decisions. The two district court cases illustrate the split in decisions on the same issues. Left for later are the possible changes that may be forthcoming from appellate review of the legality of the "new" (2003) EPA NSR regulations.[16]

Given the complexity of the CAA statutory and regulatory history, the scarcity

---

[15] The parties' arguments over ADEM's regulations and interpretations, which EPA says in its proposed Opinion at p. 23 "suffer from an absence of clarity", are probably more relevant in the *Mead* analysis, i.e. agency consistency, than they are determining whose interpretation is the true and correct one.

[16] See the discussion of the "new" CAA rules, "CAIR", *infra* at Section VI.

of appellate review of the 1999 enforcement actions, and the opposite conclusions reached by the major district court decisions reviewing same, it is not surprising to review the parties' CAA arguments and authorities and find at least some statutory and regulatory support for each point of view.

Nowhere is this dichotomy better illustrated than in the two (2) district court cases repeatedly cited by APC and EPA: *United States v. Ohio Edison*, 276 F.Supp. 2d 829 (S.D. Ohio 2003), and *United States v. Duke Energy Corp.*, 278 F.Supp. 2d 619 (M.D.N.C. 2003). There, in August of 2003, district courts in Ohio and North Carolina reviewed the same legal questions arising from the NSR provisions of the CAA, specifically on the scope of the RMRR exclusion and the method by which emission increases from regulated sources such as the APC plants are to be measured. Both courts grounded their opinions on analysis of the statute. Both courts reasoned that the statute mandated the result reached. The courts reached diametrically opposed conclusions.[17]

In *United States v. Ohio Edison, supra,* ("*Ohio Edison*") , the court sided with EPA on its CAA claims at trial, finding that Ohio Edison's plant work projects constituted multiple NSR permit violations. The *Ohio Edison* court  did not do

---

[17] Left for a decision maker more informed than this court is the question whether, if two courts review the same matter and come to opposite conclusions, is the underlying statute or regulation ambiguous?

enthusiastically:

> This case highlights an abysmal breakdown in the administrative process following the passage of the landmark Clean Air Act in 1970. For thirty-three years, various administrations have wrestled with and, to a great extent, have avoided a fundamental issue addressed in the Clean Air Act, that is, at what point plants built before 1970 must comply with new air pollution standards.

*id*. at 832.

*Ohio Edison* went to on to say that EPA's failures in enforcement did ". . . not absolve Ohio Edison from liability under a law that has always been clear"; *id*. at 833. It also found the EPA's narrow interpretation of the word 'routine' to be justified, *id*. at 855.

In *United States v. Duke Energy Corp., supra*, ("*Duke Energy*"), the court rejected the same EPA claims and liability theories.  EPA sued Duke Energy challenging modifications to its coal-fired plants as violators of the PSD provisions and state SIPs.  After extensive discovery (4.6 million pages of documents) and thorough briefing, the court, ruling on cross motions for summary judgment, said that to trigger the PSD permitting requirements, there must be a "physical change" and there must be a "significant net emissions increase".  It said there is no "physical change" for "[r]outine maintenance, repair, and replacement." 40 C.F.R. §

51.166(b)(2)(iii)(a)(1987).[18]  The *Duke Energy* court applied a standard of "routine in the industry", and said EPA has the burden of showing "that a utility engaged in a non-routine physical change that resulted in an increase of emissions".  *Id*. at 640. The *Duke Energy* court found, based on

- the PSD rules;

- the contemporaneous EPA interpretations of the PSD rules; and

- the statutory language incorporating the NSPS concept of modification into PSD,

that post-project emissions must be calculated on an annual basis, measuring emissions in tons per year.  Further, in calculating post-project emission levels, *Duke Energy* says the hours and conditions of operations must be held constant.  The practical effect is that a net emissions increase can result only from an increase in the hourly rate of emissions.  In so holding, the *Duke Energy* court refused to defer to EPA interpretations that it said were contrary to earlier EPA interpretations.  *Id*. at 641.[19]  A decision by the Fourth Circuit in *Duke Energy* is pending.  Docket No. 04-

---

[18]  A portion of *Duke Energy*'s RMRR discussion is reprinted as Exhibit A to this Opinion.

[19]  *See Mead, supra*, at 288, n. 8 (consistency of agency's interpretation a factor to be considered by reviewing court).

1763.[20]

The split in authority is not surprising in light of the inconsistent positions EPA has taken on core applications of the NSR rules.  Again, both the *Ohio Edison* and *Duke Energy* courts staked their decisions on different readings of the same statute, and both courts thought the statute commanded the result reached.

In essence, *Ohio Edison* accepts the EPA's position that the RMRR exclusion should be narrowly construed, and that emissions increases should be judged by the annual emissions increases resulting, which could include increased hours of operation or plant utilization, if appropriate.  *Duke Power* agreed with the utility's arguments on the RMRR exclusion, i.e., construed broadly based on industry norms and on how emissions increases should be measured: maximum hourly emissions must increase before PSD permitting is triggered, and greater annual facility utilization is irrelevant to the analysis.

1.     The Scope of the RMRR exclusion in *Ohio Edison* and *Duke Energy*

The *Ohio Edison* court adopted both of EPA's proposed NSR applicability tests and found that each of the eleven (11) groups of projects alleged by EPA to have needed PSD permits were not RMRR.  The projects in question cost from about $1

---

[20]  The parties have advised the Court that *Ohio Edison* has been settled by the entry of a Consent Decree, and there will accordingly be no appellate review of that district court's rulings on RMRR and emissions increases.

million to more than $28 million; their completion took from thirty-seven (37) days to eight (8) months. These differences seemed to have no impact on the court's analysis.

The *Ohio Edison* court either did not see EPA as having taken various positions over the years on the scope of the RMRR exclusion or, if it did, it chose not to discuss them in any detail. The court reasoned that EPA's narrow interpretation of the RMRR exclusion was both "reasonable" and consistent with the "plain language of the regulation." 276 F. Supp. 2d 862, 855. In doing so, the court said the CAA itself required that the RMRR exception in the regulations be construed narrowly. *Id*. It said the CAA did not contain an RMRR or any other exclusion and therefore demonstrated an intention to broadly cover "any physical change." Consequently, any regulatory exception to the statute must be construed narrowly in order to be "harmonized with the statutory language," because "if the broad definition given to [RMRR by the industry] were adopted, the regulations would be in direct conflict with the superseding and controlling language of the Clean Air Act." *Id*. In short, because the statute plainly states that "any physical change" is to be covered, it necessarily requires a narrow reading of any exclusion to that broad statutory language.

In answer to the "fair-notice issues", *Ohio Edison* arguably ignored conflicting

EPA guidance, again for textual reasons: the word "any" in the statute was clear enough:

> The plain language of the statute, read together with the routine maintenance exemption, make it clear that the exemption must have a narrow interpretation so as not to swallow the general rule requiring CAA compliance when a modification is made.

*Id* at 887 -888.[21]

The *Duke Energy* court's decision on the scope of the RMRR exclusion is inapposite.   *Duke Energy* relied upon EPA's "industrial source" statements to conclude that EPA has in fact traditionally applied the broader "routine within the industry" standard to PSD.  And, like the *Ohio Edison* court, the *Duke Energy* court also ultimately grounded its RMRR decision in the statute, not in EPA's regulations or guidance.

The *Duke Energy* court's statutory analysis considered the context in which Congress adopted the PSD modification provision, saying that prior to the adoption of the statutory PSD program, EPA had already adopted the industry's argued-for "routine within the source category" RMRR exclusion in its "new source performance standard" regulations. This NSPS provision states that RMRR that is determined to

---

[21]  In reaching this conclusion, the court relied, in part, on a similar D.C. Circuit conclusion issued in the context of allowable exemptions from the PSD's "any emissions increase" applicability prong.  *Alabama Power v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979).  In reaching its conclusions in this Opinion, the court did not believe "fair notice" is a particularly strong argument for APC, which is why it is not discussed any further than this observation.

be "routine for a source category" shall not be considered a modification. *See* 40

C.F.R. § 60.14(e)(1). The court was persuaded that Congress developed the PSD

program within this existing regulatory framework and that, when it added

"modification" to PSD coverage, Congress did so by specifically adopting the NSPS

statutory definition of "modification." The sparse legislative history surrounding the

addition of "modifications" to the PSD program was synonymous with an expressed

intention to "conform" the PSD modification provision to "usage in other parts of the

act." Congress' reference to "usage in other parts of the act" not only included the

NSPS statutory provisions, but the regulations EPA adopted to implement them as

well. This expressed intention therefore required that the PSD RMRR exclusion "be

consistent with the NSPS 'usage' of RMRR," and "this conclusion is compelled by the

statutory mandate of the PSD program and congressional intent."

> When Congress enacted the PSD program, it incorporated by explicit reference the NSPS definition of modification into the NSR definition of construction/modification. *Id.* §7479(2)(C)(PSD) ("The term 'construction' ... includes the modification (as defined in section 7411(a) of this title [NSPS] ) of any source or facility."); *id.* § 7501(4) (NNSR) ("The terms 'modifications' and 'modified' mean the same as the term 'modification' as used in section 7411(a)(4) of this title [NSPS]."). The PSD statutory definition incorporated not only the NSPS statutory definition of modification, but also the regulations implementing the NSPS program. A House-Senate Conference Committee report explained the congressional intent "to conform" the NSR definition of modification to the "usage in other parts of the Act." 123 Cong. Rec. H11956, 3665 (daily ed. Nov. 1, 1977) (Duke Energy Ex. 13). The

EPA explained that "[t]he phrase 'usage in other parts of the Act' most probably refers, not only to section 111(a)(4) [NSPS], but also to the EPA regulations implementing section 111 that were in effect at the time." 49 Fed.Reg. 43,211, 43,213 (Oct. 26, 1984) (Duke Energy Ex. 14). In addition, the Director of the Stationary Source Compliance Division, Edward E. Reich, explained:

> [T]he Clean Air Act provides in Section 169(1)(c) that for PSD purposes the term modification shall be defined as that term is defined in Section 111(a) of the Act relating to NSPS. EPA has interpreted this to mean that for PSD purposes Congress intended the term modification to include all exemptions included in the NSPS regulations promulgated under Section 111 of the Act prior to the date of enactment of Section 169.

