FILED

2006 Apr-24  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
|     Plaintiff,                 ) | |
|                           ) | |
| ALABAMA ENVIRONMENTAL    ) | |
| COUNCIL, INC.                 ) | |
|     Plaintiff-Intervenor,    ) | |
|                           )    CASE NO.  2:01-cv-00152-VEH | |
|           v.            ) | |
|                           ) | |
| ALABAMA POWER COMPANY,   ) | |
|     Defendant.               ) | |
| _____ ) | |

**PARTIAL CONSENT DECREE**

# **TABLE OF CONTENTS**

I. JURISDICTION AND VENUE ........................................................................................4

II. APPLICABILITY ........................................................................................................5

III. DEFINITIONS ..........................................................................................................5

IV. NO$_X$ EMISSIONS CONTROL ......................................................................................11

V. SO$_2$ EMISSIONS CONTROL .......................................................................................14

VI. PM EMISSIONS CONTROL ......................................................................................18

VII. MERCURY EMISSIONS MONITORING ....................................................................19

VIII. NETTING CREDITS OR OFFSETS ..........................................................................20

IX. RETIREMENT OF EMISSION ALLOWANCES AND RESTRICTION
ON USE OF SO$_2$ ALLOWANCES AFTER 2020 ....................................................................21

X. CIVIL PENALTY ......................................................................................................23

XI. RESOLUTION OF CLAIMS .......................................................................................24

XII. PERIODIC REPORTING .........................................................................................25

XIII. STIPULATED PENALTIES ....................................................................................27

XIV. FORCE MAJEURE ...............................................................................................31

XV. DISPUTE RESOLUTION .........................................................................................35

XVI. PERMITS.............................................................................................................37

XVII. INFORMATION COLLECTION AND RETENTION ...................................................39

XVIII. NOTICES ..........................................................................................................41

XIX. SALES OR TRANSFERS OF OWNERSHIP INTERESTS ..............................................43

XX. EFFECTIVE DATE ................................................................................................46

XXI. RETENTION OF JURISDICTION ............................................................................46

XXII. MODIFICATION ........................................................................................................46

XXIII. GENERAL PROVISIONS ......................................................................................46

XXIV. SIGNATORIES AND SERVICE ...........................................................................50

XXV. PUBLIC COMMENT ..............................................................................................50

XXVI. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER
DECREE .............................................................................................................................51

XXVII. FINAL JUDGMENT ............................................................................................52

## PARTIAL CONSENT DECREE

WHEREAS, the United States of America ("the United States"), on behalf

of the United States Environmental Protection Agency ("EPA"), filed on January

12, 2001, a Complaint ("Initial Complaint") and on March 4, 2005, filed an

Amended Complaint against Alabama Power Company ("APC") pursuant to, *inter*

*alia*, Sections 113(b) and 167 of the Clean Air Act ("the Act"), 42 U.S.C.

§§ 7413(b) and 7477, seeking injunctive relief and civil penalties for alleged

violations of the Prevention of Significant Deterioration ("PSD") provisions in Part

C of Subchapter I of the Act, 42 U.S.C. §§ 7470-92;

WHEREAS, the United States' Amended Complaint added an alternative

claim that APC violated the New Source Performance Standards ("NSPS"),

Section 111, 42 U.S.C. § 7411, and Subpart Da regulations with respect to Units 3

and 4 at APC's Plant Miller;

WHEREAS, Alabama Environmental Council, Inc. ("AEC") filed on April

26, 2001, a Complaint in Intervention against APC asserting the same claims

against APC as were asserted in the United States' Initial Complaint, and the Court

permitted AEC to intervene and participate on a limited basis by order dated May

29, 2001;

WHEREAS, in the Fifth Claim for Relief in the United States' Amended Complaint, the United States alleges that APC violated the Act by constructing Units 3 and 4 at APC's Plant Miller without obtaining required permits and undergoing required review under the PSD provisions of the Act, EPA regulations promulgated thereunder, and the Alabama State Implementation Plan ("Alabama SIP") because the United States alleges, *inter alia,* that APC did not undertake a continuous program to construct Units 3 and 4 at Plant Miller and to complete construction within a reasonable time; and, alternatively, the United States alleges that APC violated the NSPS provisions of the Act by failing to comply at Plant Miller Units 3 and 4 with the provisions of the NSPS Subpart Da regulations promulgated by EPA;

WHEREAS, in the Ninth and Tenth Claims for Relief in AEC's Complaint, AEC alleges, *inter alia,* that APC did not undertake a continuous program to construct Units 3 and 4 at Plant Miller and/or failed to complete construction within a reasonable time, thereby subjecting the construction of both units to the PSD provisions of the Act and applicable regulations promulgated thereunder, and applicable provisions of the Alabama SIP, without complying with such provisions;

WHEREAS, the United States' Amended Complaint (Fifth Claim for Relief) and AEC's Complaint (Ninth and Tenth Claims for Relief) allege claims against APC under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477, and 28 U.S.C. § 1355;

WHEREAS, APC answered the Initial and Amended Complaints, denying any liability for any of the claims alleged therein, and continues to deny any such liability, and APC was not required to respond to AEC's Complaint under the Court's May 29, 2001 Order and denies any liability thereunder;

WHEREAS, EPA provided APC and the State of Alabama with actual notice of violations pertaining to the alleged violations, in accordance with Section 113(a)(1) and (b) of the Act, 42 U.S.C. § 7413(a)(1) and (b);

WHEREAS, the Parties anticipate that the installation and operation of the pollution control equipment and implementation of other relief referenced in this Consent Decree will achieve reductions in emissions of sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_x$) and particulate matter (PM);

WHEREAS, the United States, AEC and APC have agreed, and the Court by entering this Consent Decree finds, that:  this Consent Decree has been negotiated in good faith and at arms length; this settlement is fair, reasonable, in the best interest of the Parties and in the public interest; this settlement is consistent with

the air quality improvement goals of the Act; and, entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter; and

WHEREAS, the United States, AEC and APC have consented to entry of this Consent Decree without trial of any issue.

