# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **ALABAMA ENVIRONMENTAL** | ) |
| **COUNCIL,** | ) |
| | ) |
| **Plaintiff-Intervenor** | ) |
| **v.** | )   **Case No. 2:01-cv-00152-VEH** |
| | ) |
| **ALABAMA POWER COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION ON ALABAMA POWER COMPANY'S MOTION FOR SUMMARY JUDGMENT AND ENTRY OF RULE 54(b) FINAL JUDGMENT ON MODIFICATION CLAIMS

On May 31, 2006, Alabama Power Company ("APC") filed a Motion for Summary Judgment and Entry of F.R.Civ.P. 54(b) Final Judgment on Modification Claims ("motion"; "APC's motion"). (Doc. 156). On July 7, 2006, the United States ("United States"; "EPA") filed a Redacted and Unredacted Version of its response to APC's motion ("U.S. Response"). (Docs. 164, 165). Intervenor Alabama Environmental Council ("AEC") filed, also on July 7, 2006, its Response to the motion ("AEC Response"). (Doc. 166).

On July 13, 2006, APC moved to strike Exhibits 2. and 3. of the U.S. Response

and paragraphs 4. through 12. of the U.S. Response ("motion to strike").  (Doc. 168).

The motion to strike is addressed in a separate opinion and Order.

On July 18, 2006, APC filed its Reply In Support of Summary Judgment ("APC

Reply", "Reply").  (Doc. 169).

## I.  <u>Standard of Review for Summary Judgment</u>

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law."  See *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion, and identifying those

portions of the pleadings or filings which it believes demonstrate the absence of a

genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has

met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings

and, by its own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for

trial.  *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are

2

irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See *Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its

initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*,

518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II. <u>Background</u>

The background and history of this litigation was set out in the Memorandum Opinion On Correct Legal Tests ("Legal Tests Memorandum") entered on June 3, 2005. *U.S. v. Alabama Power Co.*, 372 F.Supp. 2d 1283 (N.D. Ala. 2005) (Doc. 140). I will not repeat it here, and assume reader familiarity with the Clean Air Act, 42 <u>U.S.C.</u> § 7401-767 (2000) ("Clean Air Act"; "CAA"; "the Act"), and the Act's provisions concerning New Source Performance Standards ("NSPS"), New Source Review ("NSR"), and Prevention of Significant Deterioration ("PSD").

The Legal Tests Memorandum answered two (2) questions that the parties, by agreement, presented for decision:

> 1)   the correct legal test for determining a physical change, including the correct legal test for determining routine maintenance, repair and replacement, 372 F.Supp.2d at 1286; and
>
> 2)   the correct legal test for determining a significant net emissions increase. *Id.*

No Order was entered on the Legal Tests Memorandum.  A Mediation Order was entered the same day, June 3, 2005.  (Doc. 141).  The mediation was successful as to the "Miller Plant" claims, resulting in a proposed Consent Decree filed on April 24, 2006.  (Doc. 154).  Final Judgment was entered on the (Miller Plant) Consent

Decree on June 19, 2006.  (Doc. 160).

Remaining after resolution of the Miller Plant claims are the First through Fourth claims of the United States's Amended Complaint (doc. 127) and the First through Eighth Claims for Relief in AEC's Complaint (doc. 6).  Both sets of claims assert APC made modifications to equipment units ("units") in various APC coal burning, electricity-generating, power plants ("plants", "power plants") that violated the CAA  ("modification claims"; "remaining claims").

Earlier this year, the United States and AEC entered into a Stipulation with APC.  (Doc. 155).  In that Stipulation, filed April 24, 2006, which applies to the remaining claims, the United States and AEC stipulated:

> 1)     Their contention that each of the (APC) projects at issue, except for the Gorgas Unit 10 balanced draft conversion project ("Gorgas unit") resulted in a significant net emissions increase within the meaning of the relevant Prevention of Significant Deterioration ("PSD") regulations is based solely on the contention that the projects would have been projected to result in increased utilization of the (coal fired electricity generating) units at issue.

> 2)     Neither contended that the projects (except for the Gorgas unit) caused an increase in the maximum hourly rate of emissions at any of the units at issue.

> 3)     The projects at issue, including the Gorgas unit, involved work "of a type performed commonly within the industry", although perhaps infrequently at any specific one or more of APC's particular plants.

### III.  **Statutory Background Redux**

The statutory history of NNSR and NSR/PSD has been discussed before in this action.  While trying not to repeat or contradict earlier observations, the issues in this case are inextricably intertwined with the history of EPA emissions regulations leading up to EPA's 1980 rule's definition of the term "major modification", which in turn implicates the relevant provisions of the CAA.  Neither has evolved in a vacuum.

The PSD provisions, § 169 of the Act, 42 U.S.C. § 7479(2)(C), added as a part of the 1977 Clean Air Act Amendments, said that the term "modification" is used therein "as defined in section 7411(a) [Clean Air Act § 111] of this title."  In turn, § 111 of the Act defined modification as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source."  42 U.S.C. § 7411(a)(4).

It may be significant, or not, but § 111 of the Act had been part of the NSPS program since 1970, and was the basis of a prior, pre-1977 Clean Air Act Amendments PSD program.  During that time period, the phrase "increases the amount of any air pollutant emitted" had consistently been interpreted by EPA as requiring an "increase" in a source's maximum hourly emissions.

