# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
|     **Plaintiff,** ) | |
| ) | |
| **ALABAMA ENVIRONMENTAL** ) | |
| **COUNCIL,** ) | |
| ) | |
|     **Plaintiff-Intervenor** ) | |
| **v.** ) | **Case No. 2:01-cv-00152-VEH** |
| ) | |
| **ALABAMA POWER COMPANY,** ) | |
| ) | |
|     **Defendant.** ) | |

---

## MEMORANDUM OPINION AND ORDER ON ALABAMA POWER COMPANY'S MOTION FOR SUMMARY JUDGMENT ON "RMRR"
### (Routine Maintenance and Repair)

This matter is before the court on the renewed motion of the defendant, Alabama Power Company ("APC") for summary judgment. (Doc. 193). APC asks this court to find that the applicable legal test for the "routine maintenance repair, and replacement" exclusions found in the Clean Air Act should be applied to activities that are considered "routine in the industry," rather than "routine at the unit."

## I. BACKGROUND

On June 28, 2004, this action was reassigned to the undersigned. A scheduling order was entered on August 5, 2004. (Doc. 68). In response to ¶ (3) of page 2 of

that order, the parties[1] agreed that there were two legal issues that were ripe for adjudication: (1) the correct legal test for determining a physical change, including the correct legal test for determining routine maintenance, repair, and replacement ("RMRR"); and (2) the correct legal test for determining a significant net emissions increase. After the parties briefed those issues, the court issued a Memorandum Opinion on Correct Legal Tests. (Doc. 140).

After court-ordered mediation, the parties stipulated to certain facts.[2] APC moved for summary judgment. On August 14, 2006, the court entered Final Judgment in favor of APC. (Doc. 175). EPA filed a Motion to Clarify the Final Judgment Order. (Doc. 176). APC opposed the Motion. (Doc. 177). An Amended Order granting EPA's motion to clarify in part and denying the motion in part was entered on August 28, 2006. (Doc. 179). EPA appealed. (USCA 06-15456F).

By motion dated October 27, 2006, EPA moved the Eleventh Circuit to stay the appeal pending resolution of the Supreme Court's decision in *Environmental Defense v. Duke Energy Corp.*, 549 U.S. __, 127 S. Ct. 1423, 167 L.Ed. 2d 295 (2007) (*Duke*

---

[1] United States of America, Plaintiff ("United States"), Alabama Environmental Council ("AEC"), Plaintiff-Intervenor, and Alabama Power Company ("APC"), Defendant. The Plaintiffs will be collectively referred to as "EPA" unless the context indicates otherwise.

[2] They also agreed to a Partial Consent Judgment, which the court entered and certified as final on June 19, 2006. That Partial Consent Judgment resolved all issues in the case relating to the Miller Plant. No appeal was taken from the Miller Plant consent judgment, and it is no longer a part of this action.

*Energy III*).[3]  APC filed an Opposition to EPA's Motion to Stay on October 30, 2006. On November 14, 2006, the Eleventh Circuit stayed the appeal to await *Duke Energy III*.

Following *Duke Energy III*, the Eleventh Circuit vacated this court's entry of summary judgment against the United States, and remanded the action for proceedings consistent with *Duke Energy III*.  The *Duke Energy III* remand proceedings are found in the court's Order Vacating In Part Memorandum On Correct Legal Tests, entered February 25, 2008, implementing the remand Order.  (Doc. 197). That Order also sets out the remainder of the procedural history of the appeal, and it will not be repeated here.

APC filed a renewed motion for summary judgment,  accompanied by a supporting brief.  (Doc. 194).  EPA has filed its opposition (doc. 195), and APC its reply (doc. 196).  The matter has been under submission while the court considered the filings, the record, and relevant legal authority.

---

[3]  EPA refers to the original (Middle District of North Carolina) court decision, *United States. v. Duke Energy Corp.*, 278 F.Supp.2d 619 (MD.N.C. 2003) as *Duke Energy I*, the Fourth Circuit's decision on appeal, *United States. v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005) as *Duke Energy II*, and the Supreme Court's ruling, *Environmental Defense v. Duke Energy Corp.*, 549 U.S. __, 127 S. Ct. 1423, 167 L.Ed. 2d 295 (2007), as *Duke Energy III*.  While this is not the Eleventh Circuit's practice, for consistency's sake the court will adopt that nomenclature unless the context clearly indicates otherwise.

## II.  SUBJECT MATTER JURISDICTION UNDER THE CLEAN AIR ACT AND TITLE V PERMITS

Subject matter jurisdiction is present pursuant to the Clean Air Act, codified at 42 U.S.C. §§ 7401-767 (2000) ("CAA"; "the Act").  The implementing regulations are found at 40 C.F.R., pts. 50-99.  The original Act and the amending legislation can be found, respectively, at Clean Air Act Amendment of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685 (1977); Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 108 Stat. 2399 (1990).

## III. SUMMARY JUDGMENT STANDARD

The Eleventh Circuit recently summarized the summary judgment burden, including when a defendant seeks judgment as a matter of law on the basis of an affirmative defense:

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quotations and emphasis omitted).  If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no

> genuine issue of material fact as to any element of that defense. *See*
> *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th
> Cir.2003).

*International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1273-74 (11th Cir. 2006).

## IV.  **PROCEDURAL POSTURE**

The litigants are very familiar with the history of Clean Air Act enforcement actions brought by the EPA in the Fourth, Sixth, Seventh, and Eleventh Circuits, citing to those decisions that they say support their arguments here.  These cases have addressed, among other issues, how emissions increases would be measured under the NSPS and PSD provisions of the Act, *supra*.  For other readers, an abbreviated history of this action follows.

The Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency and through the United States Attorney for the Northern District of Alabama, filed this action against Defendant Alabama Power Corporation.  (Doc. 1).[4]  The EPA originally sued APC and others on November 12, 1999, in the Northern District of Georgia, Case No. 99CV2589.  That action was dismissed against APC on the grounds of lack of *in*

---

[4]  After obtaining leave of court, the EPA filed an Amended Complaint on February 17, 2005.  (Docs. 119-121).

*personam jurisdiction*, and refiled in this District on January 12, 2001.

The EPA alleged that APC constructed new, or made modifications to existing, coal-fired, steam driven electrical power generating plants APC operates in Alabama in violation of the Clean Air Act. The work was conducted many years ago at five (5) APC plants. (Doc. 127). At four of the plants (Gorgas, Barry, Gaston, and Greene County), the EPA alleged that APC commenced maintenance, repair, and replacement activities between 1985 and 1993 that were not "routine," but were "major modifications" of those plants. (Doc. 127 at ¶¶ 64-67). *See* Ala. Admin. Code r. 335-3-14-.04(2)(b), which excludes "[r]outine maintenance, repair and replacement" from the definition of "major modification." The EPA alleged that APC failed to obtain New Source Review ("NSR") permits in violation of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92, and APC violated Alabama's State Implementation Plan ("SIP").

