FILED
2011 Mar-14  PM 05:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | |
| ) | |
| ALABAMA ENVIRONMENTAL ) | |
| COUNCIL, ) | |
| ) | |
|     Plaintiff-Intervenor ) | |
| v. ) | Civil Action No. 2:01-CV-152-VEH |
| ) | |
| ALABAMA POWER COMPANY, ) | |
| ) | |
|     Defendant. ) | |

---

## MEMORANDUM OPINION

This case is presently before the Court on Defendant Alabama Power Company's ("Alabama Power") Motion to Strike Paragraph 5 of Dr. Ranajit Sahu's ("Sahu") Declaration and Exclude This New Opinion From Evidence (Doc. 312). The United States filed a response (Doc. 331) to which Alabama Power replied (Doc. 335). A hearing on this matter was held on February 18, 2011. For the reasons explained below, Alabama Power's Motion to Strike is due to be granted.

## I.     STANDARD

Federal Rule of Civil Procedure 26 requires that a party "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A).

This disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). Rule 26(a) expert reports must be "detailed and complete," they must not be sketchy, vague, or preliminary in nature. Fed. R. Civ. P. 26 advisory committee's note; *see Dixie Steel Erectors, Inc. v. Grove U.S., L.L.C.*, No. CIV-04-930-F, 2005 WL 3558663, at *6 (W.D. Okla. Dec. 29, 2005) ("The opposing party is [] entitled to rely on [the expert] report as a definitive statement of the expert's direct testimony and of the basis for that testimony"). Rule 26 disclosures must be made at the times and in the sequence a court orders. Fed. R. Civ. P. 26(a)(2)(D).

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless." *See Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) ("Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational"(quotation omitted)).

## II.    BACKGROUND

On December 14, 2009, the United States submitted its initial expert reports in this case.  The emissions analysis of Alabama Power's projects was performed by the combination of Mr. Robert Koppe ("Koppe") and Sahu.  Koppe, a power plant reliability engineer, performed the first part of the analysis, estimating how the projects would affect future generation.  (Koppe Expert Report of Dec. 14, 2009, Doc. 331 Ex. 2 at 2).  Sahu, an environmental permitting engineer, performed the second part of the analysis, converting the increased generation into increased emissions.  (Sahu Expert Report of Dec. 14, 2009, Doc. 331 Ex. 1 at 1-2).

For the balanced draft conversion at Gorgas Unit 10, Koppe analyzed two expected impacts of the project: (1) the effect of the project on hours of operation,

and (2) the effect of the project on the unit's capacity to produce electricity. (Doc. 331 Ex. 2 at 2). With regards to the unit's capacity to increase electricity, Koppe decided to base his calculations on an increase of 28 MW, since he determined that was what was used in Alabama Power's justification for the project. *Id.* at 97.

In his report of December 14, 2009, Sahu produced emissions calculations for each of the projects at issue. (Doc. 331 Ex. 1 at 26). For the Gorgas Unit 10 balanced draft conversion project, Sahu's calculations "[i]nclude[d] 126,000 MWhrs per year due to increased capacity of 28 MW plus reduction in outage hours in respective baseline periods." *Id.* at Att. G.

On February 26, 2010, Alabama Power produced its expert reports in this case. The United States' experts produced their rebuttal reports on May 28, 2010, and Sahu produced an amended rebuttal report on June 4, 2010. Sahu's actual-to-projected actual calculations in his amended rebuttal report showed that Alabama Power should have expected the Gorgas Unit 10 balanced draft conversion project to cause increases in $SO_2$ emissions of between 2,312.2 and 2,829.6 tons per year and increases in $NO_x$ emissions of between 820.7 and 984.8 tons per year. (Sahu Rebuttal Report of June 4, 2010, Doc. 331 Ex. 3 at App. C). Sahu's amended rebuttal calculations for the Gorgas Unit 10 balanced draft conversion project "[i]nclude[d] 126,000 MWhrs per year due to increased capacity of 28 MW plus reduction in

4

outage hours in respective baseline periods." *Id*.

On June 8, 2010, Alabama Power took Sahu's deposition.  At the deposition, Sahu stated that all of his final emissions calculations were included in the exhibits attached to his amended rebuttal report of June 4, 2010.[1]  (Sahu Deposition of June 8, 2010, Doc. 312 Ex. 2 at 24-25).