(Mem. from Reich to Davis (Apr. 21, 1983) at 2 (Duke Energy Ex. 16).)

*Duke Energy*, at 278 F.2d 619, 629.[22]

In essence, the *Duke Energy* court said the CAA prohibited EPA from defining (or applying) the RMRR exclusion in any way other than the pre-existing NSPS "routine within the source category" approach. 278 F.Supp. 2d 619, 629 - 632.

To buttress its statutory construction, the court said EPA itself agreed with this construction, based on a 1984 rulemaking discussion over whether fugitive emissions should be treated the same under NSPS and PSD. As previously noted, EPA said

---

[22] In its Brief and proposed Memorandum Opinion, EPA does not dispute this history; it does dispute the importance attributed to it by *Duke Energy*, saying there are more persuasive examples of EPA's promulgation and loyalty to the tests asserted in this litigation. Without passing on which authority is correct, the court observes that the existence of EPA statements and regulations that can be, and are, cited by both sides is evidence in and of itself that EPA has been neither consistent nor clear.

Congress' reference to "conforming" the PSD provisions to "usage in other parts of the act" "most probably refers, not only to [the NSPS statutory provisions], but also to the EPA regulations implementing [the NSPS statutory provisions] that were in effect at the time."  49 Fed. Reg. 43,211, 43,213 (Oct. 26, 1984).   Additional ammunition came from later EPA discussions on the scope of the RMRR exclusion, including EPA's 1988 applicability determination for *Wisconsin Electric Power Co*. and EPA's 1992 *WEPCO* rulemaking preamble statement that "routine" is to be measured by what "has been repaired or replaced within the relevant industrial category."  57 Fed. Reg. 32,314, 32,326 (July 21, 1992).

In fairness to the *Duke Energy* court, it did not accept Duke Energy's argument that **any** project performed within the industry was automatically RMRR.  Whether or not a project was RMRR had to be evaluated under EPA's traditional four-factor test[23], but those factors had to be applied with reference to the entire source category, not an individual unit.[24]

In summary, both the *Ohio Edison* and *Duke Energy* courts rest their RMRR

_____

[23]  Nature, extent, purpose, and frequency of the work, *cited* in *Duke Power*, *supra* at 638. .

[24]  Assuming a *Duke Energy* shift of the burden to EPA to prove APC's projects were not RMRR,  many of the APC projects attacked by EPA here are far more likely to be found routine under the *Duke Energy* analysis. Such specific fact finding is not before the Court in this Opinion and the Court cannot and does not express an opinion on how this analysis would play out at trial.  What is clear is that EPA's burden of proof, and therefore persuasion, would be significantly higher.

analysis on the statute and what each believes Congress intended, while reaching diametrically opposite conclusions on the scope of RMRR. *Ohio Edison* says the RMRR exclusion is narrow; *Duke Energy* says it is broad.

As previously noted there were eleven (11) projects in *Ohio Edison* which took from thirty-seven (37) days to eight (8) months to complete, costing from $1 million more or less to more than $28 million to complete. The court reads *Ohio Edison* to say that the variance in size and cost of the various projects was inconsequential. And, rather than try to resolve the various positions held by EPA over the years as to the scope and reach of the RMRR exclusion, the *Ohio Edison* court chose to focus instead on statutory construction, saying the narrow RMRR exclusion was reasonable and consistent with the plain language of the regulation. 829 F.Supp. 2d at 855. Further, because the CAA did not contain an RMRR exclusion, the regulatory exception adopted by the EPA should be construed narrowly. In essence, because the CAA says that "any" physical change is covered, the Act requires a narrow reading of any exclusions to the sweeping statutory language. The appeal of this approach is enticing. It is also incomplete.

EPA argues here that the term "change" in the statute is not defined, and it therefore has discretion to define that term and to provide for some exclusions to it. This argument was not made by EPA in *Ohio Edison* because EPA argued for and

agreed with that court's *de minimis* conclusion.  EPA revised its RMRR argument in later enforcement cases, including this one, to accommodate authority to issue the new RMRR rule. The *Ohio Edison* court never had the opportunity to consider whether the agency entrusted with implementing the statute had interpretive discretion in this particular area.

2.    The Increased Emissions Analysis in *Ohio Edison* and *Duke Energy*

A similar dichotomy applied to the emissions increase issue.  *Ohio Edison* adopted EPA's proposed emissions increase test.  It agreed that EPA's decision to abandon its traditional actual-to-potential test[25] was "well-founded."  Similarly, EPA's "actual to projected future actual" test, from the 1992 WEPCO rulemaking, was the appropriate standard because PSD, as a pre-construction permitting program, requires an applicant to perform a pre-project estimate of emission increases that it expects to result from the project.  *Ohio Edison* rejected the utility's assertion that PSD emission increases only come into play where there is an increase in maximum hourly emissions.  The difference, as the court understands it, is that the utility's approach would focus on the facility's potential emissions capacity without regard to how frequently it is operated, i.e. increased hours of operation would not be a key

---

[25]  The test accepted by the Seventh Circuit in *WEPCO*.

factor.  The *Ohio Edison* court said such a result would allow new construction or modifications without pre-construction permits, a result that it said was odds with Congressional intent.[26]  It further noted that the Ohio SIP regulations provided no such test, holding that the "hours of operation" exclusion did not apply where the increased hours of operation were accompanied by, and not independent of, a physical change (i.e., the RMRR activity). *Ohio Edison,* 276 F.Supp. 2d 829, 884. Finally, the court accepted EPA's contention that those emissions increases could be based upon expected greater annual usage after the change.  Applying this test, the *Ohio Edison* court found that each Ohio Edison project resulted in an emissions increase, based on EPA's calculation of projected increased emissions from increased operations of the plant(s) due to decreased power outages and periods where the plant(s) would have to be shut down.

The EPA increased emission test is problematic because the reason to perform maintenance or repair work at a plant is to prevent future equipment failures.  The test becomes a self-fulfilling prophecy because emission increases are inevitable: the less down times or power outages, the more operating hours; the more operating hours, the more emissions.  Only the amount of increased emissions would be at issue; the

---

[26]  In doing so, the *Ohio Edison* court did not defer or cite to 40 C.F.R. 52.21(b)(2)(iii)(F), which states that "[a] physical change or change in the method of operation shall not include... [a]n increase in the hours of operation or in the production rate").

larger the affected plant or unit, the greater the emissions increase.  The nature and scope of the maintenance project itself would not be significant.  Were one to combine *Ohio Edison's* views on both prongs of the PSD applicability test, PSD would apply to virtually any capitalized maintenance or repair project that prevented enough downtime to breach the emissions increase thresholds.

The advantage to using this analysis here would be its ease of application with a corresponding gain in judicial time saved.  There would much less for the court to try as the exhibits submitted by the parties show that applying the *Ohio Edison* analysis to APC's RMRR activities and the associated emissions, as EPA would have them measured (per operating unit), would inevitably lead to the same result as in *Ohio Edison*: APC would be in breach of the Act for not obtaining pre-construction permits and for not using BACT on the construction projects.

3.    The Increased Emissions Analysis In Duke Energy

*Duke Energy* looked to a different statutory context for guidance: the legislative context of the PSD modification program's creation and its origins in the NSPS program.  Once it decided that Congress required EPA to adopt the NSPS RMRR exclusion, the court had little difficulty concluding that Congress also intended that EPA employ the NSPS "maximum hourly emissions" test advocated by Duke Energy.  The court said EPA's regulatory "hours of operation" exclusion

required EPA to hold hours of operation constant, effectively creating a maximum

hourly emissions rate test.  Like *Ohio Edison*, *Duke Energy* rests firmly on the statute:

> The explicit reference by Congress incorporating the concept of NSPS
> modification into PSD compels the result that PSD is triggered only by
> an increase in the unit's hourly emissions rate. ... This court cannot
> envision a clearer indication of Congress' intent to trigger PSD only
> when NSPS is likewise triggered by an increase in the maximum hourly
> emissions rate.

278 F. Supp. 2d 619, 644.  EPA's position that a PSD emissions increase could occur

based solely on an increase in hours of operation when accompanied by a physical

change is, to the *Duke Energy* court, contrary to the statute.

*Duke Energy* also contains a detailed analysis of why EPA's PSD  "hours of

operation" exclusion also requires the result reached.[27]  EPA argued that, while the

PSD regulations do have an "hours of operation" exclusion, that exclusion does not

apply, as the *WEPCO* and *Ohio Edison* courts found, when the increase in hours of

operation is accompanied by physical construction to the unit itself.[28]  Put more

simply, EPA is saying the "hours of operation" exclusion is an exemption from the

---

[27] *Duke Energy*'s increased emissions analysis, which the court finds thorough and
comprehensive, is attached as Exhibit B. and incorporated by reference.

[28] *WEPCO, supra*, 893 F.2d 901, 916; *see also*, e.g., the WEPCO rulemaking, where
EPA rejected a similar position on the scope of the "hours of operation" exclusion (see 57 Fed.
Reg. 32,328, for the EPA response to the comment discussed at 57 Fed. Reg. 32,326).

"physical change/change in methods of operation" prong of the regulations[29], and <u>not</u> the "emissions increase" prong, which is separately defined.  Therefore, it is more difficult to apply the "hours of operation" exclusion from the physical change prong to calculate emissions increases under the emissions increase prong of the PSD applicability test.  The argument has logical appeal, but it isn't very well supported by EPA's NSPS precedent.  NSPS does exclude hours of operation from coverage as "modifications," but only because it does not need the exclusion to its emissions increase test;  that test is already separately defined as a "maximum hourly increase" test.