NOW, THEREFORE, without any admission of fact or law, and without any admission by APC that any of the violations alleged by the United States in its Initial and Amended Complaint or by AEC in its Complaint ever occurred, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I. <u>JURISDICTION AND VENUE</u>

1.     This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c).  Solely for the purposes of this Consent Decree and the underlying Amended Complaint filed by the United States and Complaint filed by AEC, APC waives all objections and defenses that it may have to the Court's jurisdiction over this action, to the Court's jurisdiction over APC, and to venue in this District.  APC shall not challenge the terms of this Consent Decree or this

Court's jurisdiction to enter and enforce this Consent Decree; however, APC reserves all arguments it may have regarding the construction of terms of this Consent Decree in any proceeding in which the Court is asked to construe or enforce this Decree.  For purposes of those portions of the Amended Complaint filed by the United States and Complaint filed by AEC which are resolved by the Consent Decree, and for purposes of entry and enforcement of this Consent Decree, APC waives any defense or objection based on standing.  Except as expressly provided for herein, this Consent Decree shall not create any rights in any party other than the United States and APC.  Except as provided in Section XXV (Public Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II. APPLICABILITY

2.     Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the United States, AEC, and APC, APC's successors and assigns, and APC's officers, employees, and agents solely in their capacities as such.

## III. DEFINITIONS

3.     A "30-Day Rolling Average Emission Rate" for a Unit means and is calculated by (A) summing the total pounds of the pollutant in question emitted from the Unit during an Operating Day and the previous twenty-nine (29)

Operating Days; (B) summing the total heat input to the Unit in mmBTU during the Operating Day and during the previous twenty-nine (29) Operating Days; and (C) dividing the total number of pounds of pollutants emitted during the thirty (30) Operating Days by the total heat input during the thirty (30) Operating Days, and converting the resulting value to lbs/mmBTU. A new 30-Day Rolling Average Emission Rate shall be calculated for each new Operating Day. Each 30-Day Rolling Average Emission Rate shall exclude all emissions that occur during all periods of startup, shutdown and malfunction as defined in 40 C.F.R. § 60.2.

4.     A "365-Day Rolling Average Emission Rate" for a Unit means and is calculated by (A) summing the total pounds of the pollutant in question emitted from the Unit during an Operating Day and the previous three hundred sixty-four (364) Operating Days; (B) summing the total heat input to the Unit in mmBTU during the Operating Day and during the previous three hundred sixty-four (364) Operating Days; and (C) dividing the total number of pounds of pollutants emitted during the three hundred sixty-five (365) Operating Days by the total heat input during the three hundred sixty-five (365) Operating Days, and converting the resulting value to lbs/mmBTU. A new 365-Day Rolling Average Emission Rate shall be calculated for each new Operating Day. Each 365-Day Rolling Average

Emission Rate shall include all emissions, including those that occur during all periods of startup, shutdown, and malfunction as defined in 40 C.F.R. § 60.2.

5.      "30-Day Rolling Average Removal Efficiency" means the percent reduction of the pollutant in question achieved by a Unit's pollution control device over a 30-day period as determined by 40 C.F.R. Part 60, Appendix A, Method 19, Section 12.5.3.  A new 30-Day Rolling Average Removal Efficiency shall be calculated for each new Operating Day.  Each 30-Day Rolling Average Removal Efficiency shall exclude all emissions that occur during any period of malfunction (as defined in 40 C.F.R. § 60.2) of the FGD.

6.      "CEMS" or "Continuous Emission Monitoring System" means, for obligations involving $NO_x$ and $SO_2$ under this Consent Decree, the devices defined in 40 C.F.R. § 72.2 and installed and maintained as required by 40 C.F.R. Part 75.

7.      "Clean Air Act" or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

8.      "Consent Decree" or "Decree" means this Partial Consent Decree.

9.      "Plant Miller" means Unit 3 and Unit 4 (and shall exclude Units 1 and 2 unless expressly stated otherwise herein) of the James H. Miller Jr. Power Station, located near West Jefferson, Alabama.

- 7 -

10.    "Alabama SIP" means the State Implementation Plan promulgated by the State of Alabama and approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

11.    "Emission Rate" means the number of pounds of pollutant emitted per million BTU of heat input ("lb/mmBTU") measured in accordance with this Consent Decree.

12.    "EPA" means the United States Environmental Protection Agency.

13.    "Flue Gas Desulfurization System" or "FGD" means a pollution control device that employs flue gas desulfurization technology for the reduction of sulfur dioxide.

14.    "Fossil Fuel" means natural gas, petroleum, coal, and any form of solid, liquid, or gaseous fuel derived from such material for the purpose of creating useful heat.

15.    "lb/mmBTU" means one pound of a pollutant per million British thermal units of heat input.

16.    "Mercury Continuous Emission Monitoring System" and "Mercury CEMS" mean a continuous emission monitoring system as defined in 40 C.F.R. § 72.2.

17.    "MW" means a megawatt or one million watts.

- 8 -

18.    "National Ambient Air Quality Standards" or "NAAQS" means national ambient air quality standards that are promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409.

19.    "$NO_x$" means oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

20.    "Nonattainment NSR" means the nonattainment area New Source Review program under Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, and 40 C.F.R. Part 51.

21.    "NSPS" means New Source Performance Standards within the meaning of Part A of Subchapter I, of the Clean Air Act, 42 U.S.C. § 7411, and 40 C.F.R. Part 60.

22.    "Operating Day" means any calendar day on which a Unit fires Fossil Fuel.

23.    "Parties" means APC, AEC, and the United States of America, and "Party" means any one of the three named "Parties."

24.    "Permitting Authority" means the state or local authority from which APC is required to obtain permits, licenses, or approvals in order to install or operate a source of air pollution.

25.    "Plaintiffs" means the United States of America and includes

Intervenor Plaintiff AEC.

26.    "PM" means particulate matter, measured in accordance with the provisions of this Consent Decree.

27.    "PM Emission Rate" means the number of pounds of PM emitted per million BTU of heat input (lb/mmBTU), as measured in stack tests in accordance with the provisions of this Consent Decree.

28.    "PSD" means Prevention of Significant Deterioration within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 - 7492 and 40 C.F.R. Part 52.

29.    "Selective Catalytic Reduction System" or "SCR" means a pollution control device that employs selective catalytic reduction technology for the reduction of $NO_x$ emissions.

30.    "$SO_2$" means sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

31.    "$SO_2$ Allowance" means "allowance" as defined at  42 U.S.C. § 7651a(3): "an authorization, allocated to an affected unit by the Administrator [of EPA] under [Subchapter IV of the Act], to emit, during or after a specified calendar year, one ton of sulfur dioxide."

32.    "Title V Permit" means the permit required of APC's major sources

under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

33.     "Unit" means, for the purposes of this Consent Decree, collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment and systems necessary for the production of electricity.  An electric utility steam generating station may comprise one or more Units.