When it enacted the PSD program, Congress defined "construction" to

"include[] the modification (as defined in section 7411(a) of this title) of any source or facility." 42 U.S.C. § 7479(2)(C) (Clean Air Act § 169). "Section 7411(a)" is § 111 of the Act, which defines modification for the NSPS program.  It was Congress's choice, not the court's, to define both preconstruction review and the concept of "modification" by reference to sections of the Act under which emissions rules and regulations had been developed and implemented by EPA.

In its prior programs, EPA, from the 1970 Amendments onward, consistently interpreted 42 U.S.C. § 7411(a) to say that NSPS modifications occurred only when a facility's capacity to pollute increased, as opposed to physical change that increased a facility's projected hours of operation.[1]  This was true under EPA's 1971 NSPS Rule. *See* Letter from Richard D. Wilson, Director of Stationary Source Enforcement, EPA, to James O. McDonald, Director of Enforcement Division, EPA Region V (Nov. 18, 1975) (no modification occurs when an existing component is replaced with another component with "no change in productive capacity" because "there will be no change in emissions"); Letter from Richard D. Wilson, Director of Stationary Source Enforcement, EPA, to William A. Finke, WEPCo (Dec. 13, 1974) (stating that "any physical ... changes to an existing facility which result in an increase in emission rate

---

[1] This is discussed in considerably more detail in the Exhibits to the Legal Tests Memorandum, 372 F.Supp.2d 1307 - 1319, which in turn were adopted verbatim from *United States v. Duke Energy Corp.*, 278 F.Supp. 2d 619 (M.D.N.C. 2003) ("*Duke Energy I*").

shall be a modification").  More to the point, it was explicit in EPA's 1975 NSPS Rule, which measured emission increases in kilograms per hour. *See* 40 Fed. Reg. 58,416, 58,419 (Dec. 16, 1975).

Congress created the NSR program in the 1970 Amendments to the Act.  NSR required State Implementation Programs ("SIPs") to have a "procedure ... for review, prior to construction or modification, of the location of new sources [to] provide for adequate authority to prevent the construction or modification of any new source to which [a new source performance standard applies] at any location which the State determines will prevent the attainment or maintenance" of any national ambient air quality standard.  Pub. L. No. 91-604, § 110(a)(4), 84 Stat. 1676, 1681 (1970).  SIP requirements under this section were triggered by the only type of modification there was in 1970--an NSPS modification.

Following the rejection of a proposed regulation that would have approved SIPs which permitted degradation of state clean air levels, *Sierra Club v. Ruckelshaus,* 344 F. Supp. 253  (D.D.C. 1972), *aff'd* 4 ERC 1815 (D.C. Cir. 1972) (per curiam), *aff'd by an equally divided court sub nom., Fri v. Sierra Club,* 412 U.S. 541 (1973), EPA promulgated a regulatory PSD program in 1974.  39 Fed. Reg. 42,510 (Dec. 5, 1974). EPA emphasized its intent to ensure that its definition of modification under the provisions governing SIP requirements (which included PSD), was "consistent with

9

the final definition of this term" under the provisions governing the NSPS program. *Id.* at 42,513. Thus, NSPS and PSD modifications had the same meaning.

Two (2) years later, in 1976, EPA created new SIP requirements for new or modified sources in nonattainment (NNSR) areas. 41 Fed. Reg. 55,524 (Dec. 21, 1976). The new rule created a new term: "major modification," which was an NSPS modification that increased pollution by more than one hundred (100) tons per year. *Id*. at 55,525. The 1976 regulation defined a "major modification" as one "... *which increases the allowable emissions rate*..." *Id*. (Emphasis in original, *New York v. EPA*, 413 F.3d 3, *reh'g denied*, 431 F.3d 801 at 801-02 (D.C. Cir. 2005) ("*New York I*").

The 1976 NSR SIP regulatory provisions were followed by the 1977 Amendments. Significantly to the court, despite using a term with a familiar and well-established administrative and regulatory interpretation, Congress did not leave modification undefined. Rather, it explicitly defined the term the same way EPA had when it created the regulatory PSD program: by indicating that it was used "as defined by" the NSPS program. *See* 42 U.S.C. § 7479(2)(C).

The 1976 EPA modification definition was not considered by the *New York* panel. It was first raised in EPA's petition for rehearing. Judge Williams's concurrence in denial of rehearing acknowledges that "at first blush, this appears

10

inconsistent with our holding that the 1977 amendments required a comparison of actual (or projected actual) emissions before and after the change in question.  *New York v. EPA*, 413 F.3d 3, 38-40".  *Id*.  Judge Williams says the inference of Congressional intent to adopt the same definition of modification across the NNSR and NSR/PSD was "extremely weak", even though the 1976 modification definition was in place at the time of the 1977 CAA Amendments and even though the 1976 EPA modification definition was a NSPS regulation and, therefore, by definition in the 1977 Amendments, applicable to NSR.  Judge Williams cites the different definitions in existence in the programs at the time of the 1977 Amendments.  The argument seems circular: Judge Williams says the modification definition then existing at 40 CFR § 51.18, which he describes as "radically different" from §111 (a)(4) of the Act[2], dealt with SIP provisions applicable to *new sources or modifications*.  431 F.3d at 802 (emphasis supplied).  This definition reinforces, not undercuts, the argument that Congress did not act in a vacuum and knew when it adopted the 1977 Amendments that EPA was defining modification by reference to an increased emissions rate, as opposed to actual emissions (what *New York I* said Congress intended , 413 F.3d 3, 38-40).  The reasons given in the rehearing decision, that Congress was evidently superseding rather than codifying the prior regime, 431 F.3d at 802 and that the 1976

---

[2]  42 U.S.C. § 7411(a)(4).