On April 26, 2001, the Alabama Environmental Council ("AEC") moved to intervene. (Doc. 6). On May 21, 2001, EPA, APC, and AEC filed a Joint Stipulation permitting AEC to intervene under the same terms as had been set by the Northern District of Georgia when this action was pending there.[5] (Doc.12).

---

[5] United States District Judge Julie Carnes, ND-Ga., entered an Order governing AEC's intervention. The parties stipulated to the same terms here.

On May 29, 2001, the court granted the Joint Stipulation on intervention, and

denied as moot the AEC intervention motion.  (Doc.13).

## V.  CAA EMISSION RULES: NSPS & PSD BACKGROUND
### *Duke Energy III*, *New York I*, and *New York II*

Any discussion of NSPS and PSD review, and their relation to RMRR, is

controlled, where binding, and informed, where not binding, by *Duke Energy III*, *New*

*York v. EPA*, 413 F.3d 3, 11-17 (D.C.Cir. 2005) ("*New York I*") and *New York v. EPA*,

443 F.3d 880 (D.C. Cir. 2006), *cert. denied,* 127 S. Ct. 2127, 167 L.Ed.2d 882 (2007)

("*New York II*").

The Supreme Court summarized the history of NSPS and PSD in *Duke Energy*

*III*:

> In the 1970s, Congress added two air pollution control schemes to the
> Clean Air Act: New Source Performance Standards (NSPS) and
> Prevention of Significant Deterioration (PSD), each of them covering
> modified, as well as new, stationary sources of air pollution. The NSPS
> provisions define the term "modification," 42 U.S.C. § 7411(a)(4), while
> the PSD provisions use that word "as defined in" NSPS, § 7479(2)(C).
> The Court of Appeals concluded that the statute requires the
> Environmental Protection Agency (EPA) to conform its PSD regulations
> on "modification" to their NSPS counterparts, and that EPA's 1980 PSD
> regulations can be given this conforming construction. We hold that the
> Court of Appeals's reading of the 1980 PSD regulations, intended to
> align them with NSPS, was inconsistent with their terms and effectively
> invalidated them; any such result must be shown to comport with the
> Act's restrictions on judicial review of EPA regulations for validity.

I

The Clean Air Amendments of 1970, 84 Stat. 1676, broadened federal authority to combat air pollution, see *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 845-846, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and directed EPA to devise National Ambient Air Quality Standards (NAAQS) limiting various pollutants, which the States were obliged to implement and enforce, 42 U.S.C. §§ 7409, 7410. The amendments dealing with NSPS authorized EPA to require operators of stationary sources of air pollutants to use the best technology for limiting pollution, *Chevron*, supra, at 846, 104 S.Ct. 2778; see also 1 F. Grad, Environmental Law § 2.03, p. 2-356 (2006), both in newly constructed sources and those undergoing "modification," 42 U.S.C. § 7411(a)(2). Section 111(a) of the 1970 amendments defined this term within the NSPS scheme as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted,"42 U.S.C. § 7411(a)(4).

EPA's 1975 regulations implementing NSPS provided generally that "any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of [S]ection 111." 40 CFR § 60.14(a) (1976). Especially significant here is the identification of an NSPS "modification" as a change that "increase[s] . . . the emission rate," which "shall be expressed as kg/hr of any pollutant discharged into the atmosphere."§ 60.14(b).

NSPS, however, did too little to "achiev[e] the ambitious goals of the 1970 Amendments," R. Belden, Clean Air Act 7 (2001) (hereinafter Belden), and the Clean Air Act Amendments of 1977, 91 Stat. 685, included the PSD provisions, which aimed at giving added protection to air quality in certain parts of the country "notwithstanding attainment and maintenance of" the NAAQS. 42 U.S.C. § 7470(1). The 1977 amendments required a PSD permit before a "major emitting facility" could be "constructed" in an area covered by the scheme. § 7475(a). As originally enacted, PSD applied only to newly constructed sources, but

soon a technical amendment added the following subparagraph: "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in [S]ection 111(a)) of any source or facility." § 14(a)(54), 91 Stat. 1402, 42 U.S.C. § 7479(2)(C); see also *New York v. EPA*, 413 F.3d 3, 13 (C.A.D.C. 2005). In other words, the "construction" requiring a PSD permit under the statute was made to include (though it was not limited to) a "modification" as defined in the statutory NSPS provisions.

In 1980, EPA issued PSD regulations[6], which "limited the application of [PSD] review" of modified sources to instances of "'major' modificatio[n]," Belden 46, defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."40 CFR § 51.166(b)(2)(i) (1987). Further regulations in turn addressed various elements of this definition, three of which are to the point here. First, the regulations specified that an operational change consisting merely of "[a]n increase in the hours of operation or in the production rate" would not generally constitute a "physical change or change in the method of operation."§ 51.166(b)(2)(iii)(f). For purposes of a PSD permit, that is, such an operational change would not amount to a "modification" as the Act defines it. Second, the PSD regulations defined a "net emissions increase" as "[a]ny increase in actual emissions from a particular physical change or change in the method of operation," net of other contemporaneous "increases and decreases in actual emissions at the source."§ 51.166(b)(3). "Actual emissions" were defined to "equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation."§ 51.166(b)(21)(ii). "[A]ctual emissions" were to be "calculated using the unit's actual operating hours [and] production rates." *Ibid*. Third, the term "significant" was defined as "a rate of emissions that would equal

---

[6] Although The EPA had promulgated an earlier set of PSD regulations in 1978, 43 Fed.Reg. 26380, here, as in *Duke Energy III*, none of the parties argues that the 1978 PSD regulations apply.

or exceed" one or another enumerated threshold, each expressed in "tons per year." § 51.166(b)(23)(i).

It would be bold to try to synthesize these statutory and regulatory provisions in a concise paragraph, but three points are relatively clear about the regime that covers this case:

> (a) The Act defines modification of a stationary source of a pollutant as a physical change to it, or a change in the method of its operation, that increases the amount of a pollutant discharged or emits a new one.

> (b) EPA's NSPS regulations require a source to use the best available pollution-limiting technology only when a modification would increase the rate of discharge of pollutants measured in kilograms per hour.

> (c) EPA's 1980 PSD regulations require a permit for a modification (with the same statutory definition) only when it is a major one and only when it would increase the actual annual emission of a pollutant above the actual average for the two prior years.