On September 30, 2010, the United States moved for summary judgment that the Gorgas Unit 10 balanced draft conversion was a "major modification," that is, a (1) non-routine physical or operational change that (2) should have been expected to cause a significant emissions increase.  (Doc. 307).  In support of its motion for summary judgment, the United States submitted a declaration from Sahu.  (Doc. 300

_____

[1]  The United States asserts that Sahu's calculation spreadsheet and his amended rebuttal calculation spreadsheet in their "native" electronic formats were marked as exhibits to Sahu's deposition on June 8, 2010.  (Doc. 331 at 4).  The United States produced Sahu's calculation spreadsheet in its "native" electronic format to Alabama Power on March 26, 2010.  (Letter of March 26, 2010, Doc. 331 Ex. 5).  The United States asserts that it also provided Sahu's amended rebuttal calculation spreadsheets to Alabama Power in "native" electronic format on June 4, 2010.  (Doc. 331 at 4).  The email which the United States cites in support of this fact does not state that the spreadsheet was provided in "native" electronic format; the only evidence of a spreadsheet is the list under Attachments which reads "Sahu - Amended Rebuttal Report.pdf; APC Sahu Rebuttal App C_Expert Report Final Appendix G (Sahu Calcs All Mods - Final 12.13.09) (Revised for Amended Rebuttal).xls."  (Email of June 4, 2010, Doc. 331 Ex. 6). The United States asserts that, because these spreadsheets were provided in native format, the equations and inputs used in Sahu's calculations can be seen.  (Doc. 331 at 4).  The United States does not provide any of these spreadsheets in support of its contention.

Ex. 48).  In paragraph 4 of the declaration, Sahu repeats the results of the calculations

in his amended rebuttal; specifically, that Alabama Power should have expected the

project to cause increases in $SO_2$ emissions of between 2,2321.2 and 2,820.6 tons per

year and increases of $NO_x$ emissions of between 820.7 and 984.4 tons per year.  (Doc.

312 Ex. 1 at 2-3).  In paragraph 5 of his declaration, Sahu sets forth the portion of

these calculations attributable solely to the capacity increase that was expected to

result from the balanced draft conversion.  *Id.* at 3.  Sahu states that Alabama Power

documents that he and Koppe reviewed indicate that a 28 MW capacity increase was

expected due to the balanced draft conversion.  *Id*.  Koppe also states that Alabama

Power documents indicate that Gorgas Unit 10 was expected to operate at full power

for 4,500 hours per year after the project.  *Id*.  Sahu explains that, based on this

information, Alabama Power should have expected increases of between 1,029 to

1,043 tons per year in $SO_2$ emissions and 363 to 364 tons per year in $NO_x$ emissions

due to the capacity increase alone.  *Id*.

On November 3, 2010, Alabama Power filed the instant motion.

## III.   ANALYSIS

Alabama Power seeks to strike paragraph 5 of Sahu's declaration, and to

exclude the opinion stated in it from evidence, arguing that it is a new expert opinion

improperly disclosed after the deadlines established by this Court and in violation of

Federal Rules of Civil Procedure 26(a) and 37(c)(1).   (Doc. 312 at 2).   Alabama

Power argues that, even if Sahu's opinion had been previously disclosed, the opinion

should be stricken pursuant to Federal Rule of Evidence 702, because it is premised

on inaccurate assumptions and insufficient data and uses questionable methodologies

to reach a contrived conclusion.  *Id.* at 9.  The United States argues that the motion

should be denied as there is nothing new about Sahu's calculations in paragraph 5 of

his declaration, stating that these calculations were first disclosed to Alabama Power

on December 14, 2009, in Sahu's initial expert report and were also included in

Sahu's rebuttal report of June 4, 2010.[2]  (Doc. 331 at 6-7).