Still, when one lays *Ohio Edison* and *Duke Energy* side by side, *Duke Energy's* observation that Congress clearly intended EPA to adopt the NSPS emissions increase test appears more firmly grounded in the CAA.  EPA's first regulatory PSD program, prior to creation of the statutory program, also used a maximum hourly test to define emission increases.  *Exhibit B*.  And  when the agency issued its first PSD regulations after the 1977 CAA amendments, EPA also used maximum hourly emissions to define emission increases, changing  the definition only in response to *Alabama Power v. Costle, supra*, and the changes dealt with issues unrelated to PSD modification applicability, dealing with netting and consumption of increment issues.

---

[29]  *See* 45 Fed. Reg. 52,676 at 52,703 (Aug. 7, 1980).

The court cannot tell if EPA thought about whether the maximum hourly emissions increase test would still be available for PSD applicability purposes. And, as *Duke Energy* notes, the only emissions test actually in EPA's regulations at the time was the largely discredited "actual to potential" test[30], which means that prior to the 1992 WEPCO rule implementing the "actuals to future actuals" test[31], EPA had, for many modifications, no lawful emissions increase test at all in its regulations.[32]

VI.  **THE 2003 NSR RULE; THE 2005 " CAIR"**

A third case, potentially significant, is *State of NY v. EPA* (DC Cir. Case No. 02-1387), currently briefed and awaiting decision. Published on October 27, 2003, at 68 Fed. Reg. 61248(Oct. 27, 2003) (Alabama Power Legal Tests Brief Exhibit 11) the 2003 NSR EPA rule ("the 2003 rule") provides, *inter alia*, that any plant modification costing up to twenty percent (20%) of the replacement cost of the unit

---

[30]  The "actual to potential test" compares a plant's actual past emissions with its potential future emissions. In calculating this potential, the EPA would assume that the plant ran at full capacity around the clock for a whole year. This calculation would not account for any equipment maintenance or failures in the time period. This has been called "a test virtually any activity would fail." Gaynor & Lippard, Environmental Enforcement Developments in 2003, 34 Envtl. L. Rep. 10,073, (Jan. 2004), at 5.

[31]  The "actual to actual" test looks at a generating unit's past annual emissions and compares them to the annual emissions of the generating unit after the maintenance or other project was completed. If the unit ends up emitting more pollutants after the work, then the operator would be in violation of this test. Gaynor & Lippard, *supra*, at 11.

[32]  These tests are not exclusive; APC cites five (5) different emissions tests it says EPA has used or asserted, APC Brief, pp. 9 -10, fn. 41 - 45

will be considered routine maintenance and, therefore, exempt from pollution controls, even if the plant modification results in higher levels of air pollution.[33]  In November, 2003, 14 states, the District of Columbia and 29 municipalities asked the U.S. Court of Appeals for the District of Columbia Circuit to block implementation of the 2003 EPA rule,  scheduled to take effect Dec. 26, 2003.  The Court did so. *2003 U.S. App. LEXIS 26520* (December 24, 2003).

The D.C. Circuit's ruling on the validity of the 2003 EPA rule would be binding on this court.[34]   However, the ruling is unlikely to resolve the issues addressed here.  *State of New York v. EPA* involves new NSR rules that EPA has said are not retroactive and which will not be applied retroactively.  Also, predicting the scope of an anticipated decision has not been effective in this action before.  This action was stayed for many months awaiting the Eleventh Circuit's decision in *TVA v. Whitman*, 336 F.3d 1236 (11th Cir. 2003), the thought being that the Court's decision there would either be dispositive or heavily influential on the issues in this action.  It didn't happen: the Court's decision in *TVA*, while relevant to some of the

---

[33]  The 2003 Rule is the second part, or phase, of NSR rules proposed by EPA that are involved *State of New York v. EPA*.  The earlier part, published on December 31, 2002, can be found at 67 Fed.Reg. 80186, *et seq*.

[34]  The D.C. Circuit has exclusive subject matter jurisdiction to determine the validity of EPA regulations with nationwide applicability, 42 U.S.C. §7607(b), so its pronouncement(s) on the 2003 EPA NSR rule would be binding on this court.  Its ruling, however,  may not dispose of the issues addressed here.

issues in this action,[35] was not dispositive in the manner hoped.

As noted above, if applied to the APC plant(s) work in this litigation, the new EPA rule would likely result in all of the APC work going unchallenged.[36]  Alabama Power cites the 2003 Rule in support of its position, and attaches it as an exhibit.  *See* Alabama Power Legal Tests Brief at 4 n.18, 18, 19, 53, 54, 59. Exhibit 11.

The court is aware that, on May 11, 2004, the Utility Air Regulatory Group ("UARG"), representing electric utility companies, filed a Brief in *State of New York v. EPA*, making many of the same arguments accepted by the *Duke Energy* court.  Specifically, UARG argues that EPA's NSR applicability approach for the past fifteen (15) years which, stripped to basics, has involved comparing past annual emissions with future annual emissions, is flawed.  EPA's focus, set forth in its Brief, has been to determine whether there will be an increase in "total actual annual" emissions from the source.  EPA Brief of Aug. 9, 2004, at p. 36, emphasis in original.  UARG's Brief says the correct approach should have been, and should be, analysis of a threshold question: if a change (modification) to a unit does not entail an increase in the nit's "capacity to emit" - that is, its maximum hourly emission rate - the change will not

---

[35]  Notably the extent and manner in which this court should use *WEPCO* to guide its analysis.

[36]  "Most likely" because the evidentiary record in this action is not completely developed. The court believe EPA does not seriously contest the notion that were the new rule applied to APC in this action, there would be little to litigate.

trigger NSR.

If UARG's argument, accepted by *Duke Energy*, is adopted by the D.C. Circuit, then the parties will presumably be back before the court, EPA repeating its argument that the 2003 Rule does not apply to APC's projects in this action, and APC asserting that the D.C. Circuit has settled the question and that EPA is asserting a (litigation) position that has been rejected by the D.C. Circuit.

There is, strictly speaking, considerable statutory and legislative history, referenced or discussed in this Opinion, supporting the logic of the "capacity to emit" argument.   And it is that statutory and legislative history, combined with the *Chevron/Mead* analysis found at VII. and VIII., *infra*, that leads the court to its conclusions herein.   Having said that, the court is also aware that, if the D.C. Circuit believes adoption of the "capacity to emit" argument will result in facilities that increase annual emissions not falling under NSR because the facilities' "capacity to emit" does not increase, there may be reluctance by the D.C. Circuit to accept this argument, well supported or not.

Recognizing that it is for higher courts, not this one, to determine these broader issues, and this court's role is to only address the questions presented in this case or controversy, the court will do so.   First, on its face, the 2003 EPA rule will not govern the issues addressed in this Opinion.   The preamble states that "[n]one of today's rule

revisions apply to any changes that are the subject of existing enforcement actions that the Agency has brought and none constitute a defense thereto," 68 Fed. Reg. 61,248, 61,264.

Second, the 2003 EPA rule and the D.C. Circuit's ruling thereon may, by the time this action reaches the Court of Appeals, be moot. On March 10, 2005, the EPA announced the Clean Air Interstate Rule ("CAIR"),which amends 40 C.F.R. Parts 51, 72, 73, 77, 78, and 96.[37]  CAIR, which will be phased in until 2015, appears to be the first CAA rule making that is not national in scope: twenty-eight (28) states, all in the eastern half of the country, are included. *Id*.  While even the most ardent proponent of strict statutory construction or textual analysis would have difficulty reconciling EPA's prior rulemaking or litigation positions with CAIR, because there is nothing in the CAA, or the amendments thereto, that says EPA can issue power plant (particulate matter) emission regulations affecting half of the country while not applying those regulations to new or old sources in the rest of the country, CAIR may be upheld, implemented, and, as finally implemented, apply to the facilities in this action.

---

[37]  The proposed final rule can be found at http://www.epa.gov/cair/technical.html, supporting technical documentation at http://www.epa.gov/cair/pdfs/cair_final_reg.pdf, Docket ID No. OAR-2003-053.

What the D.C. Circuit will eventually say about CAIR is speculative; the ongoing debate in the three branches of government about the CAA is not.[38]  In any event, the court will not apply the 2003 EPA rule retroactively, and the CAIR is, on its face, not retroactive.

## VII.  **The Deference Due EPA's Interpretation**

In general, reviewing courts typically grant substantial deference to the EPA's interpretation of the CAA Amendments and its implementing regulations.  The reasoning behind this deferential review is that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("*Chevron*").  Deference to agency interpretation is particularly appropriate where the subject being regulated is technical and complex. *Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).  An agency's interpretation of its own regulations must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Udall v. Tallman,* 380 U.S. 1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock &*

---

[38]  On March 9, 2005, the day before EPA announced CAIR, S. 131, proposed amendments to the CAA, commonly known as "[T]he Clear Skies Act of 2005",failed, by a 9-9 tie vote, to clear the U.S. Senate Environment and Public Works Committee.

*Sand Co.,* 325 U.S. 410, 413-14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).  However, "this standard does not give the EPA unbridled discretion to construe the [CAA] Amendments free from judicial oversight.  [The court] must consider whether the EPA's construction comports with its statutory mandate and Congress's intent in enacting clean air legislation."  *WEPCO*, 893 F.2d 901at 907.

As already noted, there is surprisingly little authority on the issues presented here despite the number of utilities sued and the substantial sums of money involved. While not dispositive, an obvious consideration for this court is how much deference is accorded the EPA.  *WEPCO* accorded substantial deference to EPA, but *WEPCO* and *Chevron* no longer exist in a vacuum.  In its August 5, 2004, Scheduling Order, the court directed the parties to address the significance of *WEPCO* and the impact of *U.S. v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292  (2001).

*Mead*'s impact on NSR litigation has already attracted comment.  See*, e.g.,* Michael P. Healy, Spurious Interpretation Redux: *Mead* and the Shrinking Domain of Statutory Ambiguity, 54 Admin.L.Rev. 673 (2002); *Duke Energy*, *supra*, 278 F.Supp. 2d 619, 641-42 (refusing to defer to an EPA interpretation that was clearly contrary to earlier interpretations).