## IV.  NO$_x$ EMISSIONS CONTROL

34.     Commencing no later than May 1, 2008, APC shall operate SCR technology on a year-round basis at Plant Miller Units 3 and 4 consistent with the technological limitations, manufacturers' specifications and good engineering and maintenance practices for the SCRs and so as to minimize NO$_x$ emissions to the extent reasonably practicable, whenever those units are in operation and combusting fossil fuel, except as is provided in Paragraph 36 below.

35.     Beginning May 1, 2008, APC shall comply with both of the following NO$_x$ emission limitations at each of Miller Units 3 and 4:  (1) a 30-Day Rolling Average Emission Rate of 0.100 lb/mmBTU, and (2) a 365-Day Rolling Average Emission Rate of 0.100 lb/mmBTU, both of which are subject to the provisions

- 11 -

concerning SCR maintenance provided in Paragraphs 36 and 37 below.  The first averaging period for each of the above emission limits shall begin with the first Operating Day on or after May 1, 2008.

36.    If the SCRs at either or both of Miller Units 3 and 4 are offline for SCR maintenance, APC may continue to operate said Unit(s) without operating the SCR(s) associated with the Unit(s), so long as at all times at least two of the Plant Miller Units 1, 2, 3 and 4 are subject to the emission limits established in Paragraph 35 above.  APC may comply with these average emission rate requirements by substituting the emissions data from either Miller Units 1 or 2 for the emissions data from whichever of Miller Units 3 or 4 is not operating the SCR (due to SCR maintenance) for the period that unit's SCR is offline.  If the SCRs at both Miller Units 3 and 4 are offline for maintenance simultaneously, APC may substitute the emissions data from both Miller Units 1 and 2 for the emissions data from Miller Units 3 and 4 for the period the Miller Units 3 and 4 SCRs are offline. Any period during which APC substitutes emissions data from Miller Units 1 or 2 for emissions data from Miller Units 3 or 4 pursuant to this Paragraph shall be termed a "substitution period" for purposes of this Section.  APC, however, will not schedule SCR maintenance during the period from May 1 through September 30 of each year.

37.     Within eight (8) months of the end of any substitution period, APC will offset 50% of the $NO_x$ emissions (calculated in tons) from the affected unit (i.e., the unit at which the SCR is offline due to SCR maintenance) in excess of the $NO_x$ emissions that would have been emitted from the affected unit at an emission rate of 0.100 lb/mmBTU with tons of $NO_x$ emissions avoided by operating either Plant Miller Units 3 or 4 or both at $NO_x$ emission rates below 0.100 lb/mmBTU. Beginning May 1, 2008, APC may "bank" all tons of $NO_x$ emissions avoided by operating Plant Miller Units 3 or 4 or both at $NO_x$ emission rates below 0.100 lb/mmBTU at any time and may use those "banked" tons to satisfy the offset obligation above for any substitution period that occurs within thirty-six (36) months.

38.     In determining the emission limits established in Paragraph 35 above, APC shall use data from CEMS operated in accordance with 40 C.F.R. Part 75; however, the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply to such determinations.

39.     Within one-hundred-eighty (180) days of May 1, 2008, APC shall demonstrate through CEMS data compliance with the 30-Day Rolling Average Emission Rate of 0.100 lb/mmBTU for $NO_x$ for each of Plant Miller Units 3 and 4. APC shall also maintain records to verify utilization and compliance with

- 13 -

Paragraphs 36 and 37 above.

## V. $SO_2$ EMISSIONS CONTROL

40.     APC shall have installed and commenced operation of an FGD on

each of Plant Miller Units 3 and 4 by December 31, 2011.

41.     APC shall operate each FGD on Plant Miller Units 3 and 4 on a year-

round basis consistent with the technological limitations, manufacturers'

specifications, and good engineering and maintenance practices for the FGD and

so as to minimize $SO_2$ emissions to the extent reasonably practicable.

42.     In determining 30-Day Average Removal Efficiencies for $SO_2$ under

this Decree, APC shall use 40 C.F.R. Part 60, Appendix A, Method 19, Section

12.5.3 and data from CEMS operated in accordance with 40 C.F.R. Part 75 using

$SO_2$ CEMS data from both the inlet and outlet of the control device; however, the

missing data substitution procedures in 40 C.F.R. Part 75 shall not apply to such

determinations.

43.     For each 30-day period which begins on or after December 31, 2011,

APC shall comply with a 30-Day Rolling Average Removal Efficiency of 95% for

$SO_2$ for each of Plant Miller Units 3 and 4.   However, in the event APC chooses to

combust coal with a sulfur content greater than 1% sulfur by weight, a 30-Day

Rolling Average Removal Efficiency of not less than 90% shall be established

- 14 -

pursuant to this Section.  In the event APC chooses to revert to combusting coal with a sulfur content less than 1% sulfur by weight, APC shall revert to complying with the 30-Day Rolling Average Removal Efficiency of 95% beginning with the first 30-day period available after the change in coal.

44.    Only in the event APC chooses to combust coal with a sulfur content greater than 1% sulfur by weight, APC shall evaluate the 30-Day Rolling Average Removal Efficiency that it can consistently achieve at Plant Miller Units 3 and 4 over a 12-month period (the "$SO_2$ Trial Period") that shall begin when APC first begins combusting such coal.  During the $SO_2$ Trial Period, and until a new 30-Day Rolling Average Removal Efficiency is established under this Section, APC shall comply with a 30-Day Rolling Average Removal Efficiency of at least 90%.

45.  Within seventy-five (75) days after the end of any such $SO_2$ Trial Period, APC shall submit a $SO_2$ Emissions Report to EPA that includes: (a) all $SO_2$ 30-Day Rolling Average Removal Efficiency calculations; (b) a complete analysis of the ability of Plant Miller Units 3 and 4 to each consistently achieve a $SO_2$ 30-Day Rolling Average Removal Efficiency consistent with manufacturers' specifications and industry experience for similar units combusting similar coal (including, if applicable, a thorough analysis of any barriers to achieving such a 30-Day Rolling Average Removal Efficiency and measures taken by APC during

- 15 -

the $SO_2$ Trial Period to overcome any such barriers);  and (c) APC's recommendation for the $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4 that shall be required under this Decree for the future operation of Plant Miller Units 3 and 4 when combusting the type of coal combusted during the $SO_2$ Trial Period.

46.     EPA shall review the $SO_2$ Emissions Report and, after consultation with AEC, notify APC within forty-five (45) days of receipt whether or not EPA agrees with APC's recommendation for the $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4 that shall be required under this Decree for the future operation of Plant Miller Units 3 and 4.  If EPA agrees with APC's recommendation, APC shall comply with that $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4 commencing at the beginning of the first full month which begins at least seven (7) days following EPA's notification to APC of such agreement.  If EPA does not agree with APC's recommendation, EPA shall set forth in its notice its recommended alternative and the reasons therefor.