11

regulation was only adopted *provisionally, id*. (emphasis in original) are not persuasive. The statements are simply made, and appear to be more afterthought than analysis. *New York I* did not discuss the extensive prior usage history outlined above and in the Legal Tests Memorandum, nor include the fact that Congress's PSD modification definition was not the only place in the 1977 Amendments where modification was adopted by reference to NSPS modifications; in another new provision governing hazardous emissions, Congress defined "modification" by stating that it "shall have the same meaning as ... under section 111(a)." 42 U.S.C. § 7412(a)(5).

Prior to *New York I*, the leading modification case was *Wisconsin Elec. Power Co. v. Reilly* ("*WEPCO*"), 893 F.2d 901 (7th Cir. 1990). *New York I* cites *WEPCO* six (6) times. *New York I* tacitly acknowledges that *WEPCO* invalidated EPA's "actual to potential" emissions measurement. While the *WEPCO* court acknowledged that it had no jurisdiction to review the propriety of the NSPS regulations themselves because 42 U.S.C. 7607(b)(1) reserves such questions to the D.C. Circuit, *WEPCO*, 893 F.2D at 914 n.6, and while it couched the analysis as review of proper application of those regulations,[3] *WEPCO* said EPA could fix the problem by notice and comment

---

[3] "In this case, WEPCO simply requests that we consider whether the EPA properly applied these regulations to the Port Washington generating units. We have jurisdiction to undertake such an inquiry. 42 U.S.C. § 7607(b)(1)." *Id*.

rule-making, 893 F.2d at 918: in other words, by adopting a new rule to replace the

one that *WEPCO* invalidated.  And, of course, the invalidated rule was one of national

application.

In any event, the effect of *WEPCO* was to send the emissions measurement

methodology back to the drawing board, with very little to show for a ten (10) year

effort to adopt a new rule:

> EPA dealt with *WEPCo* by issuing a 1992 rule that changed the test
> utilities used for measuring emissions increases. 57 Fed.Reg. 32,314.
> Under the new test, known as the "actual-to-projected-actual test,"
> utilities would determine whether they had post-change increases in
> emissions-and thus whether they needed NSR permits-by comparing
> actual emissions before the change to their projections of actual
> post-change emissions.  *See id.* at 32,323-26.  In measuring projected
> emissions, EPA permitted utilities to exclude increases stemming from
> unrelated demand growth, reasoning that such increases would in no way
> be caused by physical or operational changes.  *See id.* at 32,326-28.
> The parties call this the "demand growth exclusion."  Applying the
> actual-to-projected-actual test and the demand growth exclusion to
> utilities only, EPA left the actual-to-potential test in place for other
> sources.
>
> Various petitioners challenged the 1992 rule, but once again we stayed
> the proceedings as EPA began a new rulemaking process.  This new
> process went slowly.  EPA issued a proposed rule in 1996, 61 Fed.Reg.
> 38,250 (July 23, 1996), followed by a 1998 Notice of Availability
> ("NOA") requesting additional comment on several issues, 63 Fed.Reg.
> 39,857 (July 24, 1998), followed in turn by a four-year hiatus.  In the
> meantime, EPA began investigating numerous sources for
> noncompliance with the existing NSR program.  It ended up bringing
> complaints against thirty-two utilities in ten states.

*New York I*, 413 F.3d at 16.   This action is one of the referenced complaints.

The 1980 rule interpreted, and limited, the regulatory application of the term "modification" in 42 U.S.C. § 7479(2)(c) by adopting a "major modification" requirement that had to be met before a physical change to a stationary source could trigger preconstruction permitting.   And, as discussed in the Legal Tests Memorandum, starting in 1981, EPA interpreted the 1980 PSD Rule in a series of authoritative applicability interpretations as continuing the requirement that a source undergo preconstruction permitting only when a physical change to the source would increase its maximum hourly emissions, and it was not until 1986 and 1987 that EPA changed that interpretation.  372 F.Supp.2d at 1306, n.43.  And, when EPA made that change, the  *WEPCO* decision (and EPA's assurances to Congress and the utility industry that very few projects would actually fall within *WEPCO*'s modification analysis, *id*.) combined to create the decade plus hiatus in final emissions rulemaking described by *New York I*, and the Legal Tests Memorandum*, supra*.

To me, EPA sought and, judging by its Response to APC's motion, still seeks, regulation by litigation instead of by notice and comment rulemaking.  The history of the agency's emissions rulemaking process had been characterized by problems with reviewing courts, *e.g. Alabama Power Co. v. Costle*, 606 F.2d 1068*, superceded by Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979), *WEPCO, supra*,

14

exacerbated by EPA's inconsistent interpretation and application of the "applicable rule".  The term "applicable rule" is itself an oxymoron since, for all practical purposes, there was **no** "applicable rule" from the late 1970's until *New York I* was decided in 2005, because the 1980 and 1992 Rules had been stayed by the D.C. Circuit pending settlement discussions and new rulemaking by EPA, *see New York I* at 14-15.