*Environmental Defense*, 127 S. Ct. at 1428-30 (footnotes omitted).[7]

## VI. *WEPCO*

In the years leading up to *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"), owners and operators of power plants routinely made many types of routine repairs and modifications ("RMRR") to their units without

---

[7] For another very detailed history of the EPA emissions rules promulgated after the 1977 Amendments to the Clean Air Act, *see New York I*, 413 F.3d at 11-17.

triggering the NSR regulations.  A review of decisional law reveals no appellate examination of how to interpret RMRR, specifically the term "modification" (narrowly or broadly), until the Seventh Circuit's decision in *WEPCO*.  Wisconsin Electric Power Company challenged the EPA's determinations that WEPCO's proposed renovations to its Port Washington power plant would subject the plant to NSPS and PSD review under the Act.

In *WEPCO*, the Seventh Circuit became the first appellate court to undertake a review of a CAA enforcement action against an electric utility for violating the CAA.  The Seventh Circuit described the CAA and NSR framework thus:

> In 1970, Congress enacted the Clean Air Act Amendments, Pub.L. No. 91-604, 84 Stat. 1676, to establish minimum air quality standards that would regulate the emission of certain pollutants into the atmosphere. To this end, Congress instructed the EPA to develop National Ambient Air Quality Standards ("NAAQS") that would specify the maximum permissible concentration of air pollutants in different areas across the country.
>
> In section 111 of the 1970 Amendments, Congress required the EPA to promulgate New Source Performance Standards ("NSPS") in order to regulate the emission of air pollutants from new sources. These standards addressed hourly rates of emission and, in addition to new sources, applied to modifications of existing facilities that created new or increased pollution. Indeed, section 111(a)(2) of the Act stated that NSPS would apply to any stationary source, the construction *or modification* of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source. 42 U.S.C. § 7411(a)(2) (emphasis supplied). Congress then defined

11

"modification" as *any physical change* in, or change in the method of operation of, a stationary source *which increases the amount of any air pollutant emitted* by such source or which results in the emission of any air pollutant not previously emitted.  42 U.S.C. § 7411(a)(4) (emphasis supplied).

Subsequently, faced with only varying degrees of success in controlling pollution in different parts of the country, Congress enacted the Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (codified at 42 U.S.C. §§ 7401-7642 (1982)). Congress revised the NSPS so that regulated sources of pollution would have to use "the best system of continuous emission reduction which (taking into consideration the costs of achieving such emission reduction, and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. . . ." 42 U.S.C. § 7411(a)(1)(C). In addition, Congress added a program for the Prevention of Significant Deterioration ("PSD"), concerned with increases in total annual emissions, to ensure that operators of regulated sources in relatively unpolluted areas would not allow a decline of air quality to the minimum level permitted by NAAQS. Air quality is preserved in this program by requiring sources to limit their emissions to a "baseline rate"; regulated owners or operators in areas that have attained NAAQS must obtain a permit before constructing or modifying facilities. 42 U.S.C. § 7475(a)(1). Congress also essentially adopted its NSPS definition of "modification" for the PSD program. 42 U.S.C. § 7479(2)(C). From this statutory framework, the EPA promulgated regulations for both the NSPS and PSD programs. In this case, its regulations concerning modifications are central. The EPA defines "modification" in substantially the same terms used by Congress:

> [A]ny physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of section 111 [42 U.S.C. § 7411] of the Act. 40 C.F.R. § 60.14(a) (1988). To determine whether a physical change constitutes a modification for purposes of NSPS, EPA must

determine whether the change increases the facility's *hourly rate* of emission. 40 C.F.R. § 60.14 (1988). For PSD purposes, current EPA regulations provide that an increase in the *total amount* of emissions activates the modification provisions of the regulations. 40 C.F.R. § 52.21(b)(3) (1988).

*WEPCO*, 893 F.2d at 904-05 (emphasis in original).

In *WEPCO*, the Seventh Circuit ruled in favor of the EPA on two (2) key issues over which the industry and the EPA have been at odds with each other ever since. The first issue is what constitutes an increase in emissions. That dispute ended with the Supreme Court's ruling in *Duke Energy III*, *supra*.[8] In *Duke Energy III*, the Court said that "modification" could be defined differently by the EPA in the PSD program than it had been or was defined by the EPA in the NSPS program.[9]

The second issue decided in *WEPCO* is how to determine what types of maintenance are "routine" or RMRR, and therefore do not trigger PSD/NSR, and what types are not routine, and therefore do trigger NSR. That issue was not reached by the Supreme Court in *Duke Energy III*, nor by the Fourth Circuit in *Duke Energy*

---

[8] Also in *WEPCO*, the Seventh Circuit found that The EPA had improperly relied on inappropriate assumptions for calculating its assessment of increased total annual emissions under the "actual-to-potential" test, and remanded the matter to The EPA for review of its "prevention of significant deterioration" rule implementation. This part of the ruling led to the *WEPCO* rule-making discussed *infra.*

[9] In its earlier entry of summary judgment in favor of APC, this court, following *Duke Energy I*, held that the NSR and PSD definitions were the same.

*II*, and is now before this court on APC's Motion.

NSR applies to two similar permitting functions affecting APC, but the focus in this action is on the PSD NSR program; the court will use the terms interchangeably. NSR requires permits to be obtained for construction of new facilities and for "major modifications" of existing facilities. 42 U.S.C. §§ 7470-92. The significance of triggering NSR permitting is that any construction falling under NSR must use "best available control technology" ("BACT").[10]

The dispute between APC and EPA in this motion centers on how to determine whether any of the relevant APC facilities has undergone a "major modification," which triggers NSR, or whether APC's modifications were RMRR and not subject to NSR.

## VII.  PHYSICAL CHANGE AND THE "RMRR" EXCLUSION

The "change" prong of the analysis under the Act is simple and easily answered: "any physical change in or a change in the method of operation" of a major (emissions) source qualifies. Because this test is so broad, encompassing

---

[10]  Finding BACT to be required would not necessarily be the end of the matter, *see, e.g.*, *Sierra Club v. EPA*, 499 F.3d 653 (7th Cir. 2007) (Act was not violated by EPA permit issuance to electricity plant using high sulphur coal from mine located contiguous to plant instead of requiring importation and use of low-sulphur coal; requiring the latter would amount to requiring a redesign of the plant). The court does not suggest that *Sierra Club v. EPA* would apply here (for one thing, Alabama produces low-sulphur coal); it simply notes that the Seventh Circuit was unwilling to hold that, if a lower emitting coal is available, BACT requires its use.

nearly every change to a plant's operations, there are several exclusions, the relevant exclusion here being RMRR.[11]

The court does not understand APC to dispute that it has made "physical changes" to its affected plants in the form of needed repairs to, or replacement of, component parts at those plants. Prior to the parties' Stipulations, this issue was framed by them as whether those activities, the "physical change(s)" to APC's plants[12], fall under RMRR, as APC says, or were major modifications, as EPA says. As noted, the former does not trigger PSD permitting; the latter does.