In paragraph 5 of his declaration, Sahu states, "For this declaration, I was asked

to isolate one aspect of my prior calculations: the emissions impact of the capacity

increase that was expected to result from the Gorgas Unit 10 Balanced Draft

Conversion project." (Doc. 312 Ex. 1 at 3).   Sahu estimated emissions increases of

between 1,029 and 1,043 tons per year of $SO_2$ and of between 363 and 364 tons per

year for $NO_x$ based on a 28 MW capacity increase that was expected due to the

---

[2]  The United States also argues that denial of the Motion to Strike is
warranted because Alabama Power's counsel did not comply with the meet-and-
confer obligations set forth in Section IV.B of this Court's Uniform Initial Order.
(Doc. 331 at 1-2).  The meet-and-confer obligation does not apply to dispositive
motions.  Alabama Power's Motion to Strike is a part of its summary judgment
filings; therefore, the meet-and-confer obligation does not apply.

balanced draft conversion and the expectation that Gorgas Unit 10 would operate at full power for 4,500 hours per year after the project. *Id*. In his initial report dated December 14, 2009, Sahu stated that the calculations for the Gorgas Unit 10 balanced draft conversion project "[i]nclude[d] 126,000 MWhrs per year due to increased capacity of 28 MW <u>plus</u> reduction in outage hours in respective baseline periods." (Doc. 331 Ex. 1 at Att. G) (emphasis added). Likewise, in his amended rebuttal report dated June 4, 2010, Sahu stated that the calculations for the Gorgas Unit 10 balanced draft conversion project "[i]nclude[d] 126,000 MWhrs per year due to increased capacity of 28 MW <u>plus</u> reduction in outage hours in respective baseline periods." (Doc. 331 Ex. 3 at App. C) (emphasis added). The United States categorizes these reports as Sahu explaining that his calculations included 126,000 MWhrs per year due to increased capacity of 28 MW, which it claims is exactly what Sahu says in paragraph 5 of his declaration. (Doc. 331 at 7). While the United States correctly categorizes paragraph 5 of Sahu's declaration, it reads Sahu's calculations in his initial expert report and his amended rebuttal report too narrowly. In both his initial report and amended rebuttal report, Sahu's calculations for the emissions impact of the Gorgas Unit 10 balanced draft conversion project took into account not only the 126,000 MWhrs per year due to increased capacity of 28 MW, but also the reduction of outage hours in respective baseline periods. In paragraph 5 of his

declaration, Sahu does not take into account the reduction of outage hours, but instead isolates the emissions impact of the capacity increase alone.  The figures that result appear for the first time in paragraph 5 of Sahu's declaration; they are not in any of Sahu's previous reports.  *See generally* Doc. 331 Ex. 1; Doc. 331 Ex. 3; Emissions Summary Table from Appendix C to Sahu Amended Rebuttal Expert Report of June 4, 2010, Doc. 331 Ex. 4; Screen Shot from Appendix C to Sahu Amended Rebuttal Expert Report of June 4, 2010, Doc. 331 Ex. 9.

The difference between what Sahu states in paragraph 5 of his declaration and what he explained in his previous reports is best evidenced by an examination of the formula that Sahu used in Appendix C of his amended rebuttal report to calculate the amount of the emissions impact.  This formula reads $(126{,}000 + D5 * AI83 * AH83) * R83/2000$, where D5, AI83, AH83, and R83 all refer to different "cells" in the spreadsheet containing input data.  (Doc. 331 Ex. 9).  When applied to $SO_2$ and using an emission rate of 16.56 lbs/MWhr, the formula calculated a 2,829.6 tons per year increase in emissions.  *Id*.  This figure is reflected in paragraph 4 of Sahu's declaration.  (Doc. 312 Ex. 1 at 3).  In its brief, the United States attempts to use this formula to arrive at the calculation expressed by Sahu in paragraph 5 of his declaration.  The United States does this by altering the formula to read $126{,}000 * R83/2000$, thereby omitting three variables from the formula.  (Doc. 331 at 8 n.7)

The United States does not point to any expert report where this altered formula was discussed.  *Id.* at 7-8, 8 n.7.