Because *Mead* or, more accurately, to what end its application leads, is an

important question,[39] the court sets out *verbatim* the applicable portions of the Court's

discussion, with accompanying footnotes:

> When Congress has "explicitly left a gap for an agency to fill, there is
> an express delegation of authority to the agency to elucidate a specific
> provision of the statute by regulation," *Chevron,* 467 U.S., at 843- 844,
> 104 S.Ct. 2778, and any ensuing regulation is binding in the courts
> unless procedurally defective, arbitrary or capricious in substance, or
> manifestly contrary to the statute. [FN6] See *id.,* at 844, 104 S.Ct. 2778;
> *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 81 L.Ed.2d
> 680 (1984); APA, 5 U.S.C. §§ 706(2)(A), (D). But whether or not they
> enjoy any express delegation of authority on a particular question,
> agencies charged with applying a statute necessarily make all sorts of
> interpretive choices, and while not all of those choices bind judges to
> follow them, they certainly may influence courts facing questions the
> agencies have already answered. "[T]he well-reasoned views of the
> agencies implementing a statute 'constitute a body of experience and
> informed judgment to which courts and litigants may properly resort for
> guidance,' " *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141
> L.Ed.2d 540 (1998) (quoting *Skidmore,* 323 U.S., at 139-140, 65 S.Ct.
> 161), and "[w]e have long recognized that considerable weight should
> be accorded to an executive department's construction of a statutory
> scheme it is entrusted to administer ...." *Chevron, supra,* at 844, 104
> S.Ct. 2778 (footnote omitted); see also *Ford Motor Credit Co. v.
> Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980);
> *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441,
> 57 L.Ed.2d 337 (1978). The fair measure of deference to an agency
> administering its own statute has been understood to vary with
> circumstances, and courts have looked to the degree of the agency's care,

---

[39] The court has been unable to find any CAA appellate review in this Circuit that
controls this issue, *see, e.g.* , Propriety of EPA Determinations Whether State Implementation
Plans (SIPs) or Revisions Complied with Criteria for Approval Under Clean Air Act (42
U.S.C.A. §§ 7401 et seq.), 174 A.L.R. Fed. 137, §1b+ (2001) (no Eleventh Circuit cases
reported); Construction And Application Of § 307(B)(1) Of Clean Act (42 U.S.C.A. §
7607(B)(1)) Pertaining To Judicial Review By Courts Of Appeals, 86 A.L.R. Fed. 604 (no
Eleventh Circuit cases reported).

[FN7] its consistency, [FN8] formality, [FN9] and relative expertness, [FN10] and to the persuasiveness of the agency's position, see *Skidmore, supra,* at 139-140, 65 S.Ct. 161. The approach has produced a spectrum of judicial responses, from great respect at one end, see, *e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 389-390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) ( " 'substantial deference' " to administrative construction), to near indifference at the other, see, *e.g., Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 212-213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (interpretation advanced for the first time in a litigation brief). Justice Jackson summed things up in *Skidmore v. Swift & Co.:*

> "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S., at 140, [65 S.Ct. 161].

Since 1984, we have identified a category of interpretive choices distinguished by an additional reason for judicial deference. This Court in *Chevron* recognized that Congress not only engages in express delegation of specific interpretive authority, but that "[s]ometimes the legislative delegation to an agency on a particular question is implicit." 467 U.S., at 844, 104 S.Ct. 2778. Congress, that is, may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result. *Id.,* at 845, 104 S.Ct. 2778. When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, see *id.,* at 845-846, 104 S.Ct. 2778, but is obliged to accept the agency's position if Congress has not

40

previously spoken to the point at issue and the agency's interpretation is reasonable, see *id.,* at 842-845, 104 S.Ct. 2778; cf. 5 U.S.C. § 706(2) (a reviewing court shall set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed. See, *e.g., EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (no *Chevron* deference to agency guideline where congressional delegation did not include the power to " 'promulgate rules or regulations' " (quoting *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 50 L.Ed.2d 343 1976))); see also *Christensen v. Harris County,* 529 U.S. 576, 596- 597, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (BREYER, J., dissenting) (where it is in doubt that Congress actually intended to delegate particular interpretive authority to an agency, *Chevron* is "inapplicable"). It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. [FN11] Cf. *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (APA notice and comment "designed to assure due deliberation"). Thus, the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice- and-comment rulemaking or formal adjudication. [FN12 (*omitted*)] That said, and as significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded, see, *e.g., NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256-257, 263, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995). [FN13 (*omitted*)] The fact that the tariff classification here was not a product of such formal process does not alone, therefore, bar the application of *Chevron.*

FN6. Assuming in each case, of course, that the agency's exercise of authority is constitutional, *see* 5 U.S.C. § 706(2)(B), and does not exceed its jurisdiction, *see* § 706(2)(C).

FN7. See, *e.g., General Elec. Co. v. Gilbert,* 429 U.S. 125, 142, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (courts consider the " 'thoroughness evident in [the agency's] consideration' " (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944))).

FN8. See, *e.g., Good Samaritan Hospital v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due").

FN9. See, *e.g., Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal agency guideline that is not "subject to the rigors of the [APA], including public notice and comment," is entitled only to "some deference" (internal quotation marks omitted)).

FN10. See, *e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).

FN11. See Merrill & Hickman, *Chevron* 's Domain, 89 Geo. L.J. 833, 872 (2001) ("[I]f *Chevron* rests on a presumption about congressional intent, then *Chevron* should apply only where Congress would want *Chevron* to apply. In delineating the types of delegations of agency authority that trigger *Chevron* deference, it is therefore important to determine whether a plausible case can be made that Congress would want such a delegation to mean that agencies enjoy primary interpretational authority").

*United States v. Mead Corp.*, 533 U.S. 218, 229 - 231.

## VIII. ***WEPCO, CHEVRON*** **AND *MEAD* IN THE ELEVENTH CIRCUIT**

*WEPCO* also remains highly significant in CAA regulation and enforcement

because it discussed "life extension" projects of power plant facilities.  It was thought

when Congress passed the CAA, and probably still thought at the time of the 1970

amendments, 42 U.S.C. §7401 and the 1977 Amendments adding PSD provisions, 42

U.S.C.  § 7470, that, as existing power plants reached the end of their lives, they

would be replaced by new plants which, everyone agreed, would be subject to NSR

and PSD regulation.[40]  It was an assumption that didn't hold: utilities, faced with local

and environmental opposition, periods where demand was flat or worse, and huge

increases in construction costs, *inter alia*, did not build new plants as expected.

Rather, the utilities undertook projects to extend the life of their existing plants, or

"life extension" projects.  The applicability of NSR and PSD regulations to life

extension plants is, so far as the court can tell on the record before it, the core dispute

of this and the other 1999 CAA enforcement actions.

Post-*WEPCO*, EPA responded to Congressional concerns about the reach and

scope of *WEPCO*, particularly as it applied to life extension projects.  EPA released

or provided information to Congress and the electric industry that can be fairly

characterized as saying *WEPCO* would have limited applicability at most.  This

history is, again, ably set forth in *Duke Power*, with the relevant portion found in

---

[40]  "[b]uilding control technology into new plants at time of construction will plainly be less costly then [sic] requiring retrofit when pollution control ceilings are reached." H.R.Rep. No. 294, 95th Cong., 1st Sess. 185, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 1264.

Exhibit C to this Opinion.

What the court finds noteworthy about *Ohio Edison* and *SIEGO*, but especially *Ohio Edison,* is that the substance of EPA life extension information is there, if not in the detail and form found in *Duke Energy*.  Lacking in the *Ohio Edison* and *SIEGO* opinions are the reasons the EPA's post-*WEPCO* statements and actions (inaction may be a better choice of words) count for so little.  Put another way, if there is a countervailing case to be made to the *Duke Power* analysis, the court could not find it in *Ohio Power* or *SIEGO*.

It's an important point. The court is mindful of the Eleventh Circuit's flat rejection of a key part of the *WEPCO* analysis: the internal EPA Environmental Appeals Board ("EAB") procedure.  The Eleventh Circuit, in *TVA v. Whitman*, 336 F.3d 1236, 1239-40, 1246 (11th Cir. 2003), found the use of the EAB procedure unconstitutional because it lifted the requirement that EPA prove, in court, a CAA violation before issuing an administrative order.

EPA says, even after allowing for the EAB's proceedings being held unconstitutional, *Whitman* stands for the proposition that deference is due the EPA in the agency's interpretation of the CAA's RMRR and increased emissions provisions.  As an abstract principle, the court agrees with EPA.  And perhaps a court could exorcize the "bad" EAB portion of the Seventh Circuit's *WEPCO* analysis,

leaving the remainder for application to this action.  This court cannot.  Since the Eleventh Circuit has yet to speak directly to the issues in the Opinion, the court, mindful that anticipation could be speculation when it comes to appellate review, says nevertheless it believes the skepticism the Eleventh Circuit displayed towards EPA's enforcement efforts in *Whitman* will not have dissipated by the time this action reaches the Court on appeal, and EPA's post-*WEPCO* statements and actions will likely inform, at least in part, the Court's view of how much deference is due EPA here.

Were the court convinced that *Ohio Edison* is better researched and reasoned than *Duke Power*, the choice would be harder.  The issues are the same, the arguments overlap to a great degree, and there are pros and cons to the arguments of both sides.  Having said that, the court finds *Duke Power* clearly more thorough, comprehensive and rigorous in its analysis, and therefore the  more persuasive decision on the two (2) issues discussed here.

Even more important to the case before it, for all the reasons set out herein, the court says that the Eleventh Circuit is much more likely to approach the EPA's arguments and its enforcement posture here with *Mead*-like skepticism than it is to

approach it with *WEPCO*-like deference.[41]   EPA's arguments sound more in "litigation position", which is never entitled to *Chevron* deference, than they do in agency implementation/interpretation of ambiguous statutory language, which is entitled to *Chevron* deference.[42]   Given the EPA's zigs and zags represented by its contradictory post-*WEPCO* statements and rules[43], followed by the 2003 amendments[44], and now the 2005 CAIR, the court cannot say that EPA's interpretation of its rules is due to be afforded *Chevron* deference.  EPA admits, as

---

[41]  *Ohio Edison* relies on *WEPCO* and *United States v. SIEGO ("SIEGO)*, *supra*, 245 F.Supp. 2d 994 (S.D. Ind. 2003); *SIEGO* relies on *WEPCO*.  *Ohio Edison* 276 F.Supp. 2d at 834, n.2.