47.     If, based on the $SO_2$ Emissions Report, APC and EPA have made different recommendations for the future $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4, APC and EPA shall meet and confer in a

- 16 -

good faith effort to reach agreement (after consultation with or participation by AEC) within forty-five (45) days after EPA's notification to APC of EPA's recommendation.  Should APC and EPA reach agreement, APC shall comply with the agreed $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4 commencing at the beginning of the first full month which begins at least seven (7) days following such agreement.

48.     If, following good faith efforts under Paragraph 47 above to reach agreement, APC and EPA are unable to reach agreement, the matter shall be submitted to the Court for resolution.  Either APC or EPA may initiate the process for judicial resolution of this dispute, after undertaking the meet and confer process described in Paragraph 47 above, by notifying the other Parties of its intention to submit the matter to the Court.  Within thirty (30) days after such notification, APC and EPA shall submit a joint petition with this Court to determine the $SO_2$ 30-Day Rolling Average Removal Efficiency for each of Plant Miller Units 3 and 4 that shall apply under this Decree.  Simultaneously with the filing of the joint petition, APC and EPA shall submit their initial position statements and all data or other information in support thereof.   Any Party wishing to respond to any other Party's initial position statement shall do so by filing a response within twenty-one (21) days of the initial position statement filing date.  In deciding any such dispute

- 17 -

under this Paragraph, the Court shall determine the $SO_2$ 30-Day Rolling Average Removal Efficiency for each of Plant Miller Units 3 and 4 that is consistently and reasonably attainable and sustainable at those units based on operations consistent with the standards set forth in Paragraph 41 above, and based on any relevant information or data presented by any of the Parties, including but not limited to data set forth in APC's $SO_2$ Emissions Report.

49.    Promptly after it has been finally determined pursuant to this Section, the $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4 that shall apply under this Decree for the future operation of Plant Miller Units 3 and 4 (when combusting the type of coal combusted during the $SO_2$ Trial Period) shall be jointly submitted by the Parties as a Modification to the Decree pursuant to Section XXII (Modification).

## VI.  PM EMISSIONS CONTROL

50.    Beginning December 31, 2006, APC shall achieve and maintain a PM Emission Rate of no greater than 0.030 lb/mmBTU at the boiler exit stack of each of Plant Miller Units 3 and 4.  Compliance with this emission rate shall be determined by a performance test conducted within one-hundred-eighty (180) days and every year thereafter; however, if the performance test shows that the PM Emission Rate is equal to or less than 0.015 lb/mmBTU, the test may be conducted

- 18 -

every other year so long as a PM Emission Rate of 0.015 lb/mmBTU is

maintained.  Within thirty (30) days of completing this performance test obligation,

APC shall demonstrate compliance with the PM Emission Rate of 0.030

lb/mmBTU at the boiler exit stack of Plant Miller Units 3 and 4.

51.     The reference methods and procedures for determining compliance

with PM Emission Rates shall be those specified in 40 C.F.R. Part 60, Appendix A,

Method 5 or Method 17 (as appropriate depending on the stack temperature).  Use

of any particular method shall conform to the EPA requirements specified in 40

C.F.R. Part 60, Appendix A and 40 C.F.R. § 60.50Da (b) and (e), or any federally

approved method contained in the Alabama SIP.  APC shall calculate the PM

Emission Rates from the exit stack test results in accordance with 40 C.F.R.

§ 60.8(f).

## VII. <u>MERCURY EMISSIONS MONITORING</u>

52.     APC shall install, certify and operate a mercury continuous emissions

monitoring system ("Mercury CEMS") at Plant Miller by December 31, 2008.

Thereafter, APC shall operate the Mercury CEMS at Plant Miller and shall retain

the data generated from it pursuant to Section XVII (Information Collection and

Retention) of this Decree.

## VIII.  NETTING CREDITS OR OFFSETS

53.     Emission reductions generated by APC to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a netting credit under the Clean Air Act's Nonattainment NSR and PSD programs.

54.     The limitations on the generation and use of netting credits or offsets set forth in the previous Paragraph do not apply to emission reductions achieved by Unit 3 or Unit 4 at Plant Miller that exceed those achieved by attaining a $NO_x$ 30-Day Rolling Average Emission Rate of 0.100 lb/mmBTU and a $SO_2$ 30-Day Rolling Average Removal Efficiency of 95% (or such alternate 30-Day Rolling Average Removal Efficiency as may be established pursuant to Paragraphs 43-49). For purposes of this Paragraph, emission reductions from Unit 3 or Unit 4 are greater than those required under this Consent Decree if they result from compliance with federally-enforceable emission limits that are more stringent than the above-mentioned $NO_x$ 30-Day Rolling Average Emission Rate and $SO_2$ 30-Day Rolling Average Removal Efficiency and applicable provisions of the Clean Air Act or the Alabama SIP.

55.     Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the State

- 20 -

of Alabama or EPA as creditable contemporaneous emission decreases for the

purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42

U.S.C. § 7410, or in determining impacts on NAAQS, PSD increment, or air

quality related values, including visibility, in a Class I area.

IX.  RETIREMENT OF EMISSION ALLOWANCES AND RESTRICTION ON
USE OF $SO_2$ ALLOWANCES AFTER 2020

56**.**    Not later than forty-five (45) days after entry of this Consent Decree,

APC shall retire, by means of a transfer to a nonprofit third-party recipient as

provided below, vintage 2007 $SO_2$ emission allowances.  The value of the

allowances to be transferred shall be not less than four million, nine-hundred

thousand dollars ($4,900,000) on the date of transfer.  The actual number of

allowances transferred is to be determined by the price of such allowances on the

date of transfer.  APC shall use the United States Environmental Protection

Agency Acid Rain Program Allowance Transfer Form (OMB No. 2060-0258) to

effect this transfer to the third-party recipient.

57.    APC shall, by written agreement with the third-party recipient of the

$SO_2$ emission allowances (which shall be a 501(c)(3) organization mutually

agreeable to APC and EPA), provide that said organization shall not sell, trade, or

otherwise exchange any of the $SO_2$ emission allowances transferred to it by APC

pursuant to the preceding Paragraph.