Asking the court to ignore all of this history, thoroughly detailed in *Duke Energy I* and *New York I*, and for the application of *Chevron*[4] deference to EPA's NSR/PSD interpretation here, is asking me to put blinders on.  It's a different inquiry here than the one in *New York I* and *New York II*[5]; citing those cases as the solution is advancing a simple solution to a complex problem.  Here, as before, I write knowing mine will not be the last word.  I also write holding the belief that there is little or no analytical difference between the approaches to EPA emissions rules taken by the *WEPCO* and *Duke Energy II*[6] courts; it just depends on what parts of the opinions one reads.  And, if the Supreme Court arguments of petitioner and *amici* in *Duke Energy* are correct in their attack on the Fourth Circuit's invalidation of the 1980 rule, then

---

[4]  467 U.S. 837, 104 S.Ct. 2778 (1984).  *Chevron*'s "Step 1" and "Step 2" analysis are discussed in the Legal Tests Memorandum, *WEPCO*, and *New York I, supra*.

[5]  *New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2005), *reh'g and reh'g en banc denied*, ___ F.3d ___ (D.C. Cir., June 30, 2006) ("*New York II*").

[6]  *United States v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005), *cert. granted* 126 S. Ct. 2019 (2006).

*WEPCO*'s invalidation of the "actual to potential" test was equally wrong, as discussed in V., *infra*.

## IV. <u>Alabama Environmental Council's Response</u>

AEC concedes that, if the holdings of the Legal Tests Memorandum are applied to the Stipulations, then APC is entitled to summary judgment. Nevertheless, I will discuss AEC's other arguments. I begin with AEC's response because it raises what AEC describes as additional points regarding *New York I* and *II, supra*.[7] AEC's "additional points" are:

1.     *New York I* also set aside a portion of EPA's 2002 PSD regulations (the "Clean Units" provision) because that provision exempted from PSD review certain changes that increased actual emissions on the grounds that the plain language of the Act indicated that Congress intended to apply NSR/PSD to changes that increase actual emissions instead of potential or allowable emissions. 413 F.3d 3, 40.

2. *New York II* rejected EPA's Equipment Replacement Provision ("ERP") of the 2002 Rules (any work up to 20% of the replacement cost of the unit would be RMRR) as contrary to the plain language of section 111(a)(4) of the Act, 443 F.3d at 883, which extends to "any" physical change" (to a unit) and only allows exemptions for "physical changes that do not result in emissions increases", *id*. at 887. AEC says *New York II* rebuffed the utility industry's claim that changes involving only *de minimis* emissions increases rendered the statute unclear, holding instead that such exemptions are available only "to alleviate 'severe' administrative and economic burdens by lifting requirements on 'minuscule' emissions increases." *New York II*,

---

[7] *New York I* and *New York II* are decisions by the District of Columbia Circuit Court of Appeals dealing with numerous challenges to EPA's 2002 NSR rule. For the most part, the 2002 Rule was upheld, but those opposed to APC and the other utilities sued in 1999 EPA enforcement actions say, as here, that the *New York* decisions vindicate their positions on the definition of modification, specifically how emissions increases are measured, and what is and isn't RMRR.

443 F.3d at 888.

AEC says *New York I*'s rejection of EPA's "Clean Unit" proposal in the 2002 PSD rule as contrary to the plain language of the CAA on the grounds that Congress intended to apply NSR/PSD to changes that increase actual emissions instead of potential or allowable emissions is likewise a rejection of the Legal Tests Memorandum holding on question 2), "the correct legal test for determining a significant net emissions increase"[8].  Further, AEC says New *York II* effectively overrules the Legal Tests Memorandum's reading of the RMRR exclusion in question 1), "the correct legal test for determining a physical change, including the correct legal test for determining routine maintenance, repair and replacement".[9]  I would like to agree; a rule of decision that offers certainty and ease of application is very attractive.

The relevant language in *New York II* is this:

> Also, because the court in *New York I* rejected industry's contention Congress ratified the New Source Performance Standards (NSPS) regulations on "modification" in the 1977 amendments, *see id*. at 19-20, EPA's reliance on its NSPS regulations to demonstrate the ambiguity of "any physical change" is unavailing.  As discussed, the early emergence of a RMRR exclusion based on a *de minimis* rationale does not blur the clarity of the phrase "any physical change".  To the extent industry intervenors rely on the NSPS regime to reargue their position that "modifications" required an increase in maximum emission rates, that

---

[8]  *U.S. v. Alabama Power Co., supra*, 372 F.Supp.2d at 1286.

[9]*Id*.

issue was resolved in *New York I*, 413 F.3d at 19-20, 40; *see also New York v. EPA*, 430 F.3d 801,802-03 (D.C. Cir. 2005) (Williams, J., concurring in denial of rehearing), and is irrelevant because it does not address what constitutes a "physical change".

443 F.3d 880, 889.

Because *New York II* relies on *New York I*, I have again reviewed the quoted pages of *New York I*, 413 F.3d at 19 - 20, and also Judge Williams's concurrence in denial of rehearing, 430 F.3d at 801 - 802.