EPA cites other appellate and district court cases as authority that APC is wrong when it asserts that the 1992 (*WEPCO*) EPA rule[13] Preamble statement clarified that whether an activity is routine must be analyzed in the context of the "*relevant* industrial category," that is, the particular industry in which the activity is

---

[11] *See* 40 C.F.R. § 52.21(b)(2)(iii), and the lengthy discourses over the meaning of "any" contained in *Duke Energy III* and *New York II*, cited *supra*.

[12] The court assumes without deciding that the physical changes made at the APC plants at issue in this action resulted in increased emissions. It does so for the purpose of narrowing the scope of this Opinion and Order to the question presented, which is whether RMRR is defined by reference to the source industry or the particular plant or unit. If a physical change is RMRR, then it is not a modification subject to further PSD/NSR analysis, eliminating the need to proceed to the second part of the modification analysis, whether the physical change has resulted in any increased emissions and, if so, whether the emissions increase is large enough to trigger PSD/NSR permitting requirements.

[13] As noted *supra*, the court assumes, as did the Supreme Court, the Court of Appeals for the Fourth Circuit, and the United States District Court for the Middle District of North Carolina, that the 1980 Rule applies to this action. *See Duke Energy, III*, *supra*, 127 S. Ct. at 1430 n.4.

planned, rather than by reference to units in other industrial categories whose maintenance practices might be quite different. Here the relevant industry would be coal burning steam generating plants that generate electricity for utility companies like APC. APC cites the 1992 Preamble as the EPA's most authoritative statement on RMRR, and specifically for the proposition that RMRR is defined with reference to the industry, not the unit.

A. **THE 1992 PREAMBLE**

The 1992 guidance the EPA provided in the Federal Register is a public statement by the EPA on the routine maintenance exemption found in the Preamble to a 1992 amendment to the NSR regulations:

> A few commenters requested that EPA define or provide guidance on 'routine repair, replacement, and maintenance' activities. The June 14 proposal did not deal with this aspect of the regulations, nor do the regulatory changes promulgated today. However, the issue has an important bearing on today's rule because a project that is determined to be routine is excluded by EPA regulations from the definition of major modification. For this reason, EPA plans to issue guidance on the subject as part of a NSR regulatory update package which EPA presently intends to propose by early summer. In the meantime, EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is 'routine' under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.

## B.  *SIGECO, OHIO EDISON,* AND *DUKE ENERGY I*

In  *United States v. Southern Ind. Gas & Elec. Co.*, 245 F.Supp.2d 994, 1021 (S.D. Ind. 2003) ("*SIGECO*"), the Southern District of Indiana denied SIGECO's motion for summary judgment on the EPA's enforcement action against it.  While a primary thrust of SIGECO's argument was that it did not have "fair notice" of the government's litigating position, an issue not before this court in this motion, the *SIGECO* court concluded that prior EPA pronouncements, specifically the EPA "Clay Memorandum" discussed in *WEPCO,* gave regulated parties "sufficient notice that EPA considered how often an activity takes place at a unit to be a significant factor." *Id.*, 245 F.Supp.2d at 1021.[14]

As to the 1992 Preamble, *SIGECO* had this to say:

> However, because it is so brief, and because it was contained in a preamble to regulatory changes that had nothing to do with routine maintenance, the preamble language does not clarify much about the frequency factor, and certainly does not indicate to the regulated community that the EPA meant any change from the interpretation it advanced in the Clay Memorandum.

*Id.*

---

[14]  On September 9, 1988, EPA Acting Assistant Administrator Don R. Clay issued a memorandum in which he preliminarily concluded that the WEPCO project would subject the plant to both NSPS and PSD requirements.  Memorandum from Don R. Clay, Acting Assistant Administrator for Air and Radiation of the EPA, to David A. Kee, Director of Air and Radiation Division, Region V (Sept. 9, 1988) [Clay Memorandum].  *WEPCO*, 893 F.2D at 906.

*SIGECO* went on to grant the EPA's summary judgment motion which was based on its argument that  SIGECO's projects did not qualify for the RMRR exclusion, saying that the court  found that the EPA's current interpretation of routine maintenance was reasonable.  *Id*.  *SIGECO*, so far as this court can tell, remains pending in the District Court, and there has been no Seventh Circuit adjudication of that court's rulings that would be applicable here.

Following *SIGECO* and relying on it, the same court ruled in a similar fashion in *U.S. v. Cinergy Corp.*, 495 F.Supp.2d 909, 930-31 (S.D. Ind. 2007) ("*Cinergy III*") (RMRR exclusion applies to "a narrow range of activities," and considers each project's nature and extent, purpose, frequency at both the particular unit and at units within the industry, and cost; while industry frequency is a factor, "routine" is judged by the generating unit, not the industry as a whole).

Earlier, the emissions and RMRR issues were contemporaneously before the Southern District of Ohio in  *United States v. Ohio Edison*, 276 F.Supp.2d 829, 887-88 (S.D. Ohio 2003) ("*Ohio Edison*"), and *United States v. Duke Energy Corp.*, 278 F.Supp.2d 619 (M.D.N.C. 2003) ("*Duke Energy I*").

In August 2003, the *Ohio Edison* court concluded that eleven component replacement projects at Ohio Edison's Sammis Plant were "modifications" that

18

triggered the NSR/PSD obligation to install BACT. *Ohio Edison* agreed with the EPA's interpretation of RMRR – *i.e.*, that "routine" must be judged in reference to the unit and not the industrial category, and that there can be an emissions increase based solely on increases in hours of operation within permitted capacity, without any increase in a unit's maximum hourly emissions rate.

Three weeks later, in *Duke Energy I*, the Middle District of North Carolina agreed with Duke Energy's, not the EPA's, interpretation of NSR. Duke Energy had made twenty-nine modifications of its coal-fired electric power generation units between 1988 and 2000, all without obtaining permits. These modifications did nothing to increase the hourly rate of emissions, but since they allowed the plant to run for more hours each day, they increased the total emissions per day. Under the PSD provision, a power company must obtain a permit every time it makes a physical change that leads to a significant net emissions increase. However, the EPA had disseminated a regulation that explicitly excludes an increase in the hours of operation from qualifying as a significant net emissions increase.[15]

In *Duke Energy I*, the EPA interpreted PSD to allow an increase in the hours of operation only if the increase did not require any construction. The court granted Duke Energy's motion for summary judgment, holding that the court could not defer

---

[15] 40 C.F.R. § 51.166(b)(2)(iii)(f).

to the EPA's interpretation because it was clearly contrary to its earlier interpretations. Also, the PSD provision explicitly included the definition of modification from the New Source Performance Standards (NSPS) provision (42 U.S.C. § 7411) of the Clean Air Act, which was also contrary to the EPA's interpretation. *Duke Energy I* said RMRR must be defined relative to the industrial category (not in reference to the unit), and that a project must increase a unit's maximum achievable hourly emissions rate before an emissions increase triggers NSR (not an emissions increase based solely on increases in hours of operation within permitted capacity).