In addition to using a new formula in paragraph 5 of his declaration, Sahu also relies on previously uncited documents to support his opinion.  In paragraph 5 of his declaration, Sahu states that the documents that he and Koppe reviewed indicate that a 28 MW capacity increase was expected due to the balanced draft conversion.  (Doc. 312 Ex. 1 at 3).  In support of this contention, Sahu cites to a March 1983 study by Southern Company Services, Inc. entitled "Gorgas Unit No. 10 Balanced Draft Conversion Feasibility Study."  *Id.* at 3 n.2; (March 1983 Study, Doc. 312 Ex. 7 at 1). This document is not cited in any of his reports as the basis for any of his opinions. *See generally* Sahu Expert Report of Dec. 14, 2009, Att. E, Doc. 312 Ex. 3; Sahu Rebuttal Expert Report of May 28, 2010, Att. A, Doc. 312 Ex. 4; Sahu Amended Rebuttal Expert Report of June 4, 2010, Att. A, Doc. 312 Ex. 5.  In paragraph 5 of his declaration, Sahu also states that Alabama Power documents indicate that Gorgas Unit 10 was expected to operate at full power for 4,500 hours per year after the project.  (Doc. 312 Ex. 1 at 3).  In support of this contention, Sahu cites to an August 31, 1983, study entitled "Gorgas Steam Plant - Unit No. 10 Forced Draft Fan and Primary Air Fan."  *Id.* at 3 n.3; (August 1983 Study, Doc. 312 Ex. 8 at 1).  This document is not cited in any of his reports as the basis for any of his opinions.  *See*

*generally* Doc. 312 Ex. 3; Doc. 312 Ex. 4; Doc. 312 Ex. 5.

At the hearing held on February 18, 2011, Plaintiffs acknowledged that Sahu did not cite these two documents in his initial report but argued, for the first time, that this does not violate Rule 26 because these documents were cited in <u>Koppe's</u> initial opinion. (Doc. 370, Tr. at 353). Rule 26 states that an expert witness disclosure must be accompanied by a written report and that report must contain a complete statement of all opinions the witness will express and the basis and reasons for them. Fed. R. Civ. P. 26(a)(2)(B). The rule does not mention, nor have the Plaintiffs cited, any exception to the rule of disclosure that would allow an expert witness to exclude from his report facts or data considered by him in forming his opinion if a <u>different</u> expert witness retained by that same party cited to  those facts and data. Such an exception would produce situations where the expert witness's report was not detailed and complete as mandated by the rule. Fed. R. Civ. P. 26 advisory committee's note.

Paragraph 5 of Sahu's declaration utilizes previously undisclosed formulas and relies on previously uncited (by Sahu) documents to come to a new conclusion concerning the amount of emissions due solely to capacity increase as opposed to capacity increase and reduction in outage hours. Thus, the Court finds that Sahu's opinion concerning the expected emissions increase as stated in paragraph 5 of his declaration is a new opinion. *See* Fed. R. Civ. P. 16(a)(2)(B)(i) (stating that the

11

expert's written report must be "a complete statement of all opinions that the witness will express and the basis and reasons for them").

The Court's Order of March 19, 2010, set an expert discovery cut-off date of July 30, 2010. (Doc. 274 at 2). Because Sahu's declaration was dated September 29, 2010, and the Court has determined that the opinion contained in paragraph 5 of that declaration is a new opinion, the United States will not be allowed to use that information to supply evidence on a motion, at a hearing, or at a trial, unless the failure to disclose that opinion was substantially justified or was harmless. Fed. R. Civ. P. 37(c)(1). Alabama Power asserts that, because Sahu failed to disclose the opinion expressed in paragraph 5, Alabama Power was unable to file a motion contesting his assertions prior to the *Daubert* motion deadline. (Doc. 312 at 4-5). Alabama Power also states that it was unable to depose Sahu regarding this new opinion and therefore faces unfair surprise. *Id.* at 5. The United States' only response to this argument is that the opinion had previously been disclosed. (Doc. 331 at 8-9). Having found that this opinion was not previously disclosed and noting that the *Daubert* motion deadline passed on September 30, 2010 (Doc. 279 at 1), the Court finds that the United States has not shown that its failure to disclose this opinion was harmless; therefore, the United States is precluded from using the opinion to supply evidence on a motion, at a hearing, or at trial.

Alternatively, because Sahu's opinions are derived from Koppe's methodology, which by Memorandum Opinion published contemporaneously herewith, this Court has otherwise found not to be admissible under *Daubert*, paragraph 5 is also due to be struck on that basis.

## IV.   CONCLUSION

Accordingly, for the reasons stated above, Alabama Power's Motion to Strike is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this the 14th day of March, 2011.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

13