[42]  The court realizes that n. 17 *supra*, opens the door for the argument that because reviewing courts disagree over the "clear" command of the statute regarding RMRR application to PSD cases like this one, rendering the statute ambiguous, a reader may conclude that EPA's interpretation is be accorded *Chevron* deference.  Had EPA taken a position and stuck to it, the court would be inclined to agree.  EPA's problem, thoroughly dissected in *Duke Power*, is that it has not been consistent.  It has offered "guidance", particularly in response to Congressional pressure (e.g., Congressman Dingell) suggesting *WEPCO* would not be applied widely, or much at all.  It says RMRR is industrial source wide, then it says it isn't/might not be.  Then it says *WEPCO* does apply to all the utilities sued in 1999.  The point is that if the meaning of RMRR in PSD is ambiguous, so is EPA's interpretion(s) thereof.

[43]  To its credit, EPA doesn't say it didn't issue conflicting guidance or interpretations after *WEPCO*, *see, e.g*., APC exhibits 39 and 41.  Rather, EPA says any confusion was subsequently cleared up by later (1986) guidance and interpretation and it has been consistent thereafter, *see, e.g*., EPA exhibit 27.

[44]  EPA has indicated that it will only bring additional enforcement cases against utilities for projects that violate the 2003 NSR Rule.  SPA's Enforcement Chief Defends Review of Existing New Source Review Investigation, BNA Daily Report for Executives (Nov. 21, 2003).  This leaves the anomaly of utilities, like APC, being prosecuted for conduct that, if engaged in now, would not be prosecuted.  Put another way, this action is a sport, which is not exactly what one would expect to find in a national regulatory enforcement program.

it must, that it has not spoken with one voice, or a consistent voice, or even a clear voice, on this issue.   If the *Mead* factors are the degree of the agency's care, consistency, formality, its relative expertness, and the persuasiveness of the agency's position, *Mead, supra*, 533 U.S. 218, 229, EPA's post-*WEPCO* activities would, in the court's eyes, only pass the "expertness" prong of *Mead*.

Finally, if one compares the 2003 Rule and CAIR with this civil action, what one sees is one office of EPA attempting to expand and clarify the RMRR provisions through rulemaking, while another is attempting to redefine them through enforcement actions and litigation.   The court says this civil action is not the type of regulatory activity entitled to *Chevron* deference.

For the reasons stated herein, the court holds:

1) The RMRR exclusion applies to projects that are routine within the industry, by which is meant work of a type performed commonly within the industry, although perhaps infrequently at any specific one or more of APC's particular plants; and

2) Emission increases, for purposes of NSR/PSD analysis, are calculated only on the basis of "maximum hourly emission rates", not "annual actual emissions".   Maximum hourly emissions must increase before PSD permitting is triggered; greater annual facility utilization is irrelevant to the analysis.

At this time the Court declines, or pretermits, the issuance of a separate Order on the questions discussed.   Reference is made to the Order of Mediation of same

47

date.  Should the mediation be unsuccessful, a separate Order will issue.

Done on June 3, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

## EXHIBIT A

III. *Routine Maintenance, Repair, and Replacement*

 **\*\*8** [4] The court is presented with two different interpretations of the RMRR exemption.  As described by the Eleventh Circuit, the "central disagreement between [the utility] and EPA is whether 'routine' should be defined relative to an industrial category or to a particular unit." *Tennessee Valley Auth. v. United States EPA,* 278 F.3d 1184, 1189 n. 3 (11th Cir.2002).  The EPA argues that the RMRR exemption requires "a case-by-case determination of whether the activity is routinely performed at an individual unit within the relevant industrial category, considering common-sense factors such as nature and extent, purpose, frequency, and cost," (EPA Mem. Supp. Mot. Partial Summ. J. at 1), and that this has been the EPA's "long-standing interpretation." [FN8] (*Id.* at 23.)  Conversely, Duke Energy asserts that the " 'routine' inquiry has as its ultimate purpose the determination of whether a project is routine in the industry, considering all relevant facts-- *e.g.,* nature and extent, scope, frequency, and cost." (Duke Energy Am. Br. Opp'n Mot. Partial Summ. J. at 29.)

> FN8. The EPA cites two recent decisions, *In re Tenn. Valley Auth.,* CAA Docket No. 00-6, 2000 WL 1358648 (Envt'l Appeals Bd., U.S. EPA Sept. 15, 2000) (EPA Ex. 100), and Detroit Edison Applicability Determination (May 23, 2000) (EPA Ex. 101), to strengthen its position that the "routine at an individual unit" standard has consistently been applied.  (EPA Mem. Supp. Mot. Partial Summ. J. at 22-23.)  Both decisions, however, were issued following the EPA's decision in 1999 to initiate a number of enforcement proceedings.  Further, with respect to the order issued in *In re Tenn. Valley Auth.,* the objectivity of this decision has been brought into question because of the failure of the proceedings to comply with the requirements of due process.  *Tenn. Valley Auth. v. Whitman,* 336 F.3d 1236 (11th Cir.2003).  The Eleventh Circuit, therefore, held that the EPA must prove the existence of a CAA violation in district court, and until that time the EPA's decision was "legally inconsequential."  Accordingly, given the potentially self-serving nature of these decisions, they do not evidence a long-standing interpretation.

*Duke Power* at 629.

## **EXHIBIT B**

IV. *Net Emissions Increase*

 [10] Like the exemption for RMRR, the parties have presented two competing methods for quantifying emissions increases, both of which presumably stem from the 1980 PSD regulations. [FN17]  The EPA advances as the correct method the "actual-to-projected-actual" test.  Under this test, a source must predict a project's impact on hourly emissions rates and hours and rates of production, *i.e.,* capacity utilization.  Duke Energy argues that the only method that can be applied to its projects is the "actual-to-actual" test.  It contends that this is the test provided for under the 1980 regulations and that the test requires a comparison of pre-project actual emissions and future "actual" emissions, assuming constant hours and conditions of operation.   The court finds, based on the PSD rules, the contemporaneous interpretations of the PSD rules, and the statutory language incorporating the NSPS concept of modification into PSD, post-project emissions must be calculated on an annual basis, measuring emissions in tons per year, and in calculating post-project emissions levels the hours and conditions of operation must be held constant. Accordingly, a net emissions increase can result only from an increase in the hourly rate of emissions.

> FN17. The EPA in its briefing argued that a third test, the "actual-to-potential" test should apply to Duke Energy's units.  (EPA Mem. Supp. Mot. Partial Summ J. at 33-35.)  Under the actual-to-potential test, the EPA assumes that a unit will operate at its maximum hourly rate of emissions and will do so continuously.  Because no unit operates under these conditions, an emissions increase will always result.  During the summary judgment hearing on July 18, 2003, the EPA indicated that it would not seek application of the actual-to-potential test but would rather pursue its contention that the emissions test under PSD requires consideration of both increased hourly rates and utilization.   Accordingly, the court will not address the potential application of the actual-to-potential test.

 A. *Plain language of increased hours exclusion*

 **17** The permitting and pollution control requirements of PSD are triggered by a non-routine physical change at a source that results in a "significant net emissions

increase." 40 C.F.R. § 51.166(b)(2)(I) (1987) (Duke Energy Ex. 21).  In order to prove a "net emissions increase," the EPA must show an "increase in actual emissions from a particular physical change or change in the method of operation at a stationary source." *Id.* § 51.166(b)(3)(i)(a).  For units that have begun normal operations, such as the units at issue in the case at bar, "actual emissions" is defined according to a pre-project (or baseline) period that is "representative of normal source operation." *Id.* § 51.166(b)(21)(ii). [FN18]  **\*641** Thus, a comparison between the pre-project levels of emissions and post-project levels of emissions is required to determine whether there has been a net emissions increase above the baseline levels.

> FN18. "For any emissions unit which has not begun normal operations ... actual emissions shall equal the potential to emit of the unit ...." 40 C.F.R. § 51.166(b)(21)(iv) (1987) (Duke Energy Ex. 21). Neither party seeks to apply this standard to the units at issue.

The key to this comparison is how to calculate the post-project emissions levels. Because an increase in emissions must result from a "physical [or operational] change," which by definition excludes "[a]n increase in the hours of operation or in the production rate," *id.* § 51.166(b)(2)(iii)(f), post-project emissions levels must be calculated assuming the same pre-project "representative" conditions of operation, *i.e.,* hours and rates of production. Under the 1980 PSD regulations, therefore, only if the project increases the hourly rate of emissions will there be an annual emissions increase.

The EPA asserts that the increased hours exclusion applies only to exclude increased utilization where the increased utilization is not associated with a construction project.  Thus, whenever there is an increase in utilization coupled with a physical change, any increase in hours of operation and production rates may be considered in the emissions calculus.  Such a limitation on the application of this exclusion, however, is not provided for in the plain text of the regulations. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).  The only limitation on the increased hours exemption provided for in the regulations is that any increase in hours or rates cannot otherwise be prohibited by a federally enforceable permit. [FN19]  40 C.F.R. § 51.166(b)(2)(iii)(f) (1987) (Duke Energy Ex. 21). Nevertheless, the EPA contends that its interpretation of this exemption is reasonable and therefore entitled to deference.  The court, however, cannot simply defer to the EPA's interpretation when that interpretation imposes an additional condition on a

51

regulatory exemption.  *See Christensen v. Harris County,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

> FN19. It is undisputed that Duke Energy's units are not subject to permit limitations on hours or rates of production.