- 21 -

58.     Pursuant to Section XII (Periodic Reporting) of this Decree, APC shall include a description of APC's transfer of $SO_2$ emission allowances in the first report submitted to Plaintiffs following the date said transfer was required by Paragraph 56.  Such report shall:

(i) provide proof of the value of the $SO_2$ emission allowances on the date of transfer;

(ii) identify the nonprofit third-party organization to which APC has made said transfer;

(iii) list the serial numbers of the transferred $SO_2$ emission allowances; and

(iv) include a certification by the third-party recipient stating that the recipient will not sell, trade, or otherwise exchange any of the $SO_2$ emission allowances, will not use any of the $SO_2$ emission allowances to meet any obligation imposed by the Clean Air Act or any environmental law, and will permanently surrender to EPA all of the transferred allowances within three (3) years after said organization's receipt of the transferred allowances from APC.

59.     The Parties hereby agree and acknowledge that APC has agreed to make the transfer of $SO_2$ emission allowances pursuant to this Section as part of an appropriate response to the claims addressed by this Consent Decree; that this

- 22 -

transfer is not in lieu of any fine or penalty; and, that APC regards such transfer as voluntary and in furtherance of APC's commitment to environmental stewardship.

60.     Beginning January 1, 2021, APC shall not sell, trade, or otherwise exchange any Plant Miller excess $SO_2$ emission allowances outside of the APC system.  For purposes of this provision, (a) "Plant Miller excess emission allowances" shall mean all $SO_2$ emission allowances generated by the operation of Plant Miller Units 3 and 4 that APC does not need to meet applicable state or regulatory requirements for those units, including the Clean Air Interstate Rule; and (b) "the APC system" shall mean all coal-fired electric generating units that APC owns or operates as of the time the restriction in this Paragraph applies.

## X. CIVIL PENALTY

61.     Not later than forty-five (45) days after entry of this Consent Decree, APC shall pay to the United States $100,000 to resolve the United States' claim for a civil penalty.  The payment shall be made by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2001V00043 and DOJ Case Number 90-5-2-1-06994 and the civil action case name and case number of this action.  The costs of such EFT shall be APC's responsibility.  Payment shall be made in accordance with instructions provided to APC by the Financial Litigation Unit of

the U.S. Attorney's Office for the Northern District of Alabama.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, APC shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XVIII (Notices) of this Consent Decree.

62.     Failure to timely make payment shall subject APC to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render APC liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

63.     Payments made pursuant to this Section are not tax-deductible expenditures for purposes of federal law, pursuant to Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f).

## XI.  RESOLUTION OF CLAIMS

64.     Entry of this Decree shall resolve all civil claims for relief as to Plant Miller that were alleged by the United States in its Initial Complaint and Amended Complaint, and all claims for relief as to Plant Miller that were alleged by AEC in its Complaint.

## XII.  PERIODIC REPORTING

65.    Beginning thirty (30) days after the end of the first full calendar quarter following the entry of this Consent Decree, continuing on a semi-annual basis until December 31, 2013, or until enforcement of the obligations of this Consent Decree is conditionally terminated pursuant to Paragraph 132 of this Decree, whichever is earlier, and in addition to any other express reporting requirement in this Consent Decree, APC shall submit to EPA a progress report.

66.    The progress report shall contain the following information:

a.    all information necessary to determine compliance with this Consent Decree;

b.    all information indicating that the installation and commencement of operation for a pollution control device may be delayed, including the nature and cause of the delay, and any steps taken by APC to mitigate such delay.

67.    In addition to the progress reports required pursuant to this Section, and until enforcement of the obligations of this Consent Decree is conditionally terminated pursuant to Paragraph 132 of this Decree, APC shall provide a written report to EPA of any violation of the requirements of this Consent Decree, including but not limited to any exceedances of the $NO_x$ and $SO_2$ emission limits

- 25 -

established in Paragraphs 35 and 43 and, if applicable, Paragraphs 44 through 49 above, within ten (10) business days of when APC knew or should have known of any such violation.  In this report, APC shall explain the cause or causes of the violation and all measures taken or to be taken by APC to prevent such violations in the future.

68.    Each APC report shall be signed by APC's Vice President of Environmental Affairs, or, in his or her absence, any officer of APC, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete.  I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

- 26 -

## XIII.  STIPULATED PENALTIES

69.     For any failure by APC to comply with the terms of this Consent

Decree, and subject to the provisions of Sections XIV (Force Majeure) and XV

(Dispute Resolution), APC shall pay, within thirty (30) days after receipt of written

demand by the United States, the following stipulated penalties to the United

States:

| Consent Decree Violation | Stipulated Penalty (Per day per violation, unless otherwise specified) |
|---|---|
| a.  Failure to make payment as specified in Section X (Civil Penalty) of this Consent Decree | $10,000 |
| b.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_x$, 30-Day Rolling Average Removal Efficiency for $SO_2$, or Emission Rate for PM set forth in or established pursuant to this Consent Decree | $ 5,000 |
| c.  Failure to comply with any applicable 365-Day Rolling Average Emission Rate established by this Consent Decree | $200,000 for a 365- Day Rolling Average Emission Rate violation, plus $5,000 for each subsequent 365-Day Rolling Average Emission Rate violation that includes any day in a previously-assessed 365-Day Rolling Average Emission Rate violation |
| d.  Failure to install or operate Mercury CEMS as specified in Section VII | $1,000 per day per violation |

- 27 -

| e.  Failure to donate $SO_2$ Allowances as required by Section IX (Retirement of Emission Allowances and Restriction on Use of $SO_2$ Allowances After 2020) | (a) $32,500 plus (b) $1,000 per day |
|---|---|
| f.  Any other violation of this Consent Decree | $1,000 |

70.     Violation of an Emission Rate or Removal Efficiency that is based on a 30-Day Rolling Average is a violation on every day on which the average is based.

71.     Where a violation of a 30-Day Rolling Average Emission Rate or 30-Day Rolling Average Removal Efficiency (for the same pollutant and from the same Unit) recurs, APC shall not pay a daily stipulated penalty for any day of the recurrence for which a stipulated penalty has already been paid.

72.     All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

73.     APC shall pay all stipulated penalties to the United States within thirty (30) days of receipt of written demand to APC from the United States, and

shall continue to make such payments every thirty (30) days thereafter until the violation(s) no longer continue(s), unless APC elects within twenty (20) days of receipt of written demand to APC from the United States to dispute stipulated penalties in accordance with the provisions in Section XV (Dispute Resolution) of this Consent Decree.