*New York I*'s discussion of "modification" does suggest that, had the D.C. Circuit been ruling on the 1980 rule that, in turn, primarily governs the Alabama State Implementation Plan ("SIP") in this action, I would be bound to follow the D.C. Circuit's ruling on that issue, and would *not* accept the industry's contention "...that modification must have the same regulatory meaning for NSR as prevailed for NSPS in 1977 on the fact that Congress, by a cross-reference, used the same language in both statutory contexts".[10]   Stated more succinctly, had the *New York I* court so held, as to the regulations before me, I would revisit the issue now assuming I had not done so already in one of my other CAA actions, *e.g. National Capital Parks Association v. TVA*, 413 F.Supp.2d 1282 (N.D. Ala. 2006).

---

[10]   "Thus, the NNSR portion of the Act provided:
     The terms "modifications" and "modified" mean the same as the term modifications as used in section 7411(a)(4) of this title.  42 U.S.C. § 7501(4)."
     *New York I, op cit*.

The *New York I* court did not so hold; the entire "modification" discussion is

*dicta*, because it is followed by this language:

> **We express no opinion as to whether Congress intended to require that EPA use identical regulatory definitions of modification across the NSPS and NSR programs.** (Emphasis supplied). *Cf. United States v. Duke Energy* [citation omitted] (4th Cir. 2005).  That argument was not made by industry petitioners in their opening brief and is therefore waived . . . As industry makes no attack at all on the reasonableness of EPA's definition of modification for NSR (apart from its divergence from one of the 1975 definitions) we reject this portion of industry's challenge to the 1980 and 2002 rules.

413 F.3d at 20.

And, as already noted above, Judge Williams's concurrence in the denial of

rehearing didn't put the issue to rest, either:

> In petitioning for rehearing, EPA for the first time calls our attention to a 1976 regulation manifesting EPA's definition of "modification" for purposes of its New Source Performance Standards ("NSPS"). . . At first blush, this appears inconsistent with our holding that the 1977amendments required a comparison of actual (or projected actual) emissions before and after the changes in question.  *New York v. EPA*, 413 3, 38-40 (D.C. Cir. 2005).

431 F.3d at 802.

The court would follow *New York I* or *New York II* if it thought it were required.

It would be advantageous if either case's holding controlled one, and preferably both,

of the questions answered in the Legal Tests Memorandum; the inquiry would be over.

Having said that, *New York I*, by its very language, does not answer the NSPS v.

NSR/PSD modification argument.  It says it does not.  And, after saying it does not,

it directs the reader to compare the result reached by the Fourth Circuit a month earlier in *United States v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005), *cert. granted* 126 S. Ct. 2019 (2006).  *Duke Energy II* stands for the proposition that the definitions are the same, at least in the context of the 1999 enforcement action involved there; this action, like *Duke Energy,* is a 1999 EPA enforcement action.[11]   And Judge Williams's concurrence in the denial of rehearing is, again, *dicta*: the issue was not raised (by EPA) until rehearing, the panel did not address it in the opinion, and  the rehearing opinion, as it acknowledges, stretched to reach the issue.  AEC asserts that *New York I* and *New York II* are, as to the issues in the Legal Tests Memorandum, determinative of the validity of any applicable EPA regulations with nationwide applicability involved here, 42 U.S.C. §7607(b).  AEC reads those cases more broadly than I do.

New York II, *supra,* does undercut APC's argument that RMRR must be viewed on an industry wide basis.  Although the 1975 Regulation, the 1976 EPA NSPS

_____

[11]  To me, the distinction between the types of actions matters.  *New York I* and *New York II* were challenges to EPA rules brought by affected parties.  The policy considerations present there (e.g, *Chevron* deference, the D.C. Circuit's role as the sole forum in which to challenge the validity of the agency's adoption of the challenged regulations), to me, anyway, are quite different from the challenges mounted by Duke Energy and APC to the way the 1980 regulations are being interpreted by the United States in the enforcement actions against them.  I would characterize the arguments made in the District courts by Duke Energy and APC as shields, not swords; defensive, not offensive.  If I am correct, this could have significant influence, and impact, on the defenses available to APC here,  even if I am wrong on both aspects of the Legal Tests Memorandum.  *See Sierra Club v. Georgia Power Co*., 443 F.3d 1346, 1355 (11th Cir. 2006).

modification definition, and the 1980 rule were not before it, *New York II* is a RMRR case.  Its holding involves "any physical change".  But *New York II* says, at footnote 4, "*[T]he court has no occasion to decide whether part replacements or repairs necessarily constitute a 'modification' under the definition taken as a whole*".  443 F.3d at 888, n.4.  (Emphasis supplied).  This is what I was asked to decide: how is this definition applied in this action, which deals with "parts replacement or repairs" (actually, both)?  At what point do "parts replacements" or "repairs" become "life extension" projects that, as AEC asserts, *New York II* would surely say are subject to NSR/PSD review?  Does it matter whether the entire industry is replacing the same parts, or performing the same repairs, or is the inquiry limited to each individual plant, or each unit within each plant?  These are the issues addressed in the Legal Tests Memorandum and the more I study *New York I* and *New York II*, the more I am convinced those decisions touch on, dance around, and talk about, but do not <u>decide</u>, any of them.  Nothing would make me happier than to be wrong; it would be wonderful to be told that the law is settled, whether that law comes from the D.C. Circuit or elsewhere.