The *Duke Energy I* court concluded that the issues remaining for trial were whether the projects were routine maintenance, repair, and replacement and whether the projects caused an increase in annual net emissions.

Thus, under *Duke Energy I*, the replacement projects at issue in *Ohio Edison* would not be "modifications" and, therefore, would not trigger the obligation to install BACT, and the projects in *SIGECO* would not increase emissions so as to trigger BACT application under the PSD provisions of the Act.

20

## C. *DUKE ENERGY II & III*

The EPA appealed. Several parties, including the Environmental Defense Fund, intervened in the case on the side of the United States. The United States Court of Appeals for the Fourth Circuit affirmed, *United States v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005) ("*Duke Energy II*"). The Fourth Circuit analyzed the "modification" issue in strictly statutory terms, therefore not reaching RMRR, and held that the EPA was <u>required</u> to interpret the definition of "modification" the same way in the PSD and NSPS, since the provisions use the same definition. In other words, the Fourth Circuit held that the EPA's previous interpretation of the NSPS provision that would allow the construction without a permit must also apply to the PSD provision, *i.e.*, that the definitions in both programs were, as a statutory matter, identical.

The United States did not appeal the Fourth Circuit's *Duke Energy II* ruling. Environmental Defense, however, did. The Supreme Court granted *certiorari* on two (2) questions:

> (1) Whether the court of appeals lacked jurisdiction by virtue of Section 307(b) of the Clean Air Act, 42 U.S.C. 7607(b), which provides that nationally applicable regulations that the EPA issues to implement the Act may be reviewed only through properly filed petitions for review, not in enforcement actions?

> (2) Whether the Clean Air Act requires the EPA to interpret the statutory

term "modification" consistently in its Prevention of Significant Deterioration (PSD) provisions and New Source Performance Standards (NSPS) regulations?

The Supreme Court answered the first question "yes," the second question "no," and remanded the action to the Fourth Circuit for proceedings consistent with its opinion. *Environmental Defense v. Duke Energy Corp.*, 527 U.S. ____, 127 S. Ct. 1423, 167 L.Ed.2d 295 (2007). The Fourth Circuit, in turn, vacated its opinion and remanded the action to the District Court, where it remains pending at this time.

Meanwhile, the Eleventh Circuit had stayed the appeal from this court's entry of summary judgment in favor of APC to await the *Duke Energy III* decision. *See* Order Vacating In Part Memorandum On Correct Legal Tests. (Doc. 197).

### D. *AMERICAN ELECTRIC* AND *EAST KENTUCKY POWER*

The most recent decisions cited by the parties, and reviewed by the court, are *New York v. American Elec. Power Serv. Corp.*, Nos. 2:04-cv-1098 and 2:05-cv-360, 2007 WL 539536 (S.D.Ohio Feb.15, 2007) ("*American Electric*"), and *U.S. v. East Kentucky Power Co-op., Inc.*, 498 F.Supp.2d 976, 993-994 (E.D.Ky. 2007) ("*East Kentucky Power* ").

*American Electric*, resolved by a consent decree entered December 20, 2007, 2007 WL 3023139, follows the reasoning of *Ohio Edison* and adds some of its own. *American Electric* rejects the argument APC makes here that industry practice is

<u>dispositive</u> of the entire action: "[to] consider only industry practices would be to ignore the plain language of the statutory regulations by judicially erecting a curious scheme in which the regulated determine the applicability of the regulations without an indication of supporting legislative intent." 2007 WL 539536 at 3.

*East Kentucky Power* collects and discusses the key RMRR decisions, including *American Electric*. *East Kentucky Power* succinctly sets out the arguments for and against the EPA's and the electric utility industry's competing RMRR arguments and their treatment by the various district courts in the RMRR cases, and the court will not repeat it here. After having done so, *East Kentucky Power* held that RMRR would be judged under the multi-factor *WEPCO* test "with reference to the industry as a whole, not just the particular . . . unit at issue." 498 F.Supp.2d at 993. *See* **Section IX**., *infra*.

## VIII. <u>DEFERENCE TO ADMINISTRATIVE AGENCY</u>

The degree of deference to be accorded the EPA on the RMRR issue was, together with the emissions increase issue, discussed in some detail in this court's Opinion on Correct Legal Tests Memorandum, 372 F.Supp.2d 1283 (N.D. Ala. 2005). (Doc. 140). The court revisits the issue to assure the reader that the court is aware of the deference shown by the Supreme Court in *Duke Energy III* and by the D.C. Circuit in *New York I* and *New York II*. The court notes that those actions arose in the

23

review of emissions rules promulgated by the EPA after notice and comment rule making, not in an enforcement action. The court further notes, and discusses in **Section IX**, that both *Duke Energy III* and *New York I* make reference to the remaining 1999 enforcement actions in a manner that the court thinks clearly reserves to the lower courts still trying those enforcement actions the ability, or flexibility, to address the deference issue in the context of those actions; in other words, this court is not entertaining a challenge to the EPA's 1980 Rule, or any subsequent emissions rule. The court here addresses the issue of the degree of deference due the EPA in this enforcement action.

The court does not quarrel with the well-settled rule that courts show deference to administrative agencies in areas where Congress has legislated a broad mandate or goal, with the applicable agency filling in the statutory interstices by notice and comment rule-making. Nor does it question in any way the judicial restraint called for when the regulated area is, like here, highly technical and complex. *New York II*, *supra*, at 23 -24.

The Supreme Court has said similar things in other contexts:

We have previously pointed out that the "'power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Chevron*, 467 U.S., at 843, 104 S.Ct. 2778 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct.

1055, 39 L.Ed.2d 270 (1974); omission in original). When an agency fills such a "gap" reasonably, and in accordance with other applicable (e.g., procedural) requirements, the courts accept the result as legally binding. 467 U.S., at 843-844, 104 S.Ct. 2778; *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

*Long Island Care at Home, Ltd. v. Coke*, --- U.S. ----, 127 S.Ct. 2339, 2345-2346, 168 L.Ed.2d 54 (2007) ("*Coke III*").

Such deference is likewise shown in this Circuit.

Federal regulations are subject to one of two levels of deference, described as either *Chevron* or *Skidmore* deference. Under the *Chevron* analysis, if Congress expressly delegates authority to the agency to make rules carrying the force of law and the agency promulgates such rules pursuant to that authority, courts give controlling weight to the regulations unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); see also *United States v. Mead*, 533 U.S. 218, 226-27, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001) (*Chevron* applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). Although a delegation of authority from Congress to an agency may be explicit, the Supreme Court also has recognized that such delegations may be "implicit." *See Mead*, 533 U.S. at 229, 121 S.Ct. 2164; *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778.