B. *EPA's historic interpretation of increased hours exclusion*

The court cannot defer to the EPA's interpretation when it is clearly contrary to earlier interpretations.  Immediately after the promulgation of the PSD regulations in 1980, the EPA's Director of the Division of Stationary Source Enforcement ("DSSE"), Edward E. Reich, confirmed in two separate applicability determinations that the requirements of PSD would be implicated only by an increase in the hourly rate of emissions.  In a June 24, 1981, applicability determination, Reich wrote that "PSD applicability [at a previously operating source] is determined by evaluating any change in the [hourly] emissions rates caused by" the physical or operational change being examined.  (Letter from Reich to Gill (June 24, 1981) (Duke Energy Ex. 23).) Because the available data indicated that there would be no increase in the hourly rate of emissions following the contemplated change, Reich concluded that "[a]ctual emissions could increase only if there [was] an increase in the production rate or hours of operation, both of which are specifically exempt from PSD review."  (*Id.*) This determination reconfirmed an earlier PSD applicability determination in which Reich stated that increased hours of **\*642** operation, even when coupled with a physical or operational change, would not be considered a modification. (Mem. from Reich to Whitmore (Jan. 22, 1981) (Duke Energy Ex. 24).)  Thus, absent an increase in the maximum hourly rate of emissions, the mandates of PSD are not implicated.

**\*\*18** [11] Once an agency issues a determination or ruling, it " 'must either follow its own precedents or explain why it departs from them.' " *Puerto Rican Cement Co. v. United States EPA,* 889 F.2d 292, 298 (1st Cir.1989) (quoting *Shaw's Supermarkets, Inc. v. NLRB,* 884 F.2d 34, 36 (1st Cir.1989)).  The EPA attempts to explain why it has not followed its precedent by dismissing these determinations as "erroneous" and mere "dicta."  Reich as the Director of the DSSE, however, was not a low-level employee from an irrelevant division opining as to what he believed the appropriate interpretation of the EPA regulations should be.  Rather, he was the head

of the division at the EPA responsible for "provid[ing] guidance for interpretations which address the implementation of [the PSD] regulations." (Mem. from Reich to Devine (Feb. 13, 1978) (Duke Energy Ex. 143).) "[EPA] policy require[d] that DSSE ... make the final recommendation for interpretation of these requirements." (*Id.*) Accordingly, these contemporaneous interpretations provide compelling evidence of the rules' original meaning and cannot simply be ignored out of blind deference to the EPA's current interpretation. *Ohio Dep't of Human Servs. v. United States Dep't of HHS,* 862 F.2d 1228, 1234-35 (6th Cir.1988).

C. *Legislative intent*

 The interpretation that requires an increase in the hourly emissions rate and the exclusion of any increase in the hours of operation is not only consistent with the plain language of the regulations and the EPA's contemporaneous interpretations, but is also consistent with the NSPS definition of "modification" which was incorporated by explicit reference into PSD. [FN20] The PSD program provides that "[n]o major emitting facility on which *construction* is commenced ... may be constructed in any area to which this part applies unless--(1) a permit has been issued." 42 U.S.C. § 7475(a)(1) (1995) (emphasis added).  The term "construction" is defined to "include[ ] the modification (as defined in section 7411(a) of this title [NSPS] ) of any source or facility." *Id.* § 7479(2)(C).   An NSPS modification requires a physical or operational change and an increase in the unit's maximum hourly rate of emissions. *Id.* § 7411(a)(4);  40 C.F.R. § 60.14(a) (1975) (Duke Energy Ex. 6).  Thus, in order to undergo "construction" as defined in PSD, an existing source must also undergo a "modification" as defined in NSPS, [FN21] *i.e.,* to undergo PSD construction **\*643** a physical change must result in an increase in the hourly rate of emissions.

> FN20. *See* 123 Cong. Rec. H11956, 3665 (daily ed.  Nov. 1, 1977) (Duke Energy Ex. 13) (explaining that Congress intended "to conform" the NSR definition of "modification" to the "usage in other parts of the Act," namely NSPS).  EPA interpreted this reference to "usage" to "mean that for PSD purposes Congress intended the term modification to include all exemptions included in the NSPS regulations promulgated ... prior to the date of [PSD's] enactment."  (Duke Energy Ex. 16).

> FN21. In 1975, the EPA revised the NSPS regulations to clarify that the modification definition applied to an increase "in emissions rate," "expressed

as kg/hr."  40 Fed.Reg. 58,416, 58,419 (Dec. 16, 1975) (Duke Energy Ex. 7). The EPA explained that the unit of measurement would clarify that the modification rule would be sensitive to "increased production capacity and to the overall increase in total emissions to the atmosphere," *i.e.,* to new capacity to emit pollution, while "automatically allow[ing] increases in operating hours as intended by one of the existing exemptions under 40 CFR 60.2(h)."  39 Fed.Reg. 36,946, 36,947 (Oct. 15, 1974) (Duke Energy Ex. 8).

Under the emissions standard advanced by the EPA under the 1980 regulations, however, a physical change at an existing source that does not increase the source's hourly emissions rate, thereby implicating NSPS, could nonetheless trigger PSD based on a projected increase in hours of operation.  Accordingly, an existing source would be considered modified under PSD even in the absence of an NSPS modification at that source.  This interpretation of the regulations is inconsistent with the congressional design of defining PSD construction in terms of NSPS modification and should therefore be accorded little deference. *See Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (stating that no weight can be given to a regulatory interpretation that would "violate the Constitution or a federal statute").

**\*\*19** The EPA contends that an emissions test for PSD that excludes from its calculations any emissions caused by an increase in the hours of operation ignores the critical differences between NSPS and PSD.  Further, the EPA argues, this construction of the emissions test renders the PSD test indistinguishable from the NSPS test.  While NSPS is focused on technology requirements for source categories, PSD requirements focus on the location of the source and its potential impact on air quality in that locality. *Northern Plains Res. Council v. United States EPA,* 645 F.2d 1349, 1356 (9th Cir.1981).  An hourly emissions rate test, however, contrary to the EPA's assertion, does not ignore the objectives of each program and does not render the test for each program indistinguishable.

PSD may be triggered if there is an increase in the maximum hourly emissions rate. In this regard, the PSD and NSPS emissions tests are similar.  Unlike NSPS which is always triggered whenever there is an increase in the hourly rate of emissions, PSD is potentially triggered when there is an increase in the hourly emissions rate but only if the annualized emissions increase:  (1) exceeds the significance levels in 40 C.F.R. § 51.166(b)(23) and (2) is not offset by contemporaneous decreases at the source, *id.*

§ 51.166(b)(3). These two conditions for PSD applicability--significance levels and netting-- effectuate the air quality purpose of the PSD program. *See Alabama Power Co. v. Costle,* 636 F.2d 323, 401 (D.C.Cir.1979) (explaining that PSD is concerned only with air quality and thus requires netting). These conditions also explain why emissions under PSD must be calculated on an annual basis: measuring emissions in tons per year makes possible netting (addition and subtraction) of emissions rates between various units at a plant. [FN22]

> FN22. The netting provisions of PSD state:
> The first step in determining whether a "net emissions increase" would occur is to determine whether the physical or operational change in question would itself result in an increase in "actual emissions." If it would not, then it could not result in a "net emissions increase." If it would, the second step is to identify and quantify any other prior increases and decreases in "actual emissions" that would be contemporaneous with the particular change and otherwise creditable. The third step, finally, is to total the increase from the particular change with other contemporaneous increases and decreases. If the total would exceed zero, then a "net emissions increase" would result from the change.
> 45 Fed.Reg. 52,676, 52,698 (Aug. 7, 1980) (Duke Energy Ex. 22).

While courts have construed some of the same terms used in NSPS and PSD in **\*644** different ways, these decisions do not compel a similar result here. In fact, the explicit reference by Congress incorporating the concept of NSPS modification into the PSD concept of construction compels the result that PSD is triggered only by an increase in a unit's hourly emissions rate.

In *Northern Plains,* the court upheld the EPA's interpretation of the term "commenced," which was defined differently under NSPS and PSD. 645 F.2d at 1354-57. The court examined the regulatory history, statutory provisions, and legislative history of the term and concluded that there was "no manifest congressional intent" to apply the same definition of "commenced" under both NSPS and PSD. *Id.* at 1355. Significantly, the court observed that "commenced" was not defined in the 1970 CAA Amendments but was instead defined in 1971 by an NSPS regulation. *Id.* Accordingly, the court rejected the argument that the term should be given the same meaning under both programs because when Congress enacted PSD in 1977, it explicitly defined "commenced" in the statute differently from the

pre-existing NSPS definition and "expressly limited [the PSD definition] by the introductory phrase 'For purposes of this part--' to Part C of the Act, *i.e.,* the statutory PSD program." *Id.*

 **20** The court in *Alabama Power* similarly relied on the statutory language in holding that the EPA had the authority to "adopt definitions of the component terms of 'source' that are different in scope from those that may be employed for NSPS ... due to differences in the purpose and structure of the [NSPS and PSD] programs." 636 F.2d at 397-98.  The decision, however, was not based solely on the different objectives of the two programs.  Rather, it was based in large measure on the differences in the statutory language used in NSPS and PSD to describe the term "source."  *Compare* 42 U.S.C. § 7411(a)(3) (1995) (NSPS) (defining the term "source" to mean "any building, structure, facility, or installation") *with id.* § 7479(1)(PSD) (defining the term "source" to include "fossil-fuel fired steam electric plants ..., coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, ... [and] iron and steel mill plants").  This reference to "entire plants" in PSD, according to the court, demonstrated that "Congress clearly envisioned" that the term "source" should be given a different construction under PSD than NSPS, which applies to individual units.  *Alabama Power,* 636 F.2d at 397.