74.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 72 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.     If the dispute is resolved by agreement, or by a decision of EPA pursuant to Section XV (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within thirty (30) days of the effective date of the agreement or of the receipt of EPA's decision;

b.     If the dispute is appealed to the Court and EPA prevails in whole or in part, APC shall, within sixty (60) days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with accrued interest, except as

- 29 -

provided in Subparagraph c;

c.     If the Court's decision is appealed by APC or EPA, APC shall, within fifteen (15) days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with accrued interest.

For purposes of this Paragraph, the accrued stipulated penalties agreed by APC and EPA, or determined by APC and EPA through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 69.

75.     All stipulated penalties shall be paid in the manner set forth in Section X (Civil Penalty) of this Consent Decree.

76.     Should APC fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

77.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States by reason of APC's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, APC shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such

violation.

## XIV. <u>FORCE MAJEURE</u>

78.     For purposes of this Consent Decree, a "Force Majeure Event" shall

mean an event that has been or will be caused by circumstances beyond the control

of APC, its contractors, or any other entity controlled by or working for APC that

delays compliance with any provision of this Consent Decree or otherwise causes a

period of noncompliance with any provision of this Consent Decree despite APC's

exercise of due care / best efforts to fulfill the obligation.

79.     <u>Notice of Force Majeure Events</u>.  If any Force Majeure event occurs

or has occurred that may delay compliance with or otherwise cause a period of

noncompliance with any obligation under this Consent Decree, APC shall notify

EPA in writing as soon as practicable of the event, but, except for good cause

shown, in no event later than thirty (30) business days following the date APC first

knew, or by the exercise of due diligence should have known, that the event caused

or may cause such delay or violation.  For purposes of this Section, "good cause"

shall mean a catastrophic event (e.g., hurricane) or other event that necessarily

impaired APC's capacity to comply with the notice requirement of this Paragraph.

In this notice, APC shall describe the event, the anticipated length of time of the

event and any delay it caused or will cause, and the measures, if any, taken or to be

taken by APC to prevent or minimize the delay or period of noncompliance.  APC shall adopt all reasonable measures to avoid or minimize such delays.  Failure by APC to give notice shall not void or constitute a waiver of APC's ability to claim Force Majeure, provided APC demonstrates good cause for such failure to give notice.

80.   <u>EPA's Response</u>.  EPA shall notify APC in writing of its decision regarding APC's claim of Force Majeure within thirty (30) business days of receipt of the notice provided under Paragraph 79.  If EPA (after consultation with AEC) agrees that a Force Majeure Event occurred, EPA and APC shall stipulate to the period of time during which the event occurred and the period of time for excused non-performance and/or the period of time for any extension of deadline(s) for performance of the affected compliance requirement(s).  In such circumstances, an appropriate modification shall be made pursuant to Section XXII (Modification) of this Consent Decree.

81.   <u>Disagreement</u>.  If EPA does not accept APC's claim of Force Majeure, or if EPA and APC cannot agree on the length of the event or delay actually caused by the Force Majeure Event, or if EPA does not agree that any failure by APC to give notice of a Force Majeure Event was for good cause, the matter shall be resolved in accordance with Section XV (Dispute Resolution) of

- 32 -

this Consent Decree.

82.   Burden of Proof.  In any dispute regarding Force Majeure, APC shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event.  APC shall also bear the burden of proving that APC gave the notice (or had good cause for any failure to give notice) required by this Section and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event.  An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

83.   Events Excluded.  Unanticipated or increased costs or expenses associated with the performance of APC's obligations under this Consent Decree shall not constitute a Force Majeure Event.

84.   Potential Force Majeure Events.  The Parties agree that, depending upon the circumstances related to an event and APC's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section:  construction, labor, or equipment delays; malfunction of a Unit or emission control device; natural gas or coal supply interruption or unavailability; pollution control catalyst, chemicals

or materials supply interruption or unavailability; acts of God; acts of war or terrorism; a condition or circumstance deemed by the permitting authority to constitute an emergency under the operating permit for Plant Miller; and orders by a government official, government agency, or other regulatory body acting under and authorized by applicable law that directs APC to supply electricity in response to a system-wide (state-wide, regional, or national) emergency or to perform any act or refrain from performing any act that prevents or delays compliance with obligations in this Consent Decree.  Depending upon the circumstances and APC's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of APC and APC has taken appropriate steps to obtain the necessary permit.

85.    As part of the resolution of any matter submitted to this Court under Section XV (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, APC and EPA by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States or approved by the Court.  APC shall be liable for stipulated penalties for its failure thereafter to complete the work

in accordance with the extended or modified schedule.

## XV. DISPUTE RESOLUTION

86.     Other than for disputes regarding the $SO_2$ 30-Day Rolling Average Removal Efficiency for Plant Miller Units 3 and 4 (the resolution of which is provided for under Section V), the dispute resolution procedure provided by this Section shall be available to govern the resolution of all disputes arising under this Consent Decree, provided that the party invoking such procedure has first made a good faith attempt to resolve the matter with the other party.

87.     The dispute resolution procedure required herein shall be invoked by either APC or EPA giving written notice to the other party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing party's position with regard to such dispute.  The party receiving such a notice shall acknowledge receipt of the notice, and APC and EPA shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) days following receipt of such notice.

88.     Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations between APC and EPA. Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting among the disputing parties' representatives

unless they agree in writing to shorten or extend this period.  During the informal negotiations period, APC and EPA may also submit their dispute to a mutually-agreed-upon alternative dispute resolution ("ADR") forum if they agree that the ADR activities can be completed within the 30-day informal negotiations period (or such longer period as APC and EPA may agree to in writing).

89.   If APC and EPA are unable to reach agreement during the informal negotiation period, EPA shall provide APC with a written summary of its position regarding the dispute.  The written position provided by EPA shall be considered binding unless, within forty-five (45) calendar days thereafter, APC seeks judicial resolution of the dispute by filing a petition with this Court.  EPA may respond to the petition within forty-five (45) calendar days of filing.

90.   Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Section may be shortened upon motion of APC or EPA.

91.   This Court shall not draw any inferences nor establish any presumptions adverse to either party as a result of invocation of this Section or APC and EPA's inability to reach agreement.

92.   As part of the resolution of any dispute under this Section, in appropriate circumstances APC and EPA may agree, or this Court may order, an

extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.  APC shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that APC shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

93.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  The Parties reserve their right to assert what shall be the applicable standard of review governing resolution of the particular dispute, and shall state their respective positions concerning the applicable standard of review in their initial filings with the Court under Paragraph 89.

XVI. PERMITS

94.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires APC to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under state law, APC shall make such application in a timely manner.