Finally, how am I supposed to defer to *New York I*'s emissions analysis in light of its observation about the preamble of the 2002 Rule, which industry says attempts to retroactively require a "universal actual-to-potential test", that

21

> For *planning* purposes, the 1980 rule appears moot.  If there are still pending applications of the 1980 rule in which EPA attempts to employ the disputed sentence (which seems improbable in light of its express disclaimer), *judicial proceedings addressed to the application could solve the problem of any affected firm.*

413 F.3d at 21.  (Emphasis supplied on the second sentence).

This is a 1980 rule case, and one where I have had to interpret the rule to determine how emissions are measured.  The Legal Tests Memorandum, right or wrong, attempts to do so, answering a question on emissions measurement *presented by the parties*.  I read the above language of *New York I* to say that, as to the 2002 rule's impact on 1980 rule emissions litigation, it's up to the lower courts (and the affected Circuit courts) to sort the issues out on a case by case basis.[12]  This is not what AEC is advocating.  It is what I think the D.C. Circuit is saying should be done.

The operative word is "think": there are many points of view about *New York I* and *II*'s impact on the maelstrom ("cottage industry" might be more accurate) that

---

[12]   This is the history of the 1999 enforcement actions, and it should be no surprise to anyone that there has been disagreement among the courts about the correct application of the applicable rule or regulation(s).  Those supporting the industry can cite the Legal Tests Memorandum, and the District Court and Circuit Court opinions in *Duke Energy*; those opposed tend to cite more favorable opinions issued in some of the other 1999 enforcement actions, .*e.g., United States v. Ohio Edison*, 276 F.Supp.2d 829 (S.D. Ohio 2003); *United States v. Cinergy Corp.*, 384 F. Supp.2d 1272 (S.D. Ind. 2005) (No. 99-1693); *United States v. A. Elec. Power Corp.*, No. 99-1182 (S.D. Ohio).  One of the issues of emissions measurement is currently before the Seventh Circuit in *Cinergy*, Docket No. 06-1224 (appeal of 384 F.Supp.2d 1272).  It's possible, depending on the issue, for both sides to cite rulings from the same case, *cf. e.g.,* Judge McKinney's rulings at 384 F. Supp. 2d 1272, 397 F.Supp.2d 1025 (S.D. Ind. 2005), and at 2006 WL 372726 (S.D. Ind. 2006).

is CAA enforcement litigation.

In their responses, AEC and the United States assert, vigorously and confidently, the error of the court's rulings, making it sound like there is no other rational choice to make when it comes to the issues in the Legal Tests Memorandum. They may be right. But I've never understood the issues before me as challenges to the EPA's adoption of the 1980 rule, or the 1981 SIP, or for that matter the 1975 Regulation, and the 1976 EPA modification interpretation of the 1975 Regulation. I may be missing the point. The dispute here involves EPA's application, in this 1999 enforcement action, of the 1980 rule, and whether that application is contradictory to prior practice, prior EPA guidance, the language of the Act itself, and EPA's rules and regulations adopted by EPA under the Act. I think, and wish to be reversed if wrong, that these are appropriate defensive arguments to an enforcement action, and they are not required to be made before the D.C. Circuit. This Circuit recognized, and not in 2005 or 2006, the principal bone of contention between the parties over RMRR, and did not see the issue (routine within industry versus routine to the unit in question) as one within the exclusive jurisdiction of the D.C. Circuit. *See TVA v. EPA*, 278 F.3d 1184, 1189, n.3 (11th Cir. 2002).

## V.  <u>The United States's Response</u>

Like AEC, the United States concedes that if the Legal Tests Memorandum and holdings are applied to the Stipulations, then APC is entitled to summary judgment. In its response, the United States makes a number of arguments; I will discuss the ones that have not already been discussed.

Initially, I confess partial error.  In the Legal Tests Memorandum I said that the Eleventh Circuit would be skeptical of *WEPCO* in part because *WEPCO* had relied on EPA's Environmental Board ("EAB") procedure held unconstitutional in *TVA v. Whitman*, 336 F.23d 1236, 1239-4-, 1246 (11th Cir. 2003), 372 F.Supp.2d at 1305. The United States Response says, and after reading *WEPCO* yet again, I agree, that *WEPCO* was not an EAB case, and the statement at 372 F.Supp. 2d at 1305 saying the Eleventh Circuit rejected *WEPCO*'s EAB analysis is incorrect.

The United States says that *New York I* and *New York II*, as well as *WEPCO*, reject the "common in the industry" test.  *New York I* and *II* don't say that.  *New York II* did reject the EPA 20% replacement cost ("Clean Units") rule, which the United States asserts the D.C. Circuit was wrong to do.  There is no such rule before me. And, as to *WEPCO*, if all the non-utility litigants in CAA litigation, *i.e.*,  the actions in this court and elsewhere, are going to cite or continue to cite *WEPCO* as supporting their position, someone should answer what, to me, is the "elephant in the corner"

24

question: if *WEPCO* invalidated a rule of nationwide applicability, specifically the NSR/PSD "potential to emit" provisions, which this court believes *WEPCO* did, based on both the language in the opinion noted , 893 F. 2d at 918, and EPA's response (new rulemaking), *supra*, then, to the extent *WEPCO* did so, why aren't the PSD portions of *WEPCO* void and of no effect, precedential, persuasive, or otherwise, because the Seventh Circuit never had jurisdiction to undertake the evaluation and invalidation of the EPA NSR/PSD "potential to emit" rule?  Clearly the rule voided by *WEPCO* was one of nationwide applicability.[13]

The United States also says that the Legal Tests Memorandum's RMRR test is unbounded and will carve out large exemptions from NSR as a threshold matter.  This assertion is a bit of a straw man; I didn't write the RMRR rules, nor did I promulgate regulations or guidance saying "routine" was to be judged by whether the parts or equipment has been repaired within the relevant industrial category.  *See, e.g.,* 40 C.F.R. § 64.14(e)(1); 57 Fed.Reg. 32, 314, 32326/1 (July 21, 1992).  I answered the questions I was asked; I decline any invitation to opine on questions that were not asked.