In other situations, where a regulation fails to meet *Chevron* the *Skidmore* analysis applies. Under *Skidmore*, an agency's interpretation may merit some deference depending upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); see also

*Mead*, 533 U.S. at 234-35, 121 S.Ct. 2164.

*Buckner v. Florida Habilitation Network, Inc.*, 489 F.3d 1151, 1154-55 (11th Cir. 2007).

As to the argument that the EPA has interpreted its CAA regulations differently at different times, the court says that *Duke Energy III* and *New York I* make clear this is permissible, as do *Buckner, supra*, and *Coke III, supra*:

> The Court also noted that the DOL has interpreted these regulations differently at different times, but concluded that "**as long as interpretive changes create no unfair surprise . . . the change in interpretation alone presents no separate ground for disregarding the Department's present interpretation.**" *Coke III*, at 2342.

*Buckner, supra*, 489 F.3d at 1156 n.4.  (emphasis supplied).

This deference is, of course, not absolute:

> *Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the "specialized experience and broader investigations and information" available to the agency, 323 U.S., at 139, 65 S.Ct. 161, and given the value of uniformity in its administrative and judicial understandings of what a national law requires, *id.*, at 140, 65 S.Ct. 161. *See generally Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 136, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (reasonable agency interpretations carry "at least some added persuasive force" where *Chevron* is inapplicable); *Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (according "some deference" to an interpretive rule that "do[es] not require notice and comment"); *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of ...

delegated lawmaking powers").

*Mead*, 533 U.S. 234-235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

As noted, the level of deference changes when the agency is interpreting its own (issued) regulations, and is least deferential when it appears that the agency interpretation appears to be a litigation position in an enforcement proceeding. *Mead*, *supra*. The court has previously expressed its opinion that EPA's arguments in this case sound more in litigation position than regulation interpretation. The court reserves final decision on the degree of deference; since a trial will be necessary, it is unnecessary to enter a dispositive ruling on the deference issue at this time.

## IX.  RMRR DISCUSSION

Using the above as a framework, the court says the core of EPA's argument is that the court's earlier rulings are inconsistent with EPA's multi-factor [modification] test which the Seventh Circuit upheld in *WEPCO* (a case cited with approval by the Court in *Duke Energy III*), and also inconsistent with the logic of the D.C. Circuit's decision in *New York II*. Collectively, EPA says, those decisions require this court to vacate both of its prior rulings set forth above, *i.e.*, not just its "increase in emissions" holding, but also its RMRR holding.

Worth noting is the D.C. Circuit Court of Appeals' observation about *WEPCO* in *New York I*: "***WEPCO . . . is important because of EPA's response to it***. . ." 413

F.3d at 15 (referring to the EPA's adoption of the 1982 emissions increase rule) (emphasis supplied). *See* 57 Fed. Reg. 32,314. Every time the court reads *WEPCO,* it wants to have its vision checked. EPA may be right when it says in its Opposition that *WEPCO* struck down the EPA's <u>interpretation</u> of part of its emissions rule test, as opposed to this court's earlier observation in the Legal Tests Memorandum that *WEPCO* attacked the regulation's <u>validity</u>, an attack that could not be raised in an enforcement proceeding like *WEPCO*, see 42 <u>U.S.C.</u> § 7607(b)(2). That said, the court finds it perplexing to then re-read *New York I*, where the D.C. Circuit appears to tacitly acknowledge that *WEPCO* <u>did</u> invalidate a national emissions rule. 413 F.3d at 15-16.

Further, the EPA's 2002 Rule Proposal and Final Rule say a lot more about the RMRR exclusion adopted in the 1980 Rule than *New York II* says (" EPA has for over two decades defined the RMRR exclusion as limited to '*de minimis* circumstances.'") 443 F.3d at 884. The court will not burden the reader with extensive quotations from the EPA's RMRR discussion in its 2002 Rule proposal, 67 Fed.Reg. 80,290, 80,292-93 (Dec. 31, 2002), or in the final 2002 Rule, 68 Fed.Reg. at 61,248, 272. A fair reading of the EPA's description of how it has defined and applied RMRR during the (then) twenty (20) year history of NSR leads inexorably to the conclusion that, as the EPA said, a facility could spend millions of dollars on equipment replacement or

repair without triggering NSR.  II.B. of the Final 2002 Rule, *Issues Surrounding the RMRR Exclusion,* 68 Fed.Reg. 61,249 - 250, sums up the problems with the EPA's "case by case" approach to the RMRR exclusion; the absence of a definition led to uncertainty and what that uncertainty resulted in:

> To elaborate on the uncertainty issues: Unless an owner or operator seeks an applicability determination from his or her reviewing authority, it can be difficult for the owner or operator to know with reasonable certainty whether a particular activity constitutes RMRR.  This gives the owner or operator five choices, two of which the owner or operator is not likely to select, and the other three of which have significant drawbacks for the productivity of the plant.

68 Fed.Reg. 61,250.

That leaves as the question presented by APC's motion what remains, at the Supreme Court and in this Circuit, an undecided question of first impression: how RMRR is to be measured.  *See Tenn. Valley Auth. v. EPA*, 278 F.3d 1184, 1189 n.3 (11th Cir. 2002) ("*TVA I*"), *opinion withdrawn in part*, 336 F.3d 1236 (11th Cir. 2003), *cert. denied*, 541 U.S. 1030, 124 S.Ct. 2096, 158 L.Ed.2d 711 (2004) ("A central disagreement between [industry] and EPA is whether 'routine' should be defined relative to an industrial category or to a particular unit.").

Ostensibly, the parties agree that RMRR is not a "one trick pony"; in its Reply Brief, APC says the RMRR test is, as EPA asserts, a multi-factor test:

> Thus, the issue is not whether the specific facts or characteristics of the

29

projects are considered in determining "routine" - they are clearly part of the "analysis."   Rather, the central issue is and always has been whether the project type is evaluated against an industry or unit frame of reference.

APC Reply Brief, doc.196, p. 3.

The court's reading of the cases is that the Supreme Court in *Duke Energy III,* the D.C. Circuit in *New York I*, and, for that matter, the Seventh Circuit in *United States v. Cinergy*, 458 F.3d 705, 708 (7th Cir.2006) (Posner, J.) ("*Cinergy II*"), *supra*, were focused on and concerned with the CAA's judicial review scheme, and its perceived overturning by *Duke Energy II*, and the analyses were <u>not</u> driven by whether RMRR was to be measured by reference to work commonly performed within the industry (coal burning electricity generating plants) as opposed to the particular (here APC's) plant or unit.

The court's reading is reinforced because *New York II*, heavily relied on by the EPA here, expressly left open the question whether RMRR necessarily constitutes a modification:

> ***The court has no occasion to decide whether part replacements or repairs necessarily constitute a "modification" under the definition taken as a whole***.