 In stark contrast to these cases in which there was a clear congressional intent to treat similar terms differently, Congress clearly manifested its intent that the definition of "modification" should be given the same construction under NSPS and PSD. The CAA defines the term "modification" in only one place:  42 U.S.C. § 7411(a)(4) (NSPS).  Seven years later, when Congress enacted PSD, it explicitly defined the application of PSD according to the NSPS definition of modification.  Furthermore, Congress expressly stated that it intended "to conform" the PSD definition of "modification" to the "usage" of that term under NSPS. 123 Cong. Rec. H11956, 3665 (daily ed. Nov. 1, 1977) (Duke Energy Ex. 13).  This court cannot envision a clearer indication of Congress's intent to trigger PSD only when NSPS is likewise triggered by an increase in the maximum hourly emissions rate.

 D. *WEPCO emissions test*

 The Seventh Circuit in *WEPCO*, the only appellate court  [FN23] to date that has **645** considered this issue, similarly concluded that for a source that has begun normal operations, PSD is potentially triggered only when there is an increase in the

maximum hourly rate of emissions. *WEPCO,* 893 F.2d at 915- 18. The EPA in WEPCO found that the replacements WEPCO proposed would increase "[p]lantwide capacity ... about 40 percent above current levels." (Duke Energy Ex. 31.) As such, the EPA reasoned that to increase the capacity of some WEPCO units in a way that increases their maximum achievable hourly emissions rates triggered NSPS. (EPA Ex. 73 at 11.) The *WEPCO* court affirmed this determination. *WEPCO,* 893 F.2d at 913-15.

> FN23. The court in *Ohio Edison* rejected the position that PSD is potentially triggered only by an increase in maximum hourly rates of emissions. 276 F.Supp.2d 829, 855-57, 2003 WL 21910738, at *44-47. Instead, the court accepted the EPA's position that emissions increases under PSD should be calculated considering both an increase in the hourly rate of emissions and an increase in utilization. *Id.* 276 F.Supp.2d at 850-52, 2003 WL 21910738 at *35-39. This court respectfully disagrees with this conclusion.

In calculating the PSD emissions increases, the EPA sought to apply the "actual-to-potential" test to units that had undergone like-kind replacements. Under this approach, the EPA compared the actual annual emissions of the units during a pre-project representative period to the units' theoretical, total annual emissions, which presumes that the units operate at their maximum hourly emissions rate, twenty-four hours a day, 365 days a year. The EPA reasoned that because the source " 'ha[d] not yet begun operations following the renovation, "actual emissions" following the renovation [were] deemed to be the source's "potential to emit." ' " *WEPCO,* 893 F.2d at 916 (quoting Clay Mem. at 7).

 **21 The court rejected this approach and concluded that there was "no support in the regulations for the EPA's decision wholly to disregard past operating conditions at the plant." *Id.* at 917. On remand, the court ordered the EPA to determine "whether the renovated plant would cause a significant net emissions increase if it were operated under present hours and conditions." *Id.* at 918 n. 14. This remand instruction explicitly sets forth the "actual-to-actual" test advocated by Duke Energy and previously applied by the EPA. (*See supra* § IV.B.) This test requires that the hours and conditions of operation be held constant and places the focus on an increase in the hourly emissions rate.

The EPA contends that the *WEPCO* remand instruction does not require application

of the actual-to-actual test.  Instead, it asserts that if the *WEPCO* court agreed with the formulation of the emissions test proposed by Duke Energy, there would have been no need to remand the case, citing the court's acknowledgment that the EPA had " 'assumed that emissions increases at Port Washington would come not from an increase in emission rate, but rather from increases in production rate or hours of operation.' "  *WEPCO,* 893 F.2d at 916 (quoting Supplemental Determination at 9).  Thus, the EPA argues, had the court agreed that the hours of operation must be held constant, it would have decided, based on the EPA's assumption about emissions rates, that PSD did not apply.

 While the court arguably may have ignored an assumption by the EPA in providing its remand instruction, it did not ignore the specific facts of the case.  It was undisputed that the WEPCO replacement projects resulted in the restoration and increase in the maximum capacity (*i.e.,* hourly emissions rate) of the restored units.  *Id.* at 910.  Furthermore, the court upheld the EPA's determination that NSPS applied because of an increase in **\*646** the units' maximum hourly rate of emissions.  *Id.* at 913-15.  However, even with the determination that the renovation caused an increase in the hourly rate of emissions a remand was necessary to determine whether that increase in emissions would exceed the PSD significance levels, and thereby trigger PSD.  [FN24]

> FN24. The PSD's applicability could not be determined by the court because "WEPCO never submitted pollutant-specific data to the EPA. Consequently, the EPA could not, at the time the matter was before it, conclude whether the renovated plant would cause a significant net emissions increase if it were operated under present hours and conditions." *WEPCO,* 893 F.2d at 918 n. 14 (citation omitted). Accordingly, the court directed that "WEPCO should make such data available so that the EPA can determine on that basis whether the Port Washington plant will be subject to the PSD program." *Id.*

 Following the remand, the EPA failed to calculate the PSD emissions levels as instructed by the Seventh Circuit.  Instead it calculated post-project emissions levels by predicting future utilization of the plant.  The EPA recognized that the remand instruction could be interpreted to require that hours of operation be held constant but dismissed this interpretation as "incorrect."  (Letter from Rosenberg to Boston (June 8, 1990) at 6 (Duke Energy Ex. 33).)  Similarly, an EPA attorney noted on an internal EPA memorandum about the *WEPCO* remand instruction that " '[p]resent h[ou]rs' is

absurd.  EPA properly ignored it in [the] WEPCO remand."  (Mem. from Rivkin to Wakefield (Feb. 26, 1991) at 14 (Duke Energy Ex. 140).)

**22 Because the 1980 regulations do not provide for the actual-to-projected-actual test, the EPA relies on its interpretation of the *WEPCO* decision, in which the court stated that the EPA could not "wholly ... disregard past operating condition," *WEPCO,* 893 F.2d at 917, to support its actual-to-projected-actual test.  Based on its interpretation of this language, the EPA asserts that its decision to include in the PSD emissions test any increase in utilization should be given deference. While deference to the EPA's interpretations of the CAA's Amendments and its technical regulations is typically substantial, *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986);  *Chevron U.S.A.,* 467 U.S. at 844, 104 S.Ct. 2778, a similar deference in not warranted when what is being interpreted is the language of a judicial opinion. This is a task the court is equally able to perform.

 The EPA does not rely on the language of the 1980 PSD regulations to support its method of calculating post-project emissions.  Nowhere in the regulations is there a reference to an actual-to-projected-actual test or to increased utilization.  In fact, the EPA admitted as much in its WEPCO applicability determination.  WEPCO argued to the EPA that the EPA should "compare representative actual emissions prior to the change with 'projected' actual emissions after the renovation."  (EPA Ex. 73 at 7 n. 4.) The EPA concluded that "[t]he PSD regulations provide no support for this view." (*Id.*) More recently, the EPA's proffered expert on PSD regulations indicated that the tests he applied, which are variations of the actual-to-projected-actual test, were "not set forth in the 1980 rules" but were "plausible approaches."  (Sahu Dep. at 156 (Duke Energy Ex. 66);  Sahu Expert Report at 39, 41 (Duke Energy Ex. 110).)  The EPA, however, cannot lawfully apply a standard not provided for in the regulations on the premise that it is a plausible approach.  *See Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1135 (D.C.Cir.1979) ("It has become axiomatic that an agency is bound by its own regulations.  The fact that a regulation as written does not provide [the agency] a quick way to reach a **647** desired result does not authorize it to ignore the regulation or label it 'inappropriate.' ").

 The fact that the 1980 PSD regulations do not provide the methodology the EPA seeks to apply is further highlighted by the EPA's decision to add through notice-and-comment procedures the very methodology it now contends the 1980 regulations provide.  In 1992 the EPA promulgated the "WEPCO rule." [FN25] *See*

59

40 C.F.R. § 51.166(b)(21)(v), (b)(32) (2002);  57 Fed.Reg. 32,314 (July 21, 1992). Under this rule, post-project actual emissions for the purpose of triggering PSD at utilities are equal to "representative actual annual emissions," which are generally defined as "the average rate, in tons per year, at which the source is projected to emit a pollutant for the two-year period after a physical change." 57 Fed.Reg. at 32,335. In calculating any increase in emissions, the regulations require consideration of the "effect any change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization." *Id.* The addition of the new WEPCO Rule appears to have been unnecessary if the 1980 regulations already provided this method.

> FN25. The WEPCO Rule provisions providing an actual-to-projected-actual test do not apply to the projects at issue.  The WEPCO Rule was not incorporated into the North Carolina SIP until December 4, 1995, and into the South Carolina SIP until July 8, 2002. *See* 60 Fed.Reg. 51,923 (Oct. 4, 1995) (EPA Ex. 127);  67 Fed.Reg. 30,594 (May 7, 2002) (EPA Ex. 128).  The EPA enforces the SIP's rule until the SIP is revised. *General Motors Corp. v. United States,* 496 U.S. 530, 540, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990).  However, even for projects undertaken after the dates in which the WEPCO Rule was adopted, Duke Energy " 'opted out' of the WEPCO calculus" by failing to satisfy the regulatory prerequisite of submitting emissions data for a five-year period following the physical change.  (EPA Mem. Supp. Partial Summ. J. at 35 n. 14.)

 **\*\*23** In sum, the 1980 PSD regulations require that in calculating post-project emissions, the EPA must hold the pre-project and post-project hours and conditions of operation constant.  This is the formulation dictated by the plain language of the 1980 regulations, the EPA's contemporaneous interpretations of those regulations, and the statutory and regulatory framework of the PSD program.

 E. *Application of the "actual-to-actual" emissions test*

 [12] Duke Energy contends that because the EPA does not allege an increase in the hourly rate of emissions for any of its units following the projects, the EPA cannot establish a "net emissions increase" and it is therefore entitled to summary judgment on all claims.  The EPA has alleged, however, that following the project at Buck 4 there was an increase in Buck 4's hourly rate of emissions above its baseline rate.

This is principally due to the fact that Buck 4 was in ECS for approximately ten years. Accordingly, the EPA asserts that its baseline emissions rate is zero.