95.     Notwithstanding the previous Paragraph, nothing in this Consent

- 37 -

Decree shall be construed to require APC to apply for or obtain a PSD or

Nonattainment NSR permit for physical changes in, or changes in the method of

operation of, any APC System Unit that would give rise to claims resolved by

Section XI (Resolution of Claims) of this Consent Decree.

96.     Notwithstanding the reference to federally enforceable operating

permits and site-specific revisions to the Alabama SIP in this Consent Decree, the

enforcement of such permits and provisions shall be in accordance with their own

terms and the Act.  The federally enforceable operating permits and site-specific

revisions to the Alabama SIP shall not be enforceable under this Consent Decree,

although any term or limit established by or under this Consent Decree shall be

enforceable under this Consent Decree regardless of whether such term has or will

become part of a federally enforceable operating permit or a site-specific revision

to the Alabama SIP, subject to the terms of Section XXVI (Conditional

Termination of Enforcement Under Decree) of this Consent Decree.

97.     When APC applies to renew its Title V operating permit for Plant

Miller, and in no event later than November 18, 2007, APC shall apply for

amendment of its Title V operating permit to include a schedule for all Unit-

specific performance, operational, maintenance, and control technology

requirements established by this Consent Decree including, but not limited to, the

required emission rates and removal efficiency requirements in Paragraphs 35, 43, and 44 through 49.

98.     Before termination of this Consent Decree, APC shall apply to include the requirements and limitations enumerated in this Consent Decree in a federally enforceable operating permit issued under the Alabama SIP.

99.     APC shall provide EPA with a copy of each application to amend its federally enforceable operating permit or site-specific revision to the Alabama SIP, as well as a copy of any permit or SIP revision proposed as a result of such application, to allow for timely participation in any public comment opportunity.

## XVII. INFORMATION COLLECTION AND RETENTION

100.    Any authorized representative of the United States or Permitting Authority, upon presentation of credentials, shall have a right of entry upon the premises of Plant Miller at any reasonable time for the purpose of:

a.      monitoring the progress of activities required under this Consent Decree;

b.      verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.      obtaining samples and, upon request, splits of any samples taken by APC or its representatives, contractors, or consultants; and

- 39 -

d.      assessing APC's compliance with this Consent Decree.

101.    APC shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in its or its contractors' or agents' possession or control, and that directly relate to APC's performance of its obligations under this Consent Decree for five (5) years following compliance with the obligation of this Consent Decree to which the records relate.  This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

102.    All information and documents submitted by APC pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) APC claims in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

103.    Nothing in this Section is intended to supersede document retention or record keeping requirements established by state or federal law to the extent such requirements are more stringent than the requirements of this Section.

104.   Nothing in this Consent Decree shall limit the authority of EPA to conduct tests and inspections at APC's facilities under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

XVIII. <u>NOTICES</u>

105.   Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>As to the United States of America:</u>

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
DJ# 90-5-2-1-06994

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

and

Regional Administrator
U.S. EPA Region 4
61 Forsyth Street, S.W.

- 41 -

Atlanta, Georgia 30303-8960

As to EPA:

Regional Administrator
U.S. EPA Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia 30303-8960


As to AEC:

Jayme Hill, Executive Director
Alabama Environmental Council
2717 7th Avenue South, Ste. 207
Birmingham, AL 35233

As to APC:

Karl R. Moor
Southern Company
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308
(404) 506-0853

Willard L. Bowers
Vice President, Environmental Affairs
Alabama Power Company
600 North 18th Street
Birmingham, AL 35291

Steven G. McKinney
Michael D. Freeman
Balch & Bingham LLP
1901 Sixth Avenue North
Birmingham, AL 35203
(205) 251-8100

Daniel S. Reinhardt
Margaret C. Campbell
Troutman Sanders LLP
600 Peachtree Street, Suite 5200
Atlanta, GA 30308
(404) 885-3000

106.   All notifications, communications or submissions made pursuant to this Section shall be sent either by:  (a) overnight mail or delivery service; (b) certified or registered mail, return receipt requested; or (c) electronic transmission, unless the recipient is not able to review the transmission in electronic form.  All notifications, communications and transmissions (a) sent by overnight, certified or registered mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service.  All notifications, communications, and submissions made by electronic means shall be electronically signed and certified, and shall be deemed submitted on the date that such transmissions are sent, unless the recipient shows it did not receive such transmission.

107.   Any Party may change either the notice recipient or the address for providing notices to it by serving the other Party with a notice setting forth such new notice recipient or address.

## XIX. SALES OR TRANSFERS OF OWNERSHIP INTERESTS

108.   If APC sells or transfers to an entity unrelated to APC ("Third Party

- 43 -

Purchaser") part or all of its ownership interest in Unit 3 or 4 at Plant Miller ("Ownership Interest"), APC shall comply with the requirements of Paragraphs 109 and 110 with regard to that Unit prior to any such sale or transfer unless, following any such sale or transfer, APC remains the holder of the Title V permit for such facility.

109.   If APC sells or transfers an Ownership Interest to a Third Party Purchaser, it shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall provide a copy of such written notification to the United States and EPA pursuant to Section XVIII (Notices) of this Consent Decree.

110.   The Third Party Purchaser shall be jointly and severally liable with APC for all the requirements of this Decree that may be applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 112.

111.   This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between APC and any Third Party Purchaser as long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation – as between APC and any Third Party Purchaser of Ownership Interests – of the burdens of compliance with this Decree, provided that both APC and such Third Party Purchaser shall remain

jointly and severally liable to EPA for the obligations of the Decree applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 112.

112.   If EPA agrees, EPA, APC, and the Third Party Purchaser may execute a modification to this Consent Decree that relieves APC of its liability under this Consent Decree for, and makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Ownership Interests.  In considering whether to assent to such a modification, EPA will evaluate whether the Third Party Purchaser is financially capable of fulfilling the assumed obligations of the Consent Decree.  Notwithstanding the foregoing, however, APC may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Ownership Interests, including the obligations set forth in Sections IX (Retirement of Emission Allowances and Restriction on Use of $SO_2$ Allowances After 2020) and X (Civil Penalty).  APC may propose and EPA may agree to restrict the scope of joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Ownership Interests, to the extent such obligations may be adequately separated in an enforceable manner.