_____

[13]  The *WEPCO* court said, 893 F.2d 901, 914 n.6, that it was *not* reviewing the propriety of the NSPS regulations, and that it had no jurisdiction to do so, 42 U.S.C. § 7607(b)(1).  The opinion is silent as to whether the same analysis carries over to the review of the PSD regulations.

Further, this action is fundamentally different and distinct from *New York I* and *New York II*.  It's an enforcement action, not a challenge to new (or not so new) emissions rules promulgated by EPA.  If it's determined later that I invalidated a rule of nationwide applicability, no one will be more surprised than me.  The questions answered in the Legal Tests Memorandum dealt with interpretation of the Act, EPA's various rules, guidance and action under the 1980 emissions rule and Alabama's SIP, and applied that framework to the issues presented by the parties.  If the United States thought my answer to the questions posed would invalidate a rule of national applicability, then it invited the error(s) by (jointly) submitting the questions.  Similarly, by seeking to expand the issues before me beyond those set out in the Stipulation, the United States seeks indirectly what it should have sought directly: answers to different questions.

I would not hesitate to change my ruling in the face of binding precedent but, for the reasons already discussed, I do not believe *New York I* or *New York II* meets that qualification.  Put another way, one litigant's characterization of the Legal Tests Memorandum as a "collateral attack" on the 1980 PSD rules, *Response of United States* (doc. 166) *at 12, n.13*, could also be characterized by another litigant as a judicial proceeding addressed to the application of that Rule expressly contemplated and authorized by *New York I*, 413 F.3d at 21.  And, as the United States notes, I have

previously indicated in my other CAA actions[14] that I would follow the rulings in the Legal Tests Memorandum, where applicable, in those cases.  To change the rulings would be changing the framework within which the parties have been operating in this and my other CAA cases.  If part or all of the rulings in the Legal Tests Memorandum are erroneous, then the appellate ruling replacing them will govern, here and in the other cases.

In response to another point made by the United States, the Legal Tests Memorandum is silent on the question as to whether RMRR turns **solely** on whether routine is measured by reference to the industrial category or the individual unit. That wasn't part of the two (2) questions posed by the parties. Whether, at some point in the future, I should review additional factors besides whether a certain activity or project was routine within the industry to determine the existence and scope of an emissions violation, was and is not before me.  The Stipulation between the parties delineated the scope of the ruling.  I see nothing to be gained in discussing now what might happen in the future based on what may happen on appeal, or in some other CAA case in the D.C. Circuit or the Supreme Court.  It would be speculative, or in the nature of an advisory opinion, to undertake now the analysis of whatever issues will remain for

---

[14] *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, 413 F.Supp.2d 1282 (N.D. Ala. 2006); *Sierra Club v. TVA*, No. 3:02-cv-2279-VEH (Memorandum Opinion In Support of Order to Stay and Referral to Mediation).

decision after appellate review.

A thorough review of the record here, like the record in *Duke Energy I*, persuades me, again, that EPA's position here is a litigation position not entitled to *Chevron* deference, and even if it weren't a litigation position, EPA's contradictory applications and multiple inconsistent interpretations of the emission rules here would counsel against *Chevron* deference, 372 F.Supp.2d at 1306.  Neither *New York I* nor *New York II* had issues balancing *Chevron* deference versus litigation position. And this action, unlike  *New York I* and *New York II*, is <u>not</u> a review of EPA rulemaking.  Finally, in *New York I*, EPA, in its petition for rehearing, advocated its 1976 NSPS definition of modification (which was defined in terms of increasing the rate of emissions, not the amount) as "cast[ing] light on what concept of modification Congress meant for the New Source Review provisions".  *New York I*. 431 F.3d at 801- 02.  I don't understand how EPA can tell the D.C. Circuit within the last twelve months that Congress was defining modification in the 1977 Amendments by reference to EPA's 1976 NSPS definition of modification (emissions rates defined by increased rates of emissions), and then take a contrary position here as to those Amendments, but insist on *Chevron* deference and deny that litigation position is involved.

# VI. **Alabama Power's Reply**

In its Reply, APC notes that AEC and the United States concede, subject to the continued application of the Legal Tests Memorandum, that summary judgment is appropriate.  APC objects to the United States's request for a stay.  APC says that the exclusive reservation in the D.C. Circuit of regulations of nationwide applicability under § 307(b) of the Act, 42 U.S.C. § 7607(b), has no application where, as here, the challenge is to a state SIP promulgated by a state agency (ADEM) and approved by EPA. Ala. Admin. Code r.335-3-14.-.(04(2)(b)(2)(vi) (increase in the number of hours of operation is not a physical change or change in the method of operation).  APC points to the Eleventh Circuit's reversal of my ruling in *Sierra Club v. TVA*, 430 F.3d 1337, 1347 (11th Cir. 2005), where I granted deference to ADEM's 2% *de minimis* rule; the Court of Appeals reversed because, by not having been approved by EPA and made part of the Alabama SIP, the 2% rule was an illegal modification of Alabama's SIP and therefore not entitled to deference.  APC says that EPA, like Alabama, must follow the notice and comment provisions of the Administrative Procedures Act before it can modify Alabama's SIP without violating § 110(I) of the Act.  *Id*. at 1349.  APC says that EPA can only modify the "hours of operations" exclusion by such notice and comment rulemaking, not through an enforcement action asserting a different interpretation of the emissions rule.  APC says that what EPA now argues is

tantamount to the SIP modification process repudiated by *Sierra Club*.