*New York v. EPA II*, 443 F3d at 888 n.4 (emphasis supplied).

Additionally, while certainly not dispositive of the issue, the court notes that

the Supreme Court denied *certiorari* in *New York II* after it had issued *Duke Energy III*, *see* 127 S. Ct. at 127 (2007).

EPA misses the point when it quotes *New York II*'s language about RMRR being historically narrowly defined; those comments were made in the context of reviewing a new set of regulations that were challenged, as the court said, on every front. *New York II* and, for that matter, *Duke Energy III*, each spent little more than a paragraph discussing anything directly related to the 1999 enforcement actions. This is understandable; EPA was already on record saying it would not file additional enforcement actions and that, were they judged under current rules, most if not all of the coal-fired plants at issue in existing enforcement actions would not be found in violation of the Act.

It would take a strained reading of the detailed and annotated review of the relevant history set out by the Middle District of North Carolina in *Duke Energy I* to reach a different conclusion from that of *Duke Energy I*. *See Duke Energy I*, 218 F.Supp.2d at 636 - 637. This court believes it is superficial and insufficient to quote the Clay Memorandum and say it forecloses all further discussion. The EPA continued to publish statements about enforcement and RMRR after the Clay Memorandum. Those statements did not occur in a vacuum; the court believes the EPA meant what it said when it called the modifications in *WEPCO* extraordinary and

31

that the EPA did not anticipate bringing additional enforcement actions because of *WEPCO*. The fact that years passed before it did so speaks for itself. The electric utility industry was reading what the EPA was publishing, *e.g*., EPA's response to Congressman Dingell's "inquiry."[16]   Additionally, while EPA's statements about RMRR determination published after the filing of this action are not dispositive of the issue, the court is unwilling to say the Preamble to the 2002 Rule is irrelevant, either:

> A few commenters requested that EPA define or provide guidance on "routine repair, replacement and maintenance" activities. The June 14 proposal did not deal with this aspect of the regulations, nor do the regulatory changes promulgated today. However, the issue has an important bearing on today's rule because a project that is determined to be routine is excluded by EPA regulations from the definition of major modification. For this reason, EPA plans to issue guidance on this subject as part of a NSR regulatory update package which EPA presently intends to propose by early summer. In the meantime, EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.

57 Fed. Reg. 32,314,326.

The *SIGECO* court was unwilling to accept the argument that defining RMRR

---

[16]   The court takes judicial notice that Congressman Dingell was chairman of the House Energy and Commerce Committee from 1981 to 1995, and from 2006 to today. As chairman of that committee during *WEPCO*, and *post-WEPCO*, Congressman Dingell exercised substantial legislative and oversight authority over the EPA.

by the relevant industrial category ended the inquiry:

> SIGECO's interpretation of routine maintenance is broad in this sense: it focuses the inquiry on one factor, and interprets that factor in a way that could lead to exempting numerous projects as routine maintenance. If the "prevalent or commonplace in the industry" standard was the EPA's interpretation, then a regulated party would only have to point to other similar projects in industry to show that they take place elsewhere to avoid the strictures of NSR. The end result could be many industry projects qualifying for routine maintenance just because others in the industry have taken on similar projects, projects that may or may not have been subject to NSR for various reasons. The comparisons could be misleading for a simple reason: perhaps many companies have made "major modifications" at their facilities. The EAB made a similar conclusion in the TVA enforcement action: "[I]t is the frequency of the activity at other individual units within the industry that seems to us most relevant in this context. The mere fact that a number of different facilities within an industry may have undertaken these projects strikes us as less instructive with respect to whether a project under review should be considered 'routine,' than the observation that this kind of replacement is, for an individual unit, an usual or once or twice-in-a-lifetime occurrence." *In re TVA*, at * 25.[17]  In sum, this focus on whether or not projects are prevalent throughout industry could lead to exempting numerous expensive and complex projects, a result that strains the meaning of the word "routine," and clashes with the guidance gleaned from the regulatory context. See Def.'s Memo in Support at 13 ("commonplace," "repetitious," "in accordance with established procedure").

*SIGECO*, 245 F.Supp.2d at 1014(footnote omitted).

The court is inclined to agree with *SIGECO* that the 1992 Preamble is not the

---

[17]  Referring to *In re Tennessee Valley Authority*, Docket No. 00-6, 2000 WL 1358648, *34 (EPA ALJ Sept. 15, 2000), the EPA Environmental Appeals Board decision whose procedure was declared unconstitutional by the Eleventh Circuit in *TVA v. Whitman*, 336 F.3d 1236 (11th Cir. 2003).

end of the matter.  But the EPA's response to Congressman Dingell, set out in *Duke Energy I*, *supra*, *see also SIGECO* at 1002,[18] suggests that neither is the Clay Memorandum the beginning and end of the inquiry, and that the EPA's other RMRR statements may be entitled to more weight than *SIGECO* was willing to give.  Put another way, the EPA's freedom to adopt new interpretations of RMRR could cut both ways; it could not tell Congress it envisioned very few *future WEPCO*-type enforcement actions on the one hand, and then argue in subsequent enforcement actions that the utility industry was unreasonable in relying on those, or similar, EPA statements.

Perhaps a better way of putting it would be that the level of deference to be accorded the EPA is highest when the review involves a new set of notice and comment emissions rules, rules involving complicated and technical questions of science and regulatory policy committed by the Clean Air Act to the EPA and therefore entitled to *Chevron* deference (*New York I*, *New York II*, *Duke Energy III*, *supra*).  That is not the situation where the court is presented with, and being asked to defer to, the EPA's interpretation of such a Rule in an enforcement action.  *Duke*

---

[18] "In a June 19, 1991, letter from William Rosenberg, then Assistant EPA Administrator, to Senator John Dingell, Rosenberg stated: 'EPA's WEPCO decision only applies to utilities proposing 'WEPCO type' changes, i.e., nonroutine replacement that would result in an actual emissions increase. This is the basis for the EPA statement that the ruling is not expected to significantly affect power plant life extension projects.'"

*Energy III* and *New York II* both say that utilities in enforcement actions like this one can raise arguments about the EPA's actions and statements that were not considered by the Supreme Court and the D.C. Circuit Court of Appeals, respectively. There was no compelling reason for either court to do so; the 1980 emissions Rule is no longer operative other than in courts and Circuits like this one, where the 1999 enforcement actions remain pending.

APC also argues that, leaving everything else aside, the court should still find dispositive of APC's motion EPA's earlier stipulation that all of the work performed at the APC plants in this action would be RMRR if the frame of reference were the industry, not the individual plant. In other words, APC argues that EPA has conceded by stipulation that, if RMRR is measured against "the relevant industrial category," none of APC's physical changes to its plants in this action trigger NSR.