In calculating the baseline emissions rate, the regulations provide that "[i]n general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. § 51.166(b)(21)(ii) (1987) (Duke Energy Ex. 21). Duke Energy argues that because Buck 4 was shutdown for economic reasons, the baseline period of normal source operation occurs during the period of actual operation preceding the shutdown. Therefore, because its post-project emissions rate did not increase **648** above this pre-project level, PSD is not triggered.

Under the 1980 regulations, the EPA has historically presumed that the two years immediately preceding a change should be used to calculate the baseline. 45 Fed.Reg. 52,676, 52,705 (Aug. 7, 1980) (EPA Ex. 122). This interpretation has been applied on previous occasions. (*See, e.g., In re Monroe Elec. Generating Plant,* Petition No. 6-99-2 slip op. 14-16 (U.S. EPA 1999) (EPA Ex. 116) ("[I]n calculating the net emissions increase for reactivation of long-dormant sources potentially subject to PSD, the source is considered to have zero emissions as its baseline."); Letter from Howekamp to Connery (Nov. 6, 1987) at 8 (Cyprus Casa Grande Applicability Determination) (EPA Ex. 159).) [FN26] For example, in the Cyprus Casa Grande PSD applicability determination, the EPA concluded that the emissions during the two-year period preceding the start-up of the plant were zero and that "this period [was] representative of normal operations, since the emissions [had] been zero during each of the last ten years while the plant [had] been shut down." (EPA Ex. 159 at 8.)

> FN26. *See also* 61 Fed.Reg. 38,250, 38,254 (July 23, 1996) (EPA Ex. 130) ("The EPA has historically used the 2 years immediately preceding the proposed change to establish the baseline. However, in some cases it has allowed use of an earlier period." (citation omitted)).

The regulations provide, however, that "[t]he reviewing authority may allow the use of a different time period upon a determination that it is more representative of normal source operation." 40 C.F.R. § 51.166(b)(21)(ii) (1987) (Duke Energy Ex. 21). The EPA has indicated that the discretion to depart from the zero baseline presumption for long-dormant facilities is narrow and generally limited to

extraordinary occurrences.  Duke Energy argues that the agency interpretation of the regulations that controls the baseline level is the North Carolina Department of Environmental and Natural Resources' ("NCDENR") interpretation.

 **24 In 1982, the EPA approved North Carolina's PSD rules, thereby authorizing the State "to issue and enforce PSD permits for sources locat[ed] in [North Carolina]." 47 Fed.Reg. 7836 (Feb. 23, 1982) (Duke Energy Ex. 26).  Duke Energy argues, therefore, that the NCDENR's interpretation of North Carolina's PSD rules governs what period should be used to calculate pre-project baseline emissions levels. Accordingly, Duke Energy refers to the testimony of John Evans, the head of the NCDENR, in which he stated that, under North Carolina PSD regulations, NCDENR considers the last two years of operation preceding the shutdown as the representative baseline period for any physical change that might have occurred during the shutdown.  (Evans Dep. at 11-12 (Duke Energy Ex. 146).)

 The EPA asserted during oral argument that this evidence was irrelevant because Duke Energy never requested from the appropriate authority a different baseline. Thus, according to the EPA, Duke Energy cannot argue, *ex post,* that it should be allowed a different representative period.  Whether Duke Energy can request a different baseline after the project has been completed and an enforcement action has been initiated will not be decided by the court at this time.  Assuming only for purposes of summary judgment that Duke Energy may make such an *ex post* request, there exists at a minimum a question of fact as to whether Duke Energy can make the necessary showing that a different baseline is more representative of normal source operations.  If it is ultimately successful in making such a showing, the EPA must then prove, as it must for all projects, **649 that the Buck 4 project caused the unit's hourly emissions rate to increase above its baseline rate.  For this reason, the court cannot grant either parties' motion for summary judgment as to Buck 4. As to the other twenty-eight projects, given the size and complexity of the record, the court will defer ruling on whether these projects resulted in an increase in emissions above the baseline rate.  To the extent the projects did not increase the unit's maximum hourly rate of emissions, however, these projects are not subject to PSD.

*Duke Power, supra, 278 F.Supp. 2d 619, 640-49.*

## EXHIBIT C - LIFE EXTENSION

C. *EPA's post-WEPCO statements*

The "routine in the industry" standard is also supported by the EPA's statements that the WEPCO determination would not affect utility life extension projects. [FN13]  In December 1988, the Chairman of the House Subcommittee on Oversight and Investigations, Congressman John Dingell, informed the EPA Administrator, Lee Thomas, that his subcommittee had requested the Government Accounting Office ("GAO") to prepare a report on utility life extension issues.  (Letter from Dingell to Thomas (Dec. 21, 1988) (Duke Energy Ex. 88).)  The GAO issued its report in September 1990, stating that "[a]ccording to EPA policy officials, WEPCO's life extension project is not typical of the majority of utilities' life extension projects and concerns that the agency will broadly apply the ruling it applied to WEPCO's project are unfounded."  (GAO 1990 Report at 30-31 (Duke Energy Ex. 42).)  "Lending evidence to the officials' statements," the report **\*637** noted, "EPA's 1989 emission forecast assumed that the WEPCO decision would not result in a significant number of additional power plants having to comply with the NSPS and the PSD program requirements." [FN14]  (*Id.* at 31.)

> FN13. The EPA was aware of the utility industry practice of engaging in life extension projects as early as the 1980s.  For example, EPA inspection reports from the 1980s indicate that projects were being performed that involved "major work aimed at upgrading and extending the operating life of [the] boilers" at an "estimated ... cost of $50 million."  (Inspection Report of Riverside Generating Station (Oct. 18, 1985) (Duke Energy Ex. 78).)  Another report stated that a unit was out for a "13 week life extension major overhaul, estimated to cost approximately $15 million."  (Inspection Report of Beckjord Generating Station (Mar. 14, 1988) (Duke Energy Ex. 78).)  Furthermore, a 1989 EPA-directed study designed to assess future utility air emission trends assumed that existing coal-fired power plants would continue to operate at original capacity for fifty-five to sixty-five years, being "refurbished" around age thirty. (1989 EPA Base Case Forecasts, App. C (Duke Energy Ex. 40); Letter from Schweers to Beck (July 26, 1989) (Duke Energy Ex. 41).)  In March 1986, three EPA policy analysts published an article in which they listed ten "life extension" projects of which they were aware, including Duke Energy's PMP projects at the Dan River and Allen Plants. (James DeMocker,

63

Judith Greenwald, Paul Schwengels, *Extended Lifetimes for Coal-Fired Power Plants: Effect Upon Air Quality,* Pub. Util. Fortnightly 30, Mar. 20, 1986, at 32-33 (Duke Energy Ex. 79).)  That same year, an EPA official attended an Electric Power Research Institute ("EPRI") conference on "Life Extension and Assessment of Fossil Plants."  (U.S. Resp. to Def.'s Req. for Admis. No. 223 (Excerpt at Duke Energy Ex. 81).)  EPRI published the proceedings of the conference in an 1,100-page publication in which utilities, including Duke Energy, presented detailed descriptions of many "life extension" projects. (*Conference Proceedings:  Life Extension and Assessment of Fossil Power Plants,* EPRI Pub. CS-5208 (1987) (Excerpt at Duke Energy Ex. 82).)

FN14. Before the report was issued, GAO sent a fact sheet about life extension listing most of the information to be included in the report and asked for the EPA's comments.  (*See* Mem. from Tiber to Kete *et al.*  (Apr. 10, 1990) (Duke Energy Ex. 93).)  The fact sheet was widely distributed among the personnel in the Office of Policy, Planning and Evaluation. (*See id.*)

Chairman Dingell formally transmitted the report to the EPA and asked the Administrator about WEPCO and the GAO report's assessment.  (Letter from Dingell to Watkins *et al.*  (Oct. 9, 1990) (Duke Energy Ex. 94).)  Assistant Administrator William Rosenberg responded for the EPA, stating that "[a]s indicated in the GAO report, it is expected that most utility projects will *not* be similar to the WEPCO situation" and that the "[WEPCO] ruling is not expected to significantly affect power plant life extension projects."  (Letter from Rosenberg to Dingell (June 19, 1991) at 5-6 (Duke Energy Ex. 44).)

The EPA's position that life extension projects would not be significantly affected was again acknowledged in 1995.  The EPA's Assistant Administrator for Air and Radiation stated in response to an industry proposal to add a "restoration" exemption to the NSR programs that the EPA's position was that the "routine maintenance exclusion already included in the existing NSR regulations ... has the effect of excluding 'routine restorations' " from the requirements of the NSR programs. ("EPA's Response to Issues Raised by Industry on Clean Air Act Implementation Reform," *attached to* Letter from Nichols to Lewis (May 31, 1995) at 19 (Duke Energy Ex. 46).)

**\*\*14** [6] The EPA's position on WEPCO's life extension project and life extension

projects in general confirms the understanding that projects which are routine in the industry qualify as RMRR. To reconcile the EPA's previously stated position with its litigation position that RMRR applies only to routine activities performed at an individual unit, one must assume that a generating unit routinely and repetitively undergoes life extension projects. This assumption defies common sense. Further, this is an assumption the EPA explicitly rejected when it assumed for the purpose of assessing future utility air emission trends that coal-fired generating utilities would undergo life extension refurbishment once around age thirty. (Duke Energy Ex. 40 at App. C.) Through the EPA's statements in the Federal Register, its statements to the regulated community and Congress, and its conduct for at least two decades the EPA has established an interpretation of RMRR under which routine is judged by reference to whether a particular activity is routine in the industry. *See Shell Offshore Inc. v. Babbitt,* 238 F.3d 622, 629 (5th Cir.2001) ("existing practice" evidence of current interpretation of regulation). Accordingly, " '[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.' " *Alaska Prof'l Hunters Ass'n v. FAA,* 177 F.3d 1030, 1033-34 (D.C.Cir.1999) (quoting *Paralyzed Veterans of Am. v. D.C. Arena,* 117 F.3d 579, 586 (D.C.Cir.1997)).

*Duke Power*, 218 F.Supp. 2d 619, 636 - 637.