## XX. <u>EFFECTIVE DATE</u>

113.   The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

## XXI. <u>RETENTION OF JURISDICTION</u>

114.   <u>Continuing Jurisdiction</u>.  The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes.  During the term of this Consent Decree, either APC or EPA may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXII. <u>MODIFICATION</u>

115.   The terms of this Consent Decree may be modified only by a subsequent written agreement signed by APC and EPA.  Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

## XXIII. <u>GENERAL PROVISIONS</u>

116.   This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  The emission rates set forth herein do not

relieve APC from any obligation to comply with other state and federal requirements under the Clean Air Act, including APC's obligation to satisfy any state modeling requirements set forth in the Alabama SIP.

117.   This Consent Decree does not apply to any claim(s) of alleged criminal liability.

118.   In any subsequent administrative or judicial action initiated by the United States for injunctive relief or civil penalties relating to the facilities covered by this Consent Decree, APC shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the United States in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to affect the validity of Section XI (Resolution of Claims).

119.   Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve APC of its obligation to comply with all applicable federal, state, and local laws and regulations.  Subject to the provisions in Section XI (Resolution of Claims), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the United States to obtain

penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

120.   Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree and, except as otherwise provided in this Decree, every other term used in this Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Decree what such term means under the Act or those implementing regulations.

121.   Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8315 (Feb. 27, 1997)) concerning the use of data for any purpose under the Act, generated either by the reference methods specified herein or otherwise.

122.   Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed.  For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101.  APC shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits.  For example, if an actual

- 48 -

Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100.  APC shall report data to the number of significant digits in which the standard or limit is expressed.

123.   This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against any third parties.

124.   This Consent Decree constitutes the final, complete and exclusive agreement and understanding between the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings between the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

125.   Each Party to this action shall bear its own costs and attorneys' fees.

126.   AEC shall have the right to receive any and all notices required under this Consent Decree, but shall have no right to create or cause a dispute, or to invoke or participate in any Dispute Resolution proceedings under this Consent Decree without first making an adequate showing to the Court that the United

- 49 -

States has failed or is failing to diligently enforce the terms of this Consent Decree.

## XXIV. SIGNATORIES AND SERVICE

127.   Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

128.   This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

129.   Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXV. PUBLIC COMMENT

130.   The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper

or inadequate.  APC shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified APC, in writing, that the United States no longer supports entry of the Consent Decree.

## XXVI. <u>CONDITIONAL TERMINATION OF ENFORCEMENT UNDER DECREE</u>

131.  <u>Termination as to Completed Tasks.</u>  As soon as APC completes a construction project or any other requirement of this Consent Decree that is not ongoing or recurring, APC may, by motion to this Court, seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

132.  <u>Conditional Termination of Enforcement Through the Consent Decree.</u>  After APC:

a.   has successfully completed construction, and has maintained operation of pollution controls as required by this Consent Decree for two (2) years; and

b.   has applied to revise its Title V operating permit pursuant to this Consent Decree and has obtained a final federally enforceable operating permit issued under the Alabama SIP that includes as enforceable permit terms the requirements set forth in Paragraphs 35, 36, 37, 38, 42, 43, 44, 49, 50 (first sentence),

51, 52, and 60 of this Decree;

then APC may so certify these facts to the United States and this Court.  If the

Plaintiffs do not object in writing with specific reasons within forty-five (45) days

of receipt of APC's certification, then, for any Consent Decree violations that

occur after the filing of notice, the United States may pursue enforcement of the

requirements contained in the Title V operating permit or other federally

enforceable operating permit issued under the Alabama SIP through the applicable

permit but not through this Consent Decree and APC may, by motion to this Court,

seek termination of the provision or provisions of this Consent Decree that

imposed the requirement or the Consent Decree in its entirety.

## XXVII. FINAL JUDGMENT

133.   Upon approval and entry of this Consent Decree by the Court, this

Consent Decree shall constitute a final judgment in the above-captioned matter

between Plaintiffs and APC as to the claims addressed by this Decree, pursuant to

Section XI (Resolution of Claims) and Fed. R. Civ. P. 54(b).


SO ORDERED, THIS _____ DAY OF _____, 2006.


_____
**VIRGINIA EMERSON HOPKINS**
UNITED STATES DISTRICT JUDGE

- 52 -

Signature Page for Consent Decree in:  *United States of America and Alabama Environmental Council, Inc. v. Alabama Power Company*

**FOR THE UNITED STATES OF AMERICA**:

s/Sue Ellen Wooldridge (with consent)
SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

s/David Rosskam*
W. BENJAMIN FISHEROW
Deputy Chief
DAVID ROSSKAM
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

---

* Filer is maintaining the version of this document containing original signatures. For this electronic version, filer has obtained consent to affix electronic signatures for all other signatories.

- 53 -

Signature Page for Consent Decree in:  *United States of America and Alabama Environmental Council, Inc. v. Alabama Power Company*


s/Alice H. Martin (with consent)
ALICE H. MARTIN
United States Attorney
Northern District of Alabama


s/Lloyd C. Peeples, III (with consent)
LLOYD C. PEEPLES, III
Assistant United States Attorney
Northern District of Alabama

Signature Page for Consent Decree in:  *United States of America and Alabama Environmental Council, Inc. v. Alabama Power Company*

s/Granta Nakayama (with consent)
GRANTA NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

s/Adam M. Kushner (with consent)
ADAM M. KUSHNER
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

s/Meredith G. Miller (with consent)
MEREDITH G. MILLER
Attorney Advisor
Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Signature Page for Consent Decree in:  *United States of America and Alabama Environmental Council, Inc. v. Alabama Power Company*

s/Mary Kay Lynch (with consent)
MARY KAY LYNCH
Regional Counsel and Director
Office of Environmental Accountability
U.S. Environmental Protection Agency
Region 4
61 Forsyth St., S.W.
Atlanta, GA 30303


s/Vera S. Kornylak (with consent)
VERA S. KORNYLAK
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 4
61 Forsyth St., S.W.
Atlanta, GA 30303

Signature Page for Consent Decree in:  *United States of America and Alabama Environmental Council, Inc. v. Alabama Power Company*

**FOR ALABAMA ENVIRONMENTAL COUNCIL, INC.**:

s/Jeffrey M. Gleason (with consent)
JEFFREY M. GLEASON
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902


s/M. James Grode (with consent)
M. JAMES GRODE
GILBERT B. ROGERS
Southern Environmental Law Center
127 Peachtree Street, Suite 605
Atlanta, GA 30303-1840

Signature Page for Consent Decree in:  *United States of America and Alabama Environmental Council, Inc. v. Alabama Power Company*


**FOR ALABAMA POWER COMPANY**:


<u>s/Willard L. Bowers (with consent)</u>
Willard L. Bowers
Vice President, Environmental Affairs
Alabama Power Company
600 North 18th Street
Birmingham, AL 35291