As for the "routine within the industry" test, APC points to EPA's 1992 rule, 57 Fed. Reg. 32,314, 32,326/1 (July 21, 1992) ("routine" judged by the relevant "industrial category"); *cf.* 40 C.F.R. § 60.14(e)(1) ("routine" in NSPS regulations defined by reference to "source category").

## VII. <u>Summary</u>

1.     *Duke Energy I*'s analysis of the RMRR and emissions increase issues as they have played out in the 1999 enforcement actions appeared well reasoned, well researched, and thoroughly supported when first reviewed by me last year.  Nothing I have reviewed since changes my opinion.  Neither *Duke Energy II*, *New York I*, *New York II*, nor any of the district court opinions issued in the 1999 enforcement actions have addressed the history, reasoning, and application of the EPA utility industry emissions rules in a more comprehensive and thorough manner.

2.     Further, *New York I* and *New York II*, while clearly binding precedent on the 2002 rule, are not binding, by their terms, on this action.  The D.C. Circuit explicitly contemplates other courts in other circuits addressing 1980 rule issues, and it explicitly noted the existence of the 1999 enforcement actions before it said so.  And EPA's position in this action is litigation position not entitled to deference.  *Mead*, *supra*; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (entirely

inappropriate to defer to an agency's litigation position).

3.      *Duke Energy II* may not answer the questions posed by the parties that were answered in the Legal Tests Memorandum, and there remains the possibility that the Court will grant *certiorari* in *New York I* or *New York II*.  If not, the Supreme Court could say that the Fourth Circuit was wrong in its  view that Congress's intent was clear, remand for *Chevron* analysis or deference, and may never reach the RMRR issue.[15]

4.      It is still not known whether the Supreme Court will review *New York I* and *New York II*, and what impact, if any, the granting of *certiorari* in *Duke Energy II* may have on the Court's decision to grant any such review.  The argument can certainly be made that, if the goal is to address emissions rules with nationwide applicability and provide guidance to the lower courts, then *New York I* and *New York II* are cases of far greater importance than *Duke Energy II*.  The arguments made in the (*Duke Energy II*) *Petition for a Writ of Certiorari*, that the Fourth Circuit's *Duke Energy II* ruling presented questions of recurring national importance regarding the Act's interpretation (concerning the judicial review and/or invalidation of CAA emissions rules and their application, in particular the "longstanding" EPA

---

[15]  And, because the Fourth Circuit did not reach all the issues in *Duke Energy I*, it is quite probable that some portion of *Duke Energy I*'s holdings would survive a Supreme Court reversal of *Duke Energy II*.

interpretation of how emissions increases are measured), arguments apparently accepted by the Court, seem far more applicable to *New York I* and *New York II*.  The core of *Duke Energy II* is a "clear statute versus *Chevron* deference" question.  The analyses and holdings of *Duke Energy I*, *New York I* and *New York II* present far more important Clean Air Act statutory construction and judicial interpretation questions than *Duke Energy II*.  *See, e.g. United States v. Cinergy*, 384 F. Supp.2d 1272 (S.D. Ind. 2005) (7th Cir. Docket No. 06-1224); *United States v. American Elec. Power Corp.*, No. 99-1182 (S.D. Ohio).[16]

## VIII.  Ruling on APC Motion for Summary Judgment

After reviewing the pleadings and exhibits filed in support of APC's motion for summary judgment, the United States's and AEC's Responses, and applying the Legal Tests Memorandum holdings to the Stipulations, and for the other reasons stated herein, the court finds that there are no material facts in dispute and that APC is entitled to judgment as a matter of law.[17]  A separate Order will issue.

---

[16]  *American Electric* has been stayed pending the decision in *Duke Energy II*; the 7th Circuit declined to stay *Cinergy*.  (Doc. 164 at 2 n.1 and Exhibit 1).

[17]  If issues remain between the parties over the Gorgas units, the court has missed them. If there are, and any party asserts this Opinion does not cover the Gorgas units, I will enter the appropriate Order(s) with respect to the Gorgas units and, like the Order issued in connection with this Opinion, make any such (Gorgas units) Order(s) subject to immediate appeal.  The court's goal is to place the issues in this Opinion before the Court of Appeals sooner rather than later; the Court of Appeals has already been requested to review these issues, albeit on a derivative basis, in the appeal taken from my decision in *National Parks Conservation Ass'n, Inc. v. TVA*, 413 F.Supp.2d 1282 (N.D. Ala. 2006).  *See* APC Reply In Support of Summary

**DONE** and **ORDERED** this the 14th day of August, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

Judgment on the Modification Claims, Doc 169, Attachments 1 and 2.