EPA stipulated that the APC work was "of a type performed commonly within the industry, although perhaps infrequently at any specific one or more of [APC's] particular plants." (Doc. 144, ¶2). The court has to assume that EPA knew when it so stipulated that, if the ruling was that the reference standard was industrial category, the other factors involved in its "case by case" NSR/PSD review would be reviewed

using "routine within the industry" rather than "routine at this plant or facility."[19]

Absent such stipulation, a much better argument can be made for going forward here

using plant specific "case by case" factors, *WEPCO, et al., supra*.

Using a plant specific test for activities that occurred as far back as 1985, when

it was patently obvious what APC was doing, and the EPA said and did nothing by

way of enforcement to require any of the work to be permitted, strikes the court as a

"gotcha" test.  On the one hand, EPA says the industry had sufficient notice of its

emissions rules application policies, and that utilities, here APC, could not reasonably

or justifiably rely on contrary statements by the EPA.  Assuming the accuracy of

EPA's argument, how is it that the EPA did not realize until 1999 that most of the

coal-burning electricity plants east of the Mississippi River had been violating the Act

for nearly two decades?

Even after a careful reading of EPA's and AEC's opposition to APC's motion,

the court thinks EPA's current arguments, particularly in light of its stipulation that

all of the APC work is of a type routinely performed in the industry, sounds in

litigation strategy more than regulatory interpretation.  The court sees EPA's

---

[19]  "In this connection, to determine whether proposed work at a facility is routine, 'EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." Clay Memorandum at 3.'" *WEPCO*, 893 F.2d at 910.

opposition argument as "the D.C. Circuit and the Supreme Court have said, in 2005 - 2007, that we can interpret our emissions rules differently as conditions change and the EPA sees the scientific need to do so." The court agrees. That said, the court does not believe EPA can, in an enforcement action filed in 1999, ignore what it said and did back in the 1970's, 1980's, and 1990's up until the filing of this action.

## X. BURDEN OF PROOF

The parties have not addressed the issue of burden of proof because, until the action survives summary judgment, it would be irrelevant. APC's motion for summary judgment will be granted only in part, the court being persuaded by and intending to apply RMRR as applied in the *East Kentucky Power* decision. RMRR will not be analyzed solely by reference to the industry,[20] but judged under the multi-factor *WEPCO* test, and the analysis shall be "with reference to the industry as a whole, not just the particular [APC] unit at issue." 498 F.Supp.2d at 993. The burden of proof, previously argued by the parties in earlier summary judgment motions, will be allocated as in *East Kentucky Power*:

---

[20] The court has considered APC's argument that EPA has effectively stipulated itself out of court by its stipulation that all the work performed is of a nature performed in the industry if not at any particular APC plant, but ultimately rejects it. (Doc. 155 at ¶ 1). The court need not decide if such use of the stipulation, made after the ruling on correct legal tests, a ruling partially overturned by *Duke Energy III*, is an appropriate application of the stipulation. It suffices to say that the court has not found, nor has APC cited, any controlling or persuasive authority for the proposition that the inquiry ends if the work is routine within the industry.

the Court holds that it will ultimately determine whether EKPC's projects fall under the RMRR exclusion by applying the WEPCO multi-factor test-nature and extent, purpose, frequency, and cost-with reference to the industry as a whole, not just the particular EKPC unit at issue. This does not mean that a particular project will be considered routine simply because it has been performed by another entity within the industry. The test does not turn on whether a particular replacement project has ever occurred in the industry or even necessarily the number of times it has occurred within the industry. Rather, the Court will consider all of the WEPCO factors, including frequency, taking into consideration the work conducted at the particular EKPC unit, the work conducted by others in the industry, and the work conducted at other individual units within the industry. Based on the above, the Court will deny the plaintiff's motion regarding the RMRR exclusion test to be applied.

*East Kentucky Power*, 498 F.Supp.2d at 993-94.

## XI. SUMMARY

1.    The EPA's 1980 PSD regulations require a permit for a modification only when it is a major modification, one that increased the actual annual emission of a pollutant above the actual average for the two years prior to the modification. *Duke Energy III*, 127 S.Ct. at 1428-30.

2.    The RMRR exclusions found in the Clean Air Act apply to activities that are considered "routine in the industry."

3.    Genuine issues of material disputed fact remain regarding whether APC's challenged activities are exempt as RMRR.

4.    The court will ultimately determine whether APC's projects fall under

38

the RMRR exclusion in the same manner as the court set out in *East Kentucky Power*, *supra*, 498 F.Supp.2d at 993-994.

5.    EPA will have to prove that there was a "modification" - *i.e.*, a physical change that resulted in a net emissions increase, because that is what the rule has always been, and it will also have to prove that the modification was "major," because that is what *Duke Energy III* says is the test in PSD cases.[21]  Once EPA has met its burden of proof, the burden will shift to APC to prove that its activities are exempt from the definition of "modification" because they were RMRR.

6.    Regardless of whether APC meets or fails to meet its burden to show the challenged work was not "routine," it may offer evidence, either as part of its defense (*e.g.*, amount of deference the EPA is entitled to in this action)[22] at the liability stage, or in mitigation of penalty should EPA prevail on liability, as to the EPA's different statements about what kind or type of work at plants in the industry would violate *WEPCO* and what would not, what was RMRR and what was not, and the like.

---

[21]  ". . .(c) EPA's 1980 PSD regulations require a permit for a modification (with the same statutory definition) only when it is a major one and only when it would increase the actual annual emission of a pollutant above the actual average for the two prior years."  127 S. Ct. 1423, 1430.

[22]  But not to assert lack of "fair notice."  The court has reviewed the previously filed materials on this issue, and needs no further assistance from the parties on it.  Assuming APC has properly reserved this defense, no court has sustained the fair notice defense, and neither will this one.

39

# XII. <u>CONCLUSION</u>

For the reasons stated, it is **ORDERED** that:

1.     APC's Motion for Summary Judgment is hereby **GRANTED** in part. Specifically, the APC work at issue will be evaluated against an industry, not a plant or unit, frame of reference.  In all other respects, the Motion is **DENIED** because genuine issues of material fact remain.

2.     The court will apply the RMRR analysis as set forth in *East Kentucky Power*, *supra*, 498 F.Supp.2d at 993-994;

3.     EPA's burden of proof will be to demonstrate that the challenged work was a major modification as described above;

4.     Assuming EPA carries its burden as to any of the challenged work, then, as to that specific work, the burden will shift to APC to prove that the work was exempt as RMRR;

5.     The court will consider APC's evidence as to the EPA's different statements about what kind or type of work at plants in the industry would violate *WEPCO* and what would not, what was RMRR and what was not, as described above, provided further, however, that EPA's statements will not be applied retroactively, *e.g.*, the 2002 Rule Preamble does not, standing alone, meet APC's burden.

40

**DONE** and **ORDERED** this the 24th day of July